# EXHIBIT A

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2009 WL 1361651 (N.J.Super.A.D.)
**(Cite as: 2009 WL 1361651 (N.J.Super.A.D.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
BEACH CREEK MARINA, Plaintiff-Appellant,
v.
CITY OF NORTH WILDWOOD, Defendant-Re-
spondent.
Argued Feb. 23, 2009.
Decided May 18, 2009.

On appeal from the Tax Court of New Jersey,
Docket No. 0081-2007.
Lee S. Holtzman argued the cause for appellant
(Schneck Holtzman LLC, attorneys; Mr. Holtzman,
Michael I. Schneck and Jonathan M. Bernstein, on
the brief).

William J. Kaufmann argued the cause for respond-
ent (Cafiero & Balliette, attorneys; Mr. Kaufmann,
on the brief).

Before Judges CARCHMAN and R.B. COLEMAN.

PER CURIAM.

*1 Plaintiff Beach Creek Marina, LLC, (Beach
Creek) appeals from an order entered March 5,
2008, dismissing Beach Creek's complaint against
the City of North Wildwood. The complaint was
filed to contest North Wildwood's 2006 real estate
assessment of certain property owned by Beach
Creek. For substantially similar reasons set forth in
the letter opinion by Joseph C. Small, Presiding
Judge Tax Court, dated March 5, 2008, we affirm
the order dismissing plaintiff's claim.

The property belonging to Beach Creek, which is
the subject of this complaint, consists of approxim-
ately three acres and is part of the inter-coastal wa-
terway located in North Wildwood. Paul Cocoziello
is the sole officer and shareholder of plaintiff Beach
Creek.

In addition to marina related structures, the prop-
erty also contains a mixed-use building comprising
approximately 4,500 square feet of commercial
space and 142 rental apartments. The commercial
portion of the tower is known as Marina Bay
Towers and it, too, is owned by Beach Creek. The
residential portion of the tower is owned by Marina
Bay Towers Urban Renewal II, L.P., which in turn
leases the residential units to Marina Bay Towers
Condominium Association, Inc.

The residential owner, Marina Bay Towers Urban
Renewal II, pays its taxes pursuant to a Payment in
Lieu of Taxes (PILOT) agreement under the Long
Term Tax Exception Law, *N.J.S.A.* 40A:20-1 to -
22. The real estate tax associated with the commer-
cial units includes improvements only; there is no
"land" component to that tax assessment. Beach
Creek pays local real estate tax on the marina and
the entire three-acre parcel of land. Thus, each year
Beach Creek receives two tax bills; one for the im-
provements associated with the commercial space
and another for the marina, which includes the par-
cel of land. The latter tax bill forms the basis of this
appeal.

According to North Wildwood's tax assessor, 2006
was a "re-evaluation year" for North Wildwood.
Therefore, North Wildwood employed the services
of CLT/Tyler technologies to inspect and assess
properties within the municipality. The tax assessor
would then review and prepare his own assessments
to be mailed to taxpayers.

For 2006, Beach Creek's property was assessed at

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

$14,612,900,[FN1] which represented a substantial increase from the 2005 assessment of $1,526,200. The manifest increase in assessed value raised Beach Creek's property tax bill from approximately $39,000 in 2005 to approximately $103,000 in 2006. North Wildwood also reconfigured the tax map so that the three-acre parcel, formerly designated as Block 152, Lot 400, was re-classified as Block 152, Lot 1. In addition to the reclassification, the Tax Assessor's Office inexplicably changed the mailing address of record for Beach Creek from 608-610 New York Avenue, North Wildwood, to 391 Lakeside Avenue, Orange; an address that is not directly associated with the subject property or the owner.

> FN1. $14,005,300 was attributed to the land, and $607,600 attributed to the improvements.

In February 2006, North Wildwood sent out Notices of Assessment to property owners within the municipality. An assessment for the commercial space located in the tower, and owned by Beach Creek, was allegedly mailed to 622 Eagle Rock Avenue, West Orange, New Jersey. Although that mailing address was proper, the notice mistakenly combined the tax assessments for improvements on the commercial space with the three-acre parcel of land associated with the marina. Beach Creek did not contact North Wildwood regarding the error in the notice.

*2 Under separate cover, an assessment for the marina which also included the three-acre parcel of land was sent to 391 Lakeside Avenue, Orange, the address for Marina Bay Towers Urban Renewal II, L.P., an entity in which Cocoziello maintains no ownership interest.

On July 24, 2006, North Wildwood sent out its Third Quarter Tax Bill for the marina and its associated property. Again, the bill was mistakenly sent to Marina Bay Towers Urban Renewal II, L.P., at the 391 Lakeside Avenue address.

On December 1, 2006, First Community Development Corporation, the general partner of Marina Bay Towers Urban Renewal II which owns the residential units on the property, forwarded to Cocoziello the assessments erroneously mailed to 391 Lakeside Avenue, along with a letter which communicated:

Please find enclosed a Delinquent Notice received from the City of North Wildwood claiming $105,924.00 to be due. Also enclosed are notices received from the City of North Wildwood indicating that any delinquencies not paid by December 11, 2006 will be advertised for two weeks in the Cape May County Herald starting on December 13, 2006, and the tax sale will be held on December 27, 2006. It is our understanding that you are taking the necessary steps to resolve the tax issues.

Thereafter, in December 2006, Cocoziello contacted North Wildwood's Tax Collector in an attempt to clarify the irregularities. It is undisputed that Cocoziello and the Tax Collector did not speak until at least the middle of December. After speaking with the Tax Collector, Cocoziello then contacted the Chief Financial Officer (CFO) of North Wildwood. Following that conversation, Cocoziello sent a letter to the CFO, which purported to clarify the ownership and tax liability of each entity and which contained copies of the tax bills that Cocoziello had actually received.

On January 18, 2007, Beach Creek filed a complaint, challenging the 2006 assessment of the marina and the three-acre parcel of property. Thereafter, North Wildwood filed an answer, followed by a motion to dismiss filed on May 30, 2007.

During the motion hearing, North Wildwood acknowledged that the mailings intended for Beach Creek were sent to an address that was neither the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

physical address of the property, nor the address of record for the property owner. North Wildwood further acknowledged that it was in contact with Cocoziello throughout the month of December 2006.

Cocoziello testified that he did not receive notice that the property was subject to a re-evaluation and that, in the past, he customarily received tax notices for Beach Creek at 622 Eagle Rock Avenue. As to the correspondence from First Community Development Corporation dated December 1, 2006, Cocoziello acknowledged that he was in receipt of the letter the "first week" of December 2006.

Based upon these facts, the Tax Court judge determined that it was proper to grant North Wildwood's motion to dismiss. In his written decision, the judge stated "[m]y conclusions to a large extent are based on the credibility of the witnesses."He added, "I conclude that [Cocoziello] and [First Community Development Corporation] had communicated no later than December 1, 2006, about the subject's tax delinquency."The judge also noted that the notice of delinquency, which was sent to 391 Lakeside Avenue in November 2006, was received, but curiously, the earlier assessment of February 2006 was not.

**\*3** The court determined that "assuming [Cocoziello] first learned of the tax assessment on December 1st, [his complaint] was due at the latest, on January 16, 2007,[FN2] two days before the actual complaint was filed...." In dismissing the complaint, the judge explained "[t]o decide otherwise would amount to this court's voiding of the statutory deadline for filing a tax appeal when a sophisticated taxpayer had actual notice of its tax assessment long before it filed its tax appeal...."

> FN2. Forty-five days from December 1, 2006 was January 15, 2007, a holiday.

On appeal from a tax court decision, the Appellate Division must determine whether the judge's findings were supported by substantial credible evidence. *Yilmaz, Inc. v. Director, Div. of Taxation,* 390 N.J.Super. 435, 443 (App.Div.2007) (citing *125 Monitor St. v. Jersey City,* 23 N.J. Tax 9, 13 (App.Div.2005). Moreover, like the deference given to credibility findings of a judge in a non-jury civil trial, due regard should be given to the Tax Court's ability to judge credibility. *First Republic Corp. of Am. v. Borough of E. Newark,* 17 N.J. Tax 531, 536-37 (App.Div.1998), *certif. denied,* 157 N.J. 647 (1999).

The threshold issue before the Tax Court was determining when Beach Creek had actual notice of its 2006 real estate assessment and whether its appeal of that assessment was timely filed. Taxpayer appeals are governed by *N.J.S.A.* 54:3-21(a) which provides:

Except as provided in subsection b. of this section *a taxpayer feeling aggrieved by the assessed valuation of the taxpayer's property, or feeling discriminated against by the assessed valuation of other property in the county, or a taxing district which may feel discriminated against by the assessed valuation of property in the taxing district, or by the assessed valuation of property in another taxing district in the county, may on or before April 1, or 45 days from the date the bulk mailing of notification of assessment is completed in the taxing district, whichever is later,* appeal to the county board of taxation by filing with it a petition of appeal; provided, however, that any such taxpayer or taxing district may on or before April 1, or 45 days from the date the bulk mailing of notification of assessment is completed in the taxing district, whichever is later, *file a complaint directly with the Tax Court, if the assessed valuation of the property subject to the appeal exceeds $750,000.*In a taxing district where a municipal-wide revaluation or municipal-wide reassessment has been implemented, a taxpayer or a taxing district may appeal before or on May 1 to the county board of taxation by filing with it a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

petition of appeal or, if the assessed valuation of the property subject to the appeal exceeds $750,000, by filing a complaint directly with the State Tax Court.[FN3]

> FN3. The Legislature amended *N.J.S.A.* 54:3-21 in 1991 by what is commonly referred to as "Chapter 75," L.1991, c. 75. The amendment added a new requirement, not previously part of New Jersey local property tax law, that "[e]very assessor, prior to February 1, shall notify by mail each taxpayer of the current assessment and preceding year's taxes."*N.J.S.A.* 54:4-38.1; *L.* 1991, c. 75, § 32. The legislation also added a corresponding provision to *N.J.S.A.* 54:3-21, requiring appeals to be filed on or before April 1, "or 45 days from the date the bulk mailing of notification of assessment is completed in the taxing district, whichever is later."*L.* 1991, c. 75, § 28.

This provision should be read with an understanding that "[s]trict adherence to statutory time limitations is essential in tax matters," because those timeframes are "borne of the exigencies of taxation and the administration of local government." *F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 424 (1985); *see also McCullough Transp. Co. v. Div. of Motor Vehicles,* 113 *N.J.Super.* 353, 360 (App.Div.1971) ("Limitation periods for claims for refund are common administrative provisions found in tax legislation and justified by the need for predictability of revenues by public agencies.").

*4 On appeal, petitioner Beach Creek raises the following claims:

*POINT I:* BEACH CREEK'S DUE PROCESS RIGHTS WERE VIOLATED AS A RESULT OF NORTH WILDWOOD'S INACTION.

*POINT II:* THE STATUTE OF LIMITATIONS

DOES NOT BAR BEACH CREEK'S RIGHT TO APPEAL ITS TAX ASSESSMENT.

*POINT III:* BEACH CREEK'S EQUAL PROTECTION RIGHTS WERE VIOLATED AS A RESULT OF NORTH WILDWOOD'S INACTION.

We discuss each in turn.

I.

Beach Creek's first argument on appeal is that its due process rights were violated by the Tax Court's decision. Relying on *Schneider v. City of E. Orange,* 196 *N.J.Super.* 587, 595 (App.Div.1984), *aff'd,* 103 *N.J.* 115,*cert. denied,* 479 U.S. 824, 107 *S.Ct.* 97, 93 *L. Ed.*2d 48 (1986), Beach Creek argues that it was not given adequate notice and a fair hearing. After a careful review of the record, we disagree.

The essential components of due process are "adequate notice, opportunity for a fair hearing and availability of appropriate review." *Family Realty Co. v. Secaucus Town,* 16 *N.J. Tax* 185 (Tax Ct.1996) (citation omitted). Generally, when a county board of taxation mails a notice to an incorrect address, adequate notice has not been provided. *Id.* at 193.However, if the intended taxpayer actually receives notice of an assessment, the requisite level of notice has been provided, despite the taxing authority's error. *Ibid.* Our Tax Court has addressed this issue in prior complaints.

In *Centorino v. Tewksbury Twp.,* 18 *N.J. Tax* 303, 307 (Tax Ct.1999), a taxpayer did not receive notice of an increased property assessment for 1998 until August 1 of that year due to an error in the municipality's mailing system. The plaintiff contacted the tax assessor and filed an appeal, which the municipality rejected as untimely. The taxpayer subsequently filed a complaint with the Tax Court. *Id.* at 308.The municipality contended that it mailed the assessment to the correct address, but to the at-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 5 of 9

Case 2:09-cv-02649-KSH-PS    Document 18-3    Filed 07/24/09    Page 6 of 33 PageID:
233
Not Reported in A.2d, 2009 WL 1361651 (N.J.Super.A.D.)
(Cite as: 2009 WL 1361651 (N.J.Super.A.D.))

tention of the previous owner. The taxpayer contended that she never received notice, even one addressed to the previous owner. *Id.* at 309.The court determined that the taxpayer never received the notice prior to August 1998. *Id.* at 310.The court also determined that "[u]pon receipt of the bill she took prompt action in contacting the assessor and filing an appeal to the county board." *Id.* at 319.The Tax Court judge held that "[u]nder these unique facts and circumstances, the principles of due process necessitate the extension of the filing deadline so that the taxpayer is not denied access to the court and the opportunity for a hearing on her appeal."*Id.* at 321.

The Tax Court has addressed issues of "notice" in other contexts as well. In *Family Realty Co., supra,* the Tax Court was faced with a taxpayer's petition of appeal to the county board. 16 *N.J. Tax,* 185.The petition designated its signer as the "Attorney-or person to be notified of hearing and judgment." *Id.* at 187.When the taxpayer contacted the county to inquire about the status of the appeal, he was advised that the hearing had been scheduled, no one had appeared, and it had been adjourned. *Id.* at 187-88.A hearing was set four months later, with approximately three weeks notice provided to the petitioner. When the petitioner did not appear at the hearing, the county board granted a motion by the county to dismiss for failure to prosecute. *Id.* at 189.The county board judgment, which was received by the taxpayer, was incorrectly addressed to him personally despite explicit direction by the taxpayer to use his company's name-due to a sign on the building which referenced only the taxpayer's business.

*5 The Tax Court found that the omission of the name of the petitioner's company on the hearing notice was "a significant departure from the instructions received by the county board." *Id.* at 194.Accordingly, the Tax Court concluded that the improperly addressed notice was not received, so that the taxpayer should not be denied the opportunity

for a hearing on appeal, and denied the municipality's motion to dismiss. *Ibid.*

Due process principles were also at issue in *City of Camden v. Camden Masonic Ass'n,* 9 *N.J. Tax* 331 (1987), *aff'd,* 11 *N .J. Tax* 88 (App.Div.1989). There, the county admitted that it never gave the taxpayer notice of the revocation of its previously-held tax exemption "or notice that the subject property was included as an omitted assessment for the tax years 1983 and 1984, and the county board agreement that, if applicable, the correct assessment was $50,000 and not $394,400." *Id.* at 336.The court held that the failure of the tax assessor and tax collector to comply with the notice requirements of the alternate method for the omitted assessment statute, *N.J.S.A.* 54:4-63.35[FN4], and failure to provide a subsequent notice of the regular assessment or resultant tax bill, where the taxpayer had no knowledge of the assessments and did not have the opportunity to timely appeal them in accordance with the relevant statutes, required an extension of the filing deadlines for a reasonable period of time. *Id.* at 341-42.Our Supreme Court has instructed that when dealing with taxpayers, the "government must turn square corners." *F.M.C. Stores Co., supra,* 100 *N.J.* at 426, (quoting *Gruber v. Mayor and Twp. Com. of Raritan Twp.,* 73 *N.J.Super.* 120 (App.Div.), *aff'd,* 39 *N.J.* 1 (1962)).

> FN4. That provision, entitled "Notice to owner of omitted tax assessment" provides that:
>
> As soon as the certified copy of the omitted assessment list is received by the assessor from the county board *the assessor shall cause a notice to be sent by certified mail to the owner of each of the properties affected stating that an omitted tax assessment has been made* as to the taxpayer's property and that the tax payable as a result thereof may be ascertained from the collector of taxes of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 6 of 9

Case 2:09-cv-02649-KSH-PS    Document 18-3    Filed 07/24/09    Page 7 of 33 PageID: Page 6
Not Reported in A.2d, 2009 WL 1361651 (N.J.Super.A.D.)
(Cite as: 2009 WL 1361651 (N.J.Super.A.D.))

taxing district.

[*N.J.S.A.* 54:4-63.35 (emphasis added).]

Here, the record shows that although North Wildwood erred in mailing out Beach Creek's assessments, it has not been demonstrated that it acted in a manner inconsistent with Beach Creek's due process rights. Rather, North Wildwood simply appeared to be confused with respect to the different ownership interests and mailing addresses of the several entities located on the same property. Despite those errors, the notice provided to Beach Creek was sufficient to satisfy the constitutional obligations of due process insofar as Beach Creek had a reasonable time to appeal.

Cocoziello testified that he received notice of the increased tax assessment sometime in "early December 2006." This taken alone will have cast doubt on the Tax Court's determination that Cocoziello had notice on December 1. However, there are other factors that mandate an affirmation.

First, the letter addressed to Cocoziello stated: "It is our understanding that you are taking the necessary steps to resolve the tax issues."This language tends to show that there was some prior communication with Cocoziello that First Community was in possession of the tax assessment. In addition, the letter addressed to Cocoziello on December 1, was purportedly sent via facsimile on the same date. Second, the facts are clear with respect to the extensive relationship between Rubicon Properties and the partners that comprise Marina Bay Towers Urban Renewal II, L.P.; specifically, that Rubicon managed the property owned by that entity. Third, doubt was shed on Cocoziello's testimony by virtue of the fact that First Community did receive other tax notices in November 2006 at the same address to which the original assessment was sent. Also, as both the testimony and the judge's decision reflect, Cocoziello is a "sophisticated real estate investor," the type of investor who would make reasonable in-

quiries with respect to his respective companies' tax obligations. And finally, the judge noted that, interestingly, Beach Creek did not solicit the testimony or a certification from the author of the December 1 letter.

*6 Therefore, based on the aforementioned, it appears that the notice provided to Beach Creek and the subsequent time to file an appeal under either *N.J.S.A.* 54:3-21(a) or the reasoning from *Centorino, supra,* 18 *N.J. Tax* 303, and *Camden Masonic Ass'n, supra,* 9 *N.J. Tax* 331, were sufficient and do not run afoul of any constitutional notions of due process.

II.

Beach Creek's second argument is that the forty-five day limitation on appeal under *N.J.S.A.* 54:3-21(a) is inapplicable to a taxpayer who never received a Chapter 75 Notice from the taxing authority. In support of that position, Beach Creek relies primarily on the holding in *Centorino, supra,* 18 *N.J. Tax* at 303.*Centorino* is distinguishable, however, for the reasons discussed herein, and Beach Creek is accurate in that the timeframe for appeal under *N.J.S.A.* 54:3-21(a) does not apply in this case.

First, regarding the inapplicability of *Centorino,* the municipality mailed the Chapter 75 notice to the wrong owner. Thereafter, realizing its mistake, the notice was sent to the taxpayer on August 1, 1998. *Id.* at 306.The taxpayer subsequently appealed the assessment twenty-three days later. *Id.* at 308.The County Board of Taxation found that the taxpayer appealed the assessment in an untimely fashion. *Id.* at 316.On appeal, the municipality contended that *N.J.S.A.* 54:3-21 did not apply and the court agreed.

At that time, the discretionary function of the County Board of Taxation was governed by *N.J.S.A.* 54:3-21.4.[FN5]After finding that the forty-five day appeal period under *N.J.S.A.* 54:3-21 did

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

not apply because the decision to extend the appeal period was governed by Section 21.4, and that *N.J.S.A.* 54:3-21.5 was inapplicable, the court went on to hold that forty-five days would, indeed, be a reasonable amount of time and that under *N.J.S.A.* 54:3-21.4, the county board could have properly extended the time of appeal due to the municipality's failures. *Centorino, supra,* 18 *N.J. Tax* at 315.

> FN5. That section, which has been repealed, provided that:
>
>> Notwithstanding the provisions of any law, rule or regulation to the contrary, a county board of taxation may, upon the written application of the taxpayer and the approval of the Director of the Division of Taxation, whenever a local assessor fails, for any reason, to mail or otherwise deliver a notification of assessment or change in assessment, *extend the time for appeal* provided in *R .S.* 54:3-21 for any taxpayer feeling aggrieved by the assessed valuation of his property, or feeling that he is discriminated against by the assessed valuation of other property in the county.
>
>> [*N.J.S.A.* 54:3-21.4 (emphasis added).]

A similar result was reached in *Regent Care Ctr. v. Hackensack City,* 18 *N.J. Tax* 320 (Tax Ct.1999). In that case, the taxpayer received a property tax assessment notice that erroneously understated the assessment by several million dollars. *Id.* at 322.The tax assessor claimed that upon realizing the mistake, a second assessment was mailed; the taxpayer contended that it never received the second notice. *Ibid.* The taxpayer argued that its first notice of the increased assessment occurred when the third quarter tax bill was mailed, which was sometime in "late July" 1997. *Id.* at 323.Finding that the taxpayer never received any accurate Chapter 75 notice, the court went on to hold that *N.J.S.A .* 54:3-21 did

not apply, but that forty-five days would be a reasonable timeframe in which to appeal. *Id.* at 325.Because the taxpayer failed to appeal within that "reasonable" timeframe, appealing forty-eight days later, the matter was dismissed.

*7 Beach Creek also relies on *Simon v. Chicago Title Ins. Co.,* 363 *N.J.Super.* 582 (App.Div.2003), a case involving the sale of a tax title lien. In that case, the State owned the property in question and with it came a tax exempt status. *Id.* at 583.However, in 1995 and 1996, there was some confusion by the tax assessor's office, and taxes for the property were assessed against "Inman, William A., et al, unknown address," which was a mistake, and the taxes were not paid. *Id.* at 585.

Thereafter the township in which the property sat offered for sale, a tax title lien on the property. *Ibid.* In 1996, the property was purchased, and the purchaser pursued a foreclosure action and ultimately, obtained a favorable judgment. Following the foreclosure, the purchaser found out that the title was not clear because of the State's ownership interest. *Ibid.*

The purchaser sued the insurance company that conducted the title search, who, in turn, sued the township. The trial court found that the taxes assessed to "Inman, William A., et al, unknown address," were erroneous and that the tax sale and subsequent foreclosure were void. *Ibid.*

On appeal, the township argued that the State should have appealed the assessment. Rejecting the assertion by the municipality, the court held that the State was never provided with notice. It never received a tax bill nor did it receive a notice of change in assessment. *Id.* at 586.Therefore, the State did not sit on its rights and as a result, nothing in *N.J.S.A.* 54:3-21 should be read to create a windfall for taxes to the township to which it was never entitled. *Id.* at 588.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1361651 (N.J.Super.A.D.)
(Cite as: 2009 WL 1361651 (N.J.Super.A.D.))

*Simon* is distinguishable in that the State had no notice at all of the assessment or tax sale and, thus, the appeal provisions of *N.J.S.A.* 54:3-21 could not serve to validate the erroneously issued taxes and subsequent tax sale.

Generally, the forty-five day period prescribed under *N.J.S.A.* 54:3-21 is applicable in three situations, none of which is directly implicated in this case. First, a taxpayer has until April 1 to appeal an assessment; both parties agree this was not possible in this case because Beach Creek did not physically receive the Chapter 75 Notice. Second, if the annual assessment was not received in time to appeal the assessment a taxpayer has forty-five days from the date of bulk mailing to contest the assessment.[FN6] Third, and finally, a taxpayer has forty-five days from receipt of actual notice to challenge a change of assessment notice. *Ibid.*

> FN6. The City of North Wildwood mailed its bulk Notice of Assessment in mid-February 2006.

Here, the judge found that Beach Creek had received the notice on or before December 1, 2006, albeit from First Community. Nevertheless, even if the court were to decline to accept that finding, rendering *N.J.S.A.* 54:3-21 inapplicable, the judge also found that Beach Creek received actual notice of the assessment on December 1, 2006, at the latest. This determination was based, in large part, on the credibility, or lack thereof, of Cocoziello. Therefore, applying the forty-five day appeal period employed in both *Regent Care Ctr.* and *Centorino*, under principles of fairness, that same timeframe would have required Beach Creek to file its tax appeal by January 16, 2007.

### III.

**\*8** The final argument offered by Beach Creek is that the judge's decision violated its equal protection rights. Specifically, Beach Creek contends that the judge's description of Cocoziello as a "sophisticated" real estate developer evinces a bias and consequently unequal treatment of him-as opposed to a less sophisticated taxpayer. For the following reasons, this argument fails.

Under the New Jersey Constitution, all real property is to be:

> assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.

[*N.J. Const.* art. VIII, § 1, ¶ 1(a).]

Similarly-situated taxpayers must be treated in the same fashion. *Twp. of W. Milford v. Van Decker*, 120 *N.J.* 354, 361 (1990) (stating that "[e]quality of treatment in sharing the duty to pay real estate taxes is a constitutional right.") (quoting *Murnick v.. Asbury Park*, 95 *N.J.* 452, 458 (1984)).

In support of its position, Beach Creek cites primarily to *Simon, supra,* 363 *N.J.Super.* at 582.Beach Creek contends that the "sophisticated" taxpayer in that case, the State, was not held to a higher standard than a taxpayer with less resources and sophistication. Plaintiff's reading of the case is accurate. In *Simon,* the court held that:

> In the case before us, the State was out of the loop. It was not "called upon to pay tax bills."It received none. Nor did it receive notice of a change in assessment status. Acceptance of the Township's argument would require the State to scour the assessment records each year of every municipality in which it owns property to assure itself that local assessors have not incorrectly assessed its property to third parties and file an appeal in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1361651 (N.J.Super.A.D.)
**(Cite as: 2009 WL 1361651 (N.J.Super.A.D.))**

any such instance. There is no basis to impose such an obligation on the State or other public entities to protect against assessors' mistakes.

[*Id.* at 586-87.]

Therefore, as a general proposition, in light of both Article VIII and *Simon,* it is true, both in terms of financial obligations and affirmative obligations, that all taxpayers must be treated equally.

In this case, neither of those concerns have been demonstrated. Specifically, there has been no evidence presented that any other taxpayer who received a late notice was given more time to contest the notice by virtue of their "sophistication." Moreover, the judge's decision simply does not put any greater burden on Beach Creek than permitted by law. That is, the judge gave Beach Creek the benefit of the doubt and utilized the latest possible date of actual notice that was supported by the evidence.

Therefore, having properly balanced the principles of fairness discussed in *Regent Care Ctr., supra,* 18 *N.J. Tax* 320, with the need to have tax issues resolved in a timely fashion, *see McCullough Transp. Co., supra,* 113 *N.J.Super.* at 353, the forty-five day appeal period utilized by the Tax Court was proper and did not violate Beach Creek's constitutional rights.

**\*9** In light of Beach Creek's actual notice, received at the latest on December 1, 2006, and likely well before forty-five days, was the statutory maximum time for its appeal of the assessment.

Affirmed.

N.J.Super.A.D.,2009.
Beach Creek Marina v. City of North Wildwood
Not Reported in A.2d, 2009 WL 1361651 (N.J.Super.A.D.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT

# B

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.)
(Cite as: 2008 WL 819968 (D.N.J.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
J.M. and M.M., on behalf of A.M., and J.M. and
M.M., individually, Plaintiffs,
v.
EAST GREENWICH TOWNSHIP BOARD OF
EDUCATION, et al., Defendants.
**Civil Action No. 07-2861 (NLH).**

March 25, 2008.

Alan A. Reuter, Esquire, Nash Law Firm LLC,
Blackwood, NJ, for Plaintiffs.

William S. Donio, Esquire, Cooper Levenson April
Niedelman & Wagenheim, P.A., Atlantic City, NJ,
for Defendants.

**OPINION**

HILLMAN, District Judge.

**\*1** This matter has come before the Court on defendants' motion to dismiss certain claims in plaintiffs' complaint. For the reasons expressed below, defendants' motion will be granted in part and denied in part.

**BACKGROUND**

Plaintiffs, J.M. and M.M., are parents to their son, A.M., who at the time of the filing of their complaint was seven years old and a student in the East Greenwich School District. When A.M. was born, he was diagnosed with Noonan Syndrome, which is a genetic disorder. A.M. takes medication for a heart condition and he suffers from bilateral severe sensorineural hearing loss. Plaintiffs state in their

complaint that it is "paramount" to them that A.M. is not limited, and they desire that A.M. not be taken out or precluded from a mainstream educational environment.

This lawsuit concerns an Individualized Educational Plan ("IEP") which was developed for A.M. for the 2006-2007 school year. Plaintiffs claim that defendants violated the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., by implementing A.M.'s IEP without a proper IEP meeting, and by not considering the parents' wishes for their son. Plaintiffs claim that the Child Study Team Supervisor, Mary Heade, improperly and unilaterally determined prior to the IEP meeting that A.M. was to be placed either in a self-contained classroom or beginner's kindergarten, without even considering A.M.'s placement in developmental kindergarten, a class in which A.M. was currently enrolled during the afternoon. Plaintiffs contend that Heade refused to even discuss the option of developmental kindergarten, even though M.M. had raised the issue numerous times.

It appears from the complaint that because plaintiffs objected to the IEP developed for their son, they filed a due process complaint pursuant to the procedures in the IDEA. It also appears that A.M. did not resume attendance at the Greenwich Township schools, but was instead home schooled. While being home schooled, plaintiffs requested additional services, such as speech therapy, occupational therapy, and physical therapy from the school district, but plaintiffs claim that these requests were denied.

Based on the foregoing, plaintiffs claim that defendants violated the IDEA (Count I), the Americans with Disabilities Act ("ADA") (Count II), Rehabilitation Act (Count IV), and New Jersey's Law Against Discrimination ("NJLAD") (Count V). Plaintiffs have brought these claims for direct viol-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ations of those laws, as well as pursuant to 42 U.S.C. § 1983 (Count III). Plaintiffs also claim that defendants created a hostile educational environment (Count VI), breached the duty of good faith and fair dealing (Count VII), participated in a civil conspiracy (Count VIII), and committed the torts of intentional infliction of emotional distress (Count IX) and fraud (Count X).

Defendants have moved to dismiss all of plaintiffs' claims except for their IDEA claim. Defendants argue that this case is simply about the dispute over the IEP developed for A.M., and all the other claims either have no basis in law or plaintiffs have failed to state any basis for relief. Furthermore, defendants argue that because this case is essentially an appeal of an Administrative Law Judge's ruling on plaintiffs' due process petition brought pursuant to the IDEA's appeal procedures, this Court lacks subject matter jurisdiction over plaintiffs' other claims. Plaintiffs have opposed defendants' motion.

### DISCUSSION

#### A. Jurisdiction

**\*2** Plaintiffs have alleged this Court's jurisdiction over their claims based on federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. Defendants have challenged the jurisdictional basis for plaintiffs' claims other then their IDEA claim.

#### B. Standard for Motion to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher,* 423 F.3d

347, 351 (3d Cir.2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim. *Bogosian v. Gulf Oil Corp.,* 562 F.2d 434, 446 (3d Cir.1977). However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 149-50 n. 3 (1984) (quotation and citation omitted).

A district court, in weighing a motion to dismiss, asks " 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.' " *Bell Atlantic v. Twombly,* 127 S.Ct. 1955, 1969 n. 8 (2007) (quoting *Scheuer v. Rhoades,* 416 U.S. 232, 236 (1974)). A court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429-30 (3d Cir.1997). The defendant bears the burden of showing that no claim has been presented. *Hedges v. U.S.,* 404 F.3d 744, 750 (3d Cir.2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991)).

Finally, a court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. *Southern Cross Overseas Agencies, Inc. v. Kwong Shipping Group Ltd.,* 181 F.3d 410, 426 (3d Cir.1999). A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56. Fed.R.Civ.P. 12(b).

## C. Analysis

**\*3** Plaintiffs have advanced claims that can be separated into two categories: 1) the appeal of the ALJ's decision on their due process complaint concerning the IEP developed for A.M. for the 2006-2007 school year; and 2) all other claims arising from the events concerning and arising out of the development of the IEP. Defendants claim that the second category of plaintiffs' claims fall outside the scope of the primary issue, which is whether A.M. has received a free appropriate public education (FAPE). They also argue that those claims, if considered, constitute an impermissible end-run around the limited damages afforded by the IDEA.

Under the IDEA, any aggrieved party may "present a complaint ... with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."20 U.S.C. § 1415(b)(6). The party may elect to have the complaint investigated by the state educational agency, *see*34 C.F.R. § 300.661, or avail itself of an "impartial due process hearing," 20 U.S.C. § 1415(f). Any party aggrieved by the outcome of the due process hearing "shall have the right to bring a civil action with respect to the complaint presented ... in a district court of the United States, without regard to the amount in controversy."*Id.* § 1415(i)(2)(A). This action must be initiated within 90 days from the date of the hearing officer's decision. *Id.* § 1415(i)(2)(B). The district court is authorized to grant "such relief as the court determines is appropriate," including attorneys' fees, reim-

bursement for a private educational placement, and compensatory education. *See id.* § 1415(i)(3)(B)(i).

In reviewing an administrative law judge's decision, a district court must employ a modified version of *de novo* review. *S.H. v. State-Operated Sch. Dist. of the City of Newark,* 336 F.3d 260, 269-70 (3d Cir.2003). Under this standard, the court "must make its own findings by a preponderance of the evidence," but "must also afford due weight to the ALJ's determination." *Shore Regional High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 199 (3d Cir.2004). The Third Circuit has explained that due weight means that the "factual findings from the administrative proceedings are to be considered prima facie correct," so that "if a reviewing court fails to adhere to them, it is obliged to explain why." *S.H.,* 336 F.3d at 271.

A district court is not confined to hearing only those issues ruled upon by the ALJ, however. *See Rancocas Valley Reg'l High School,* 380 F.Supp.2d 490, 493 (D.N.J.2005) (noting that "the language creating subject matter jurisdiction is both explicit and broad"). Even though failure to raise an issue at the administrative level will result in a waiver of the issue in a civil action before a federal district court, "IDEA plaintiffs may raise claims not presented in the state due process hearing if it would have been impossible or futile for them to have done so." *S.C. v. Deptford Twp. Bd. of Educ.,* 213 F.Supp.2d 452, 456-57 (D.N.J.2002). Examples of when it would be impossible or futile to bring a claim before the ALJ include,

**\*4** [1] where the question presented is purely a legal question ( *Lester H. by Octavia P. v. Gilhool,* 916 F.2d 865, 869-70 (3d Cir.1990)), [2] where the administrative agency cannot grant relief ( *Komninos by Komninos v. Upper Saddle River Bd.of Educ.,* 13 F.3d 775 (3d Cir.1994)), [3] where 'an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law,'" ( *Association for Community Living*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 4 of 13

Case 2:09-cr-0264-KSH-PS    Document 18-3    Filed 07/24/09    Page 15 of 33 PageID: Page 4
Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.) 253
(Cite as: 2008 WL 819968 (D.N.J.))

*in Colorado v. Romer,* 992 F.2d 1040, 1044 (10th Cir.1993) (quoting H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985))[and] ... [4] "where plaintiffs allege structural or systemic failure and seek system wide reforms[,]" *Romer,* 992 F.2d at 1044;*see also Beth V. by Yvonne V. v. Carroll,* 87 F.3d 80, 89 (3d Cir.1996).

*Grieco v. New Jersey Dept. of Educ.,* 2007 WL 1876498, *6 (D.N.J. June 27, 2007).

Thus, to determine whether plaintiffs' non-IDEA claims can survive defendants' motion for failure to state a claim, it must also be determined whether they should have been, and could have been, brought before the ALJ. To do so, each claim must be analyzed.[FN1]

> FN1. Defendants attach a copy of the ALJ's opinion to theirbrief, and restate a portion of the ALJ's decision in theirbrief. Plaintiffs object to defendants' submission and use of the ALJ's opinion, arguing that it is irrelevant to defendants'motion to dismiss, which must only be based on the face of plaintiffs' complaint.

> The Third Circuit has held that although "a prior judicial opinion constitutes a public record of which a court may take judicial notice, it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion." *Lum v. Bank of America,* 361 F.3d 217, 222 n. 3 (3d Cir.2004) (citation omitted)." '[A] court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment.' " *Id.* (citing *Southern Cross,* 181 F.3d at 427 n. 7 (explaining that "[i]t has been suggested that the appropriate analogy is the hearsay rule, which allows an out-of-court statement

to be admitted into evidence for purposes other than establishing the truth of the statement")).

The Court finds it premature to convert defendants' motion to one for summary judgment, and as such, aside from acknowledging that an ALJ issued a decision on plaintiffs' IDEA due process claim, the Court is constrained from otherwise considering the ALJ's findings at this time.

**1. Plaintiffs' ADA and Rehabilitation Act claims**

Plaintiffs claim that the school district and two individuals-Mary Heade, the Child Study Team Supervisor, and Barbara Harris, a Child Study Team member and case manager-violated the ADA by discriminating against A.M., M.M., and J.M. "under the guise of acting under the IDEA and applicable laws."(Compl.¶ 220.) Plaintiffs claim that defendants discriminated against them "because of, by virtue of and on the basis of the disabilities of A .M. and thereby violated their rights under Title II" of the ADA by "denying Plaintiffs the benefits of receiving full and equal access to the public education programs and activities offered within the school district, when such access could have been achieved with reasonable accommodations."(*Id.* ¶ 221.)

In addition to their ADA claims, plaintiffs allege that defendants collectively violated § 504 of the Rehabilitation Act by denying "Plaintiff the benefits of receiving full and equal access to the public education programs and activities offered within the school district, when such access could have been achieved with reasonable accommodations, and by improperly restricting the rights of A.M. and the choices of M.M. and J.M. with respect to the education of A.M."(*Id.* ¶ 237.)

Section 12132 of Title II of the ADA provides that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.)
(Cite as: 2008 WL 819968 (D.N.J.))

"[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."42 U.S.C. § 12132. This statement constitutes a general prohibition against discrimination by public entities. *New Directions Treatment Services v. City of Reading,* 490 F.3d 293, 301-02 (3d Cir.2007). Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ."29 U.S.C. § 794(a).

*5 The Third Circuit has noted that "[a]s the ADA simply expands the Rehabilitation Act's prohibitions against discrimination into the private sector, Congress has directed that the two acts' judicial and agency standards be harmonized." *New Directions,* 490 F.3d at 302 (citation omitted). The Third Circuit has also noted, however, that the ADA and the Rehabilitation Act are not exactly the same, and that the language of these two statutory provisions "regarding the causative link between discrimination and adverse action is significantly dissimilar." *Id.* at 301 n. 4 (citations omitted).

The Third Circuit has also found that although a party may use the same conduct as the basis for claims under both the IDEA and the Rehabilitation Act, a violation of the IDEA is not a per se violation of the Rehabilitation Act, regardless of whether it meets the independent requirements for an Rehabilitation Act violation. *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation,* 490 F.3d 337, 349 (3d Cir.2007) (stating that even in cases also brought under the IDEA a plaintiff must still prove that there was a violation of the Rehabilitation Act).

Thus, based on these principles, even though the ADA and Rehabilitation Act are very similar, and even though the same conduct may be used to support an ADA and/or Rehabilitation Act claim as used to support an IDEA claim, claims for violations of the ADA, Rehabilitation Act, and IDEA are distinct. As discussed below, the elements to prove an IDEA claim are different than those to prove an ADA and Rehabilitation Act claim, and the damages available for these claims are also different.[FN2] Additionally, plaintiffs were not able to bring these claims pursuant to the due process procedures of the IDEA when they challenged the development of A.M.'s IEP. Consequently, even though defendants may ultimately prove that plaintiffs have not been able to establish these claims, plaintiffs' ADA and Rehabilitation Act claims are not precluded by virtue of plaintiffs' availment of the IDEA due process procedure.[FN3]

> FN2. Damages available under the Rehabilitation Act and ADA include compensatory damages, injunctive relief, and other forms of relief traditionally available in suits for breach of contract. *See A.W. v. Jersey City Public Schools,* 486 F.3d 791, 804 (3d Cir.2007). Punitive damages are not available. *Bowers v. National Collegiate Athletic Ass'n,* 346 F.3d 402, 429 (3d Cir.2003) (citing *Barnes v. Gorman,* 536 U.S. 181 (2002)).

> Even though the Third Circuit has not specifically addressed the issue, it appears that damages available under the IDEA are limited to compensatory education. *Brandon V. v. Chichester School Dist.,* 2007 WL 2155722, *3 (E.D.Pa. July 25, 2007) (reviewing decisions from other circuits and holding, "The Court agrees with the overwhelming weight of authority that compensatory damages are generally inconsistent with the purpose and statutory scheme of the IDEA, and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

until the Third Circuit holds otherwise, will not recognize damages as an available form of relief in IDEA actions").

FN3. At least one court has found "where the ADA and Rehab Act claims are premised upon violations of the IDEA, the claims aremerely derivative and suffer the same fate as the IDEA claim." *Emily Z. v. Mt Lebanon School Dist.,* 2007 WL 3174027, *4 (W.D.Pa.2007) (citing *Melissa S v. School District of Pittsburgh,* 183 Fed. Appx. 184, 188 (3d Cir.2006) (affirming grant of summary judgment where summary judgment was appropriately entered on IDEA claim and where "the allegations underlying the Rehabilitation Act claim do not differ substantively from those underlying the IDEA claim"), quoting *Matula,* 67 F.3d at 492-93 ("there appears to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition"); *Falzett v. Pocono Mountain School District,* 152 Fed. Appx. 117, 120-21 (3d Cir.2005) (stating that, "[b]ecause Pocono provided Tiber with a FAPE, the District Court correctly granted Pocono summary judgment on Tiber's claims under the ADA, the Rehabilitation Act, and 42 U.S.C. § 1983"); *Derek B. ex rel. Lester B. v. Donegal School District,* Civ. No. 6-2402, 2007 WL 136670 at *13 (E.D.Pa. Jan. 12, 2007) (holding that, because the court denied relief under the IDEA, it must also deny relief under § 504); *P.G. ex rel. C.B. v. Southern York County School District,* 2006 WL 3042966 (M.D.Pa. Oct. 24, 2006) (stating that where § 504 and ADA claims are premised upon the same core of operative facts as an IDEA claim, the Commonwealth Court's entry of judgment in favor of the school district on the IDEA claim mandated, on the basis of collateral estoppel, the entry of judgment in favor of the school district on the ADA and Rehab Act claims) and *Colon ex rel. Disen-Colon v. Colonial Intermediate Unit 20,* 443 F.Supp.2d 659, 677 (M.D.Pa.2006)). That case was decided at the summary judgment stage, however, and is inapposite here.

This finding, however, does not address whether these claims can survive defendants' motion to dismiss. In order to make out a *prima facie* case of disability discrimination under the ADA, a plaintiff must establish that he (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an adverse action because of that disability. *Turner v. Hershey Chocolate U.S.,* 440 F.3d 604, 611 (3d Cir.2006) (citation omitted). A plaintiff can prove his Rehabilitation Act claim where "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation,* 490 F.3d 337, 350 (3d Cir.2007) (quoting *Ridgewood Board of Education v. N.E.,* 172 F.3d 238, 253 (3d Cir.1997)).FN4 Reviewing plaintiffs' allegations against these standards, plaintiffs have adequately pleaded their ADA and Rehabilitation Act claims for the purposes of Rule 12(b)(6).

> FN4. Even though the Third Circuit has not specifically addressed the issue, it appears that to prove a Rehabilitation Act claim, a plaintiff must show that the defendant acted with deliberate indifference. *See L.T. v. Mansfield Tp. School Dist.,* 2007 WL 2332308, *5 (D.N.J. Aug. 10, 2007).

*6 Despite this, there are several problems with

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.)
(Cite as: 2008 WL 819968 (D.N.J.))

these claims as pleaded by plaintiffs. First, plaintiffs seeks punitive damages for defendants' alleged ADA and Rehabilitation Act claims. Punitive damages are not available for these claims. *See Doe v. County of Centre, PA,* 242 F.3d 437, 455-58 (3d Cir.2001) (concluding punitive damages are not available under § 504 of the Rehabilitation Act or Title II of the ADA).

Second, claims against the individual defendants are unavailable for these claims. With regard to the ADA, the Third Circuit has followed other circuit courts of appeals in holding that individuals are not liable under Titles I and II of the ADA, which prohibit discrimination by employers and public entities respectively. *Emerson v. Thiel College,* 296 F.3d 184, 189 (3d Cir.2002) (citations omitted).

With regard to the Rehabilitation Act, the Third Circuit has held that if an individual defendant does not receive federal aid, a plaintiff cannot state a claim against him or her under the Rehabilitation Act. *See Emerson v. Thiel College,* 296 F.3d 184, 190 (3d Cir.2002). Here, because plaintiffs have not alleged that any of the teachers or administrators receive federal aid, following *Emerson,* the individual defendants cannot be held liable under Section 504 of the Rehabilitation Act.

Thus, plaintiffs' ADA and Rehabilitation Act claims may proceed past the motion to dismiss stage, except that punitive damages are unavailable and these claims can only be maintained against the Board of Education.

**2. Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983**

Plaintiffs have asserted a separate cause of action against defendants pursuant to 42 U.S.C. § 1983. As a primary matter, § 1983 does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere. *Doe v. Delie,* 257 F.3d

309, 314 (3d Cir.2001) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). To the extent that plaintiffs are bringing their IDEA, ADA, and Rehabilitation Act claims pursuant to § 1983, the Third Circuit has recently clarified that this is improper. In *A.W. v. Jersey City Public Schools,* 486 F.3d 791, 803, 805 (3d Cir.2007), the Third Circuit held that § 1983 is not available to provide a remedy for defendants' alleged violations under the IDEA or Section 504. Even though the *A.W.* court did not address whether the prohibition applies to ADA claims brought pursuant to § 1983, because the ADA, as noted above, is the public analogue of the Rehabilitation Act, it is clear that this prohibition with regard to the IDEA and the Rehabilitation Act is applicable to the ADA as well. *See Woodruff v. Hamilton Tp. Public Schools,* 2007 WL 1876491, *4 (D.N.J. June 26, 2007).

To the extent that plaintiffs have attempted to bring any of their other claims under § 1983, plaintiffs cannot do so. "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges or immunities secured by the Constitution or laws of the United States." 42 U.S.C. § 1983. Plaintiffs have not alleged any constitutional violation claims, or claims arising under any other federal law.[FN5] Consequently, even though claims brought pursuant to § 1983 may not be deemed waived because they did not bring them before the ALJ during the IDEA due process hearing, these claims must be dismissed pursuant to Rule 12(b)(6).

> FN5. Even if plaintiffs did assert additional valid claims pursuant to § 1983, those claims would be dismissed against the individual defendants, because although plaintiffs have sued the individual plaintiffs in their official capacities, claims against school administrators or teachers in their official capacities is duplicative of claims against the school. *See Hafer v.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.)
(Cite as: 2008 WL 819968 (D.N.J.))

*Melo,* 502 U.S. 21, 25 (1991).

### 3. Plaintiffs' NJLAD and Hostile Educational Environment claims

**\*7** Plaintiffs claim that "Defendants, including Heade and Harris, ... fraudulently and with actual malice and through willful misconduct violated the LAD by discriminating against plaintiffs."(Compl.¶ 243.) Plaintiffs also claim that "Defendants, including Heade and Harris, have maliciously, fraudulently and through willful misconduct and malicious intent subjected A.M., M.M. and J.M. to unwelcome, unjustified and illegal harassment."(*Id.* ¶ 250.)With regard to their harassment claim, plaintiffs claim that defendants used their "authority and obligations" under the IDEA to create a hostile, abusive and inflexible environment for them, and that this harassment has been so pervasive, it has altered the conditions of A.M.'s education. (*Id.* § 257.)

First it must then be determined whether these claims are of the type that could have, and should have, been brought before the ALJ in plaintiffs' due process hearing. If not, it must then be determined whether plaintiffs have asserted valid claims under the NJLAD and for hostile educational environment.

#### 1) *Whether plaintiffs' NJLAD and hostile environment claims could have or should have been brought before the ALJ*

As a primary matter, there is no independent cause of action for hostile educational environment. To the extent that such a claim may exist, it has been interpreted as a claim arising under the NJLAD. *See, e.g., Woodruff v. Hamilton Tp. Public Schools,* 2007 WL 1876491, *4 (D.N.J. June 26, 2007) (recognizing that plaintiffs pleaded a novel theory of law for hostile educational environment claim under the NJLAD). Thus, the Court's analysis of

plaintiffs' hostile environment claim must be considered as part of the analysis of plaintiffs' NJLAD claim.

The NJLAD provides,

All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

N.J. Stat. Ann. 10:5-4. Damages available under the NJLAD include compensatory and punitive relief. *See*N.J. Stat. Ann. 10:5-13 ("All remedies available in common law tort actions shall be available to prevailing plaintiffs."); *Lehmann v. Toys R Us, Inc.,* 32 626 A.2d 445, 461 (N.J.1993) (recognizing right to both compensatory and punitive damages under NJLAD)."[I]n adjudicating cases brought under the ADA and NJLAD, courts apply the burden-shifting framework applicable to cases brought under Title VII," *Marzano v. Computer Science Corp. Inc.,* 91 F.3d 497, 502 (3d Cir.1996), and therefore, the ADA and NJLAD claims are governed by the same standards, *Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 70 (3d Cr.1996) (citing *Ensslin v. Township of North Bergen,* 646 A.2d 452, 458-59 (N.J.Super.Ct.App.Div.1994), *cert. denied,* 663 A.2d 1354 (N.J.1995)); *see also Morales-Evans v. Administrative Office of the Courts of New Jersey,* 102 F.Supp.2d 577, 586 (D.N.J.2000) (noting that the NJLAD is the state version of the federal Title VII of the Civil Rights Act).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 9 of 13

Case 2:09-cv-02854-SH-PS    Document 18-3    Filed 07/24/09    Page 20 of 33 PageID:
Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.)258
(Cite as: 2008 WL 819968 (D.N.J.))

*8 Based on these standards, plaintiffs' NJLAD claims could not have been brought before the ALJ: (1) the elements to prove an IDEA claim are different than those to prove an NJLAD claim, (2) the damages available for these claims are different, and (3) plaintiffs were not able to bring these claims pursuant to the due process procedures of the IDEA when they challenged the development of A.M.'s IEP.

### 2) Whether plaintiffs have stated viable NJLAD claims

With regard to defendants' motion to dismiss plaintiffs' general NJLAD claim for failure to state a claim, defendants argue that the NJLAD claim could result in the potential recovery of the very type of damages that the federal courts have prohibited in the context of IDEA, ADA, and Rehabilitation Act claims brought pursuant to those statutes, as well as pursuant to § 1983. In other words, defendants argue that because punitive damages are not available for claims under the ADA, Rehabilitation Act, or IDEA, plaintiffs's NJLAD claims must be dismissed because punitive damages are available under the NJLAD.

Defendants' argument is unavailing. First, the fact that there are no punitive damages available under the ADA, Rehabilitation Act, or IDEA does not mean that a plaintiff who has successfully proven an ADA, Rehabilitation Act, and/or IDEA claim as well as a NJALD claim is not entitled to all the damages available under each statute. Second, although it is true that a plaintiff cannot bring IDEA, ADA, and Rehabilitation Act claims pursuant to § 1983, the reason for that prohibition cannot be automatically extended to plaintiffs' NJLAD claims. The Third Circuit prohibited the use of § 1983 to bring IDEA, ADA, and Rehabilitation Act claims because the court found that Congress intended those statues to supplant § 1983. See A.W. v. Jersey City Public Schools, 486 F.3d 791 (3d

Cir.2007). In so finding, the Third Circuit did not say that bringing those claims pursuant to § 1983 was barred because § 1983 allows for punitive damages, while the IDEA, ADA, and Rehabilitation Act do not.

Even though by virtue of prohibiting a plaintiff from bringing IDEA, ADA, and Rehabilitation Act claims pursuant to § 1983, the Third Circuit effectively eliminated the availability of punitive damages for violations of those statutes, streamlining damages was not the basis for the Third Circuit's decision. Indeed, as noted above, the ADA and Rehabilitation Act allow for money damages, while the IDEA has been interpreted to only allow for compensatory education. Accordingly, this Court cannot deny plaintiffs the damages available under the NJLAD simply because the IDEA, ADA and Rehabilitation Act do not afford the same type of damages.[FN6]

> FN6. The Court also notes that the A.W. court's interpretation of § 1983 law does not preclude this Court, when properly exercising supplemental jurisdiction, from granting remedies based on state law that exceed the scope of remedies available under similar federal laws.

With regard to plaintiffs' hostile environment claim, most hostile environment claims arise in the employment context. Generally, to state a hostile environment claim under the NJLAD, a plaintiff must show that the complained-of conduct: (1) would not have occurred but for his race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity; and it was (2) severe or pervasive enough to make a(3) reasonable, similarly-situated person believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. Id. (citation omitted).

*9 Plaintiffs apparently wish to extend this standard

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.)
(Cite as: 2008 WL 819968 (D.N.J.))

to the education environment. As noted above, this Court in *Woodruff v. Hamilton Twp. Public Schools,* 2007 WL 1876491, *4 (D.N.J. June 26, 2007) recognized in that case that the plaintiffs pleaded a novel theory of law for a hostile educational environment claim under the NJLAD, and consequently did not dismiss that claim pursuant to the defendants' Rule 12(b)(6) motion. Defendants argue that the facts as pleaded by the plaintiffs in *Woodruff* are completely dissimilar to the facts pleaded by plaintiffs here, and as such, plaintiffs should not be permitted to assert such a cause of action. Plaintiffs argue that they have sufficiently pleaded a claim such that it should proceed past the motion to dismiss stage.

Defendants' argument is not persuasive at this time. Plaintiffs claim that defendants' alleged harassment of them was severe and pervasive, was motivated by A.M.'s disability, and created an abusive educational and learning environment. Plaintiffs allege a series of events, and if they are accepted as true, they set forth allegations sufficient to satisfy plaintiffs' requirement to give the defendants fair notice of what their claims are and the grounds upon which they rest. Even though plaintiffs may not ultimately be able to prove such a claim, the issue on a Rule 12(b)(6) motion is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Bell Atlantic v. Twombly,* 127 S.Ct. 1955, 1969 n. 8 (2007) (citation omitted). Plaintiffs' pleading is sufficient to allow them to offer evidence to support this claim. Consequently, plaintiffs's general NJLAD claim and hostile educational environment claim under the NJLAD survive defendants' motion to dismiss.[FN7]

> FN7. Plaintiffs' NJLAD claims against the individual defendants may stand as well. The NJLAD prohibits unlawful employment practices by an "employer," as that term is defined under the law. *Tarr v. Ciasulli,* 853 A.2d 921, 927-28 (N.J.2004).

Although a person in a supervisory capacity is not an "employer" under the NJLAD, an individual may nevertheless be liable under N.J.S.A. 10:5-12(e) if he "aids or abets" others (namely, an employer) in committing acts forbidden by the law. *Hurley v. Atlantic City Police Dept.,* 174 F.3d 95, 126 (3d Cir.1999); *Tarr,* 853 A.2d at 928-29. The Third Circuit has stated that "employee aids and abets a violation of the [NJ]LAD when he knowingly gives substantial assistance or encouragement to the unlawful conduct of his employer." *Failla v.. City of Passaic,* 146 F.3d 149, 158 (3d Cir.1998). Further, the Third Circuit has found that a supervisor "may be liable as an aider and abettor for active harassment or knowing and willful inaction" under the NJLAD. *Hurley,* 174 F.3d at 128. Thus, if the Court were to find that plaintiffs have proven a valid hostile educational environment claim, by analogy to the employment context, plaintiffs may maintain this claim against the individual defendants.

### 4. Plaintiffs's Breach of the Duty of Good Faith and Fair Dealing Claim

Plaintiffs claim that defendants "Heade and Harris, as educators responsible for the welfare of A.M., M.M. and J.M., and who are compensated with the tax dollars of M.M. and J.M., are charged with the obligation to and employed to educate A.M., owe a duty of good faith and fair dealing to A.M., M.M. and J.M." (Compl.¶ 262.) Plaintiffs also claim that the other defendants are liable for the actions of Heade and Harris under the principles of respondeat superior. (*Id.* ¶ 266.)

This claim must be dismissed. The covenant of good faith and fair dealing is implied in every contract in New Jersey; thus, it is axiomatic that a contract must exist between two parties before a court

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 11 of 13

Case 2:09-cv-02849-KSH-PS    Document 18-3    Filed 07/24/09    Page 22 of 33 PageID:
Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.) 260
(Cite as: 2008 WL 819968 (D.N.J.))

will infer this covenant. *Space v. BRPM Towing Service, Inc .,* 2007 WL 4570157, *6 (D.N.J.2007) (citing *Wade v. Kessler Inst .,* 778 A.2d 580, 584 (N.J.Super.Ct.App.Div.2001) (stating that "[i]n the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing")) (other citations omitted). Any contention that a breach of the implied covenant may arise absent an express or implied contract finds no support in New Jersey case law. *Id.*

*10 Here, plaintiffs appear to assert that a contract exists between them and defendants Heade and Harris because plaintiffs pay taxes, and part of those taxes go toward paying their salaries.[FN8] This tenuous connection does not constitute a contract between plaintiffs and defendants. Consequently, because there is no contract between the parties, the duty of good faith and fair dealing does not apply.

> FN8. If plaintiffs are trying to allege that defendants had a general duty to act in good faith while formulating and implementing A.M.'s IEP, that is a claim for a violation of the IDEA, and cannot stand alone as a separate cause of action.

### 5. Plaintiffs' Intentional Infliction of Emotional Distress Claim

Plaintiffs claim that defendants Heade and Harris intentionally inflicted upon them severe emotional distress during the development of A.M.'s IEP. (Compl.¶ 272-73.) This claim must be dismissed as well.

The New Jersey Supreme Court has explained the standard for an IIED claim.

[T]o establish a claim for intentional infliction of emotional distress, a plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. Initially, the plaintiff must prove that the defend-

ant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.

Second, the defendant's conduct must be extreme and outrageous. The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress. Fourth, the emotional distress suffered by the plaintiff must be "so severe that no reasonable man could be expected to endure it." By circumscribing the cause of action with an elevated threshold for liability and damages, courts have authorized legitimate claims while eliminating those that should not be compensable.

*Buckley v. Trenton Saving Fund Soc.,* 544 A.2d 857, 863 (N.J.1988) (internal citations and quotations omitted).

There are several problems with plaintiffs' IIED claim. One problem is that plaintiffs' allegations do not evidence that Heade or Harris acted "recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." This defect corresponds to the fact that none of the alleged conduct of Heade or Harris can be described as "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Plaintiffs' claims relate to the development of A.M.'s IEP, and the dispute over whether A.M. should be in a self-contained classroom and/or which level of kindergarten class. Even if Heade or Harris violated the IDEA with regard to their methods of determining A.M.'s IEP,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 12 of 13

Case 2:08-cv-02542-KSH-PS    Document 18-3    Filed 07/24/09    Page 23 of 33 PageID: 261
Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.)
(Cite as: 2008 WL 819968 (D.N.J.))

none of that conduct as alleged by plaintiffs rises to the level of going "beyond the bounds of decency."

**\*11** Another problem with plaintiffs' IIED claim is that plaintiffs have failed to specifically articulate the emotional distress they suffered, and any distress that they have articulated is not "so severe that no reasonable man could be expected to endure it."Plaintiffs make a conclusory statement that they suffered severe emotional distress, but they do not indicate how each of them has suffered. Plaintiffs' bald assertions are insufficient to survive a motion to dismiss. Accordingly, because of these defects in plaintiffs' IIED claim, it must be dismissed.

### 6. Fraud Claim

Plaintiffs claim that defendants "Heade and Harris, by their conduct, defrauded A.M., M.M. and J.M. in his educational rights, protection and benefits to which he was and is entitled."(Compl.¶ 275.) Plaintiffs further claim that Heade and Harris "acted maliciously and with fraudulent intent and their actions constitute willful misconduct."(*Id.* ¶ 276.)As with plaintiffs' good faith and fair dealing and IIED claims, this claim must be dismissed as well.

The five elements of common law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v.. Weichert Co. Realtors,* 691 A.2d 350 (N.J.1997). Corollary to that standard, the Federal Rules of Civil Procedure provide, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."Fed.R.Civ.P. 9(h).

Plaintiffs have failed to meet both standards.

Plaintiffs have not alleged how Heade or Harris knowingly misrepresented a fact, and intended either A.M., J.M. or M.M. to rely on that fact. Indeed, the opposite is true as alleged by plaintiffs. Plaintiffs claim that Heade made up her mind prior to the IEP meeting not to place A.M. in developmental kindergarten. Plaintiffs do not allege that Heade misrepresented her intentions for A.M.'s placement in order to induce the parents to sign the IEP. Instead, the parents were well aware of Heade's opinions, which Harris agreed with. They disputed those opinions, and they refused to sign the IEP. This difference of opinion as to A.M.'s placement, and the way the IEP was implemented, may state a claim under the IDEA, but it does not rise to the level of fraud.

### 7. Plaintiffs's Civil Conspiracy Claim

Plaintiffs claim that Heade and Harris "with malicious and fraudulent intent, and willfully, agreed between themselves to and did discriminate against A.M., M.M. and J.M. and violate and abuse the IDEA and applicable laws for their own benefit and to the detriment of A.M., M.M. and J.M. and with disregard for the rights and welfare of Plaintiffs."(Compl.¶ 269.) Plaintiffs claim that this harmed them, and constitutes an unlawful civil conspiracy. (*Id.* ¶ 270.)

**\*12** This claim must be dismissed because it is simply plaintiffs' IDEA claim recast as an alleged civil conspiracy. Plaintiffs' entire complaint centers around plaintiffs' claims that defendants did not properly prepare and implement an IEP for A.M. This alleged conduct may be enough to state a claim under the IDEA, as well as the ADA, Rehabilitation Act and NJLAD, but it cannot also form the basis for a civil conspiracy.

"A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the principal element of which is an agreement between the parties to injure another, and an overt act that results in damage." *Morgan v. Union County Bd. of Chosen Freeholders,* 633 A.2d 985 (N.J.Ct.App.Div.1993) (quotations and citations omitted). The primary requirement for a civil conspiracy is the existence of a separate underlying tort. *In re Orthopedic Bone Screw Products Liability Litigation,* 193 F.3d 781, 789 (3d Cir.1999). A plaintiff "cannot sue a group of defendants for conspiring to engage in conduct that would not be actionable against an individual defendant."*Id.*"Instead, actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor."*Id.* (internal quotations and citations omitted)).

As a primary matter, this conspiracy claim must fail because plaintiffs have not alleged a viable tort claim against any of the defendants. Without an actionable tort committed by one defendant, none of the other defendants can be held to have conspired to commit that tort.

This claim must also fail because plaintiffs have not alleged that all the defendants, or even some of the defendants, had an agreement to injure A.M. or his parents. The fact that defendants collaborated in the development of A.M.'s educational plan, which the parents ultimately objected to, does not automatically create a conspiracy to harm plaintiffs. Rather, working collaboratively is a requirement of the IDEA, and failure to do so constitutes a violation. Indeed, plaintiffs complain that the IDEA requires the educational team to work collaboratively with the parents, and not just with each other.

Consequently, plaintiffs' civil conspiracy claim must be dismissed. To hold otherwise would open the door for every IDEA plaintiff to assert a civil conspiracy claim as well.

### CONCLUSION

Based on the foregoing, defendants' motion to dismiss must be granted as to plaintiffs' § 1983 claims, and their claims for the breach of the duty of good faith and fair dealing, intentional infliction of emotional distress, fraud and civil conspiracy. Plaintiffs' IDEA, ADA, Rehabilitation Act, and NJLAD claims may proceed, except that plaintiffs' ADA and Rehabilitation Act claims are dismissed as to the individual defendants. An appropriate Order will be entered.

D.N.J.,2008.
J.M. ex rel. A.M. v. East Greenwich Tp. Bd. of Educ.
Not Reported in F.Supp.2d, 2008 WL 819968 (D.N.J.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT

# C

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2007 WL 4570157 (D.N.J.)
**(Cite as: 2007 WL 4570157 (D.N.J.))**

C
Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Raymond SPACE, Individually and on behalf of all
others similarly situated, Plaintiff,
v.
BRPM TOWING SERVICE, INC.; Dente Brothers
Towing, Inc.; Jerry's Towing, Inc.; and The Home
Depot, Inc., Defendants.
**Civil Action No. 07-947 (JAG).**

Dec. 21, 2007.

Joel E. Davidson, Davidson & Grannum, LLP, Old
Tappan, NJ, for Plaintiff.

Nicholas Stevens, Starr, Gern, Davison & Rubin,
PC, Roseland, NJ, Joseph Gerard Falcone, Thomas
J. Hall, Chadbourne & Parke, LLP, New York, NY,
for Defendants.

**OPINION**

GREENAWAY, JR., District Judge.

**\*1** This matter comes before this Court on the motion of Defendant The Home Depot U.S.A., Inc. ("Home Depot") [FN1], to dismiss for failure to state a claim upon which relief can be granted, pursuant to FED.R.CIV.P. 12(b)(6). For the reasons set forth below, Home Depot's motion is granted.

> FN1. Defendant The Home Depot U.S.A., Inc. was incorrectly named The Home Depot, Inc. in the Complaint.

**I. FACTUAL BACKGROUND**

On approximately December 5, 2006, Plaintiff Raymond Space ("Plaintiff") parked his tractor trailer truck and empty flat bed trailer in a parking lot located at 2465 Springfield Avenue, Union, New Jersey. (Compl.¶ 15.) Plaintiff alleges that "no signs [were] posted [to] inform[him] that it was illegal to park in the lot."(*Id.* at ¶ 25.)When Plaintiff returned, on December 6, 2006, to retrieve the truck and trailer bed, he found that both were missing.(*Id.* at ¶ 16.)Plaintiff claims that temporary signs were then posted with duct tape in the parking lot. (*Id.* at ¶ 26.)

Plaintiff inquired as to the location of his vehicle at the Home Depot, the owner of the parking lot (*id.* at ¶ 24), and was told that the vehicle had been towed by Defendant BRPM Towing Services, Inc. ("BRPM") (*id.* at ¶ 16). Plaintiff called the telephone number he was given, and allegedly was told that "he would have to pay $6,350.00 in cash ... to retrieve his truck."(*Id.* at ¶ 17.)Plaintiff alleges that, although he was told that BRPM had towed his truck and trailer bed, the number he called is registered to Defendant Jerry's Towing, Inc. ("Jerry's").(*Id.* at ¶ 21.)

During this first telephone call, Plaintiff was instructed to contact a man named Ryan. (*Id.* at ¶ 22.)Plaintiff called Ryan, and again was told that he would need to pay $6,350.00, in cash, to retrieve his vehicle. (*Id.*) Allegedly, Ryan told Plaintiff to bring the payment to a storage facility owned by Defendant Dente Brothers Towing, Inc. ("Dente Brothers").(*Id.*) Plaintiff, apparently, traveled to Dente Brothers and paid the towing fee, and was then given a receipt bearing BRPM's name. (*Id.* at ¶ 29.)

Plaintiff alleges that the towing charge is excessive, unconscionable, and exorbitant (*id.* at ¶¶ 24, 29-31), and that Defendants Jerry's, BRPM, and Dente Brothers ("Towing Defendants") "have

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 2 of 8

Case 2:09-cv-02849-KSH-PS    Document 18-3    Filed 07/24/09    Page 27 of 33 PageID: 265
Not Reported in F.Supp.2d, 2007 WL 4570157 (D.N.J.)
(Cite as: 2007 WL 4570157 (D.N.J.))

charged hundreds of individuals [ ] excessive truck and car towing charges over the past six years" *(id.* at ¶ 32). Plaintiff also alleges that Jerry's and/or BRPM subcontracted with Dente Brothers to tow Plaintiff's vehicle, and that the Towing Defendants acted in concert to overcharge for towing services. *(Id.* at ¶ 23.)Plaintiff also claims that Home Depot contracted with the Towing Defendants to remove vehicles from the lot located at 2465 Springfield Avenue, and authorized the Towing Defendants to charge excessive fees for such towing services. *(Id.* at ¶ 24.)

As a result of these claims, Plaintiff filed the instant class action on January 11, 2007 in the Superior Court of New Jersey *(see generally,* Compl.), alleging that Defendants Home Depot, BRPM, Jerry's, and Dente Brothers (collectively "Defendants") violated the Union Township Municipal Code ("the Code"), UNION TWP. MUN.CODE § 505-15 *(id.* at ¶¶ 38-39); and the New Jersey Consumer Fraud Act ("NJCFA"), N.J. STAT. ANN.. § 56:8-2.26 (2007)*(id.* at ¶¶ 41-42). Plaintiff also alleges that Defendants breached the covenant of good faith and fair dealing. *(Id.* at ¶¶ 44-48.)Finally, Plaintiff raises a claim pursuant to the common law tort theory of conversion. *(Id.* at ¶¶ 50-51.)

*2 Home Depot removed this lawsuit to the District of New Jersey on February 28, 2007 *(see generally,* Notice of Removal), and filed a motion to dismiss on March 2, 2007 *(see generally,* Mot. to Dismiss). On June 22, 2007, Plaintiff filed his opposition to Home Depot's motion to dismiss. *(See generally,* Pl.'s Br. in Resp. to Def.'s Mot. to Dismiss.) Home Depot filed a reply on June 29, 2007. *(See generally,* Def.'s Reply in Supp. of Mot. to Dismiss.) [FN2]

> FN2. Home Depot argues that Plaintiff untimely filed his opposition to Home Depot's motion to dismiss, and as such, the opposition should be disregarded and the

motion granted as unopposed. (Def.'s Reply in Supp. of Mot. to Dismiss 1.) Plaintiff was required to file his opposition "at least 14 days prior to the original motion date ..."L. CIV. R. 7.1(d)(2). In other words, Plaintiff's opposition was due on, or before, March 12, 2007. However, this Court may extend the time in which a party is to act, and therefore permit a late-filing, when "on motion made after the time has expired if the party has failed to act because of excusable neglect."FED.R.CIV.P. 6(b)(1)(B). In determining whether neglect is excusable, a court may consider 1) the danger of the prejudice to the opposing party, 2) the length of the delay and its impact on the judicial proceedings, 3) the reason for the delay, and 4) whether the moving party acted in good faith. *In re Diet Drugs Prods. Liab. Litig.,* 401 F.3d 143, 153 (3d Cir.2005).

On June 13, 2007, after Magistrate Judge Madeline Cox Arleo denied Plaintiff's motion to remand this case to state court, Plaintiff requested leave to file an out of time opposition to Home Depot's motion to dismiss. *(See* Letter from Joel E. Davidson, Attorney for Plaintiff, June 13, 2007.) Although this request was made approximately three months after Plaintiff's opposition was due, this Court finds that Plaintiff's failure to file his opposition timely is excusable. First, Home Depot is not prejudiced by Plaintiff's late filing, and the delay of Plaintiff's opposition has not substantially lengthened the proceedings before this Court. Second, Plaintiff delayed filing a response to Home Depot's motion to dismiss pending the resolution of his motion to remand this matter to state court. Although the delay was improper, and without an or-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

der from this Court, this Court holds that the delay was reasonable. For these reasons, this Court will consider both Plaintiff's opposition and Home Depot's reply in deciding the instant motion to dismiss.

## II. STANDARD OF REVIEW

A motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, should be granted if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007) (abrogating *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. See *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384-85 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. See *In re Warfarin Sodium,* 214 F.3d 395, 397-98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir.2000).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. See *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 n. 8 (3d Cir.1997)."The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005).

## III. DISCUSSION

### A. Union Township Municipal Code

Defendant argues that Plaintiff's claim, pursuant to the Union Township Municipal Code, fails to state a claim because "(1) that section only applies to 'police-requested' towing, (2) that section only applies to a 'towing operator', which Home Depot is not, and (3) Plaintiff did not satisfy the statutory prerequisites of Chapter 505 prior to instituting this action."(Def.'s Br. in Supp. of Mot. to Dismiss 4) (emphasis in original). Plaintiff counters and argues that Chapter 505 of the Code "goes beyond police tows and prohibits *any* illegal and excessive charges for private property tows ..." (Pl.'s Br. in Resp. to Def.'s Mot. to Dismiss 4.) In addition, while Plaintiff acknowledges that Home Depot is not a towing operator within the meaning of Chapter 505 of the Code, Plaintiff claims that Home Depot remains responsible for the towing charges. *(Id.)*

*3 Finally, Plaintiff states that although he believes that Chapter 505 of the Code extends to private property tows, he suggests that Section 505-17, which requires that "[a]ny complaint as to services rendered by the tower or as to fees charged are to be addressed in writing to both the Chief of Police and the Clerk within 10 days of paying for said services,"UNION TWP. MUN.CODE § 505-17(D)(2), only applies to police directed tows (Pl.'s Br. in Resp. to Def.'s Mot. to Dismiss 5). Plaintiff cannot have it both ways.

"In construing the language of an ordinance, it is well established that courts apply the same rules of judicial construction as they apply when construing statutes. Generally, a court's duty in construing a statute is to determine the intent of the Legislature."*AMN, Inc. of N.J. v. Twp. of S. Brunswick Rent Leveling Bd.,* 93 A.2d 1138, 1141 (N.J.1983) (internal citation omitted). Courts "must

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

interpret statutes in accordance with their plain meaning ... [and] effectuate the intent of the Legislature [by] considering the language used and the objective sought to be achieved." *Fair Lawn Retired Policemen v. Borough of Fair Lawn,* 299 N.J.Super. 600, 691 A.2d 859, 861 (N.J.Super.Ct.App.Div.1997). When "the intent of the Legislature [ ] ha[s] been clearly expressed and its intention plainly apparent ... it is improper to usurp the function of the legislative branch under the guise of statutory construction." *Ayres v. Dauchert,* 23 N.J. 551, 130 A.2d 1, 6 (N.J.Super.Ct.App.Div.1974).

This Court finds the language of Chapter 505 of the Union Township Municipal Code to be unambiguous. This chapter does not apply to Home Depot. First, Chapter 505 of the Union Township Municipal Code clearly provides that "[t]he purpose of this chapter is to provide standards, regulations and rates for *police-requested towing and storage services* requiring a response thereto by the licensees."UNION TWP. MUN.CODE § 505-1 (emphasis added). Similarly, the subsection which Plaintiff seeks to invoke specifies that the outlined charges pertain to fees accumulated for towing and storage services made at the request of the Union Township Police Department. *Id.* at § 505-15 (stating that "[t]owing and storage charges shall be paid by the owner of a vehicle towed and/or stored by a licensee at *police request*..." (emphasis added). The plain language of these two subsections evidences the Township's intent to limit application of this chapter to towing and storage services provided by Township licensees, and made at the request of the Police Department.

A review of the chapter in its entirety supports this conclusion. While the chapter acknowledges that towing and storage services may be provided by unlicensed towing operators, and performed without the request of the Township or its Police Department, *see e.g., id* . at § 505-3(B)(2) (stating that "[n]o license shall be required by the police to tow

any vehicle from private property without the consent of the owner and private property owner except on the express instruction of the police in the event of an emergency."), each subsection makes specific reference to the responsibilities of licensees, *see generally,*UNION TWP. MUN.CODE §§ 505-1 to-17. A licensee is defined as "[a] towing operator having a license granted by the Township pursuant to the provisions of this chapter."UNION TWP. MUN.CODE § 505-2. The Township meant to restrict application of this chapter to towing operators licensed by the Township, who perform towing and storage services at the request of the Township or its Police Department.

*4 Second, even if the Township intended to extend the towing and storage charges established in § 505-15 to unlicensed towing operators, who tow vehicles from private property without request from the Township or Police Department, Chapter 505 remains inapplicable to Home Depot. Specifically, § 505-15 only applies to fees charged by a towing operator for its towing and storage services. Home Depot is not towing operator.[FN3]Plaintiff concedes this fact in his papers. *(See* Pl.'s Br. in Resp. to Def.'s Mot. to Dismiss 4) ("Home Depot, while not a licensed towing operator, cannot stand back and claim innocence when at its direction the other Defendants in this case proceeded to tow vehicles at excessive and illegal charges.").

> FN3. A towing operator is defined as "[a]n individual or entity engaged in the business of providing towing and storage services."UNION TWP. MUN.CODE § 505-2.

Home Depot is not engaged in the business of providing towing and storage services, and therefore, did not violate the Code.[FN4]

> FN4. This Court finds that Chapter 505 of the Union Township Municipal Code is inapplicable to Home Depot because this

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 5 of 8

Case 2:08-cv-02349-JSH-PS    Document 18-3    Filed 07/24/09    Page 30 of 33 PageID: 268
Not Reported in F.Supp.2d, 2007 WL 4570157 (D.N.J.)
(Cite as: 2007 WL 4570157 (D.N.J.))

chapter is addressed solely to police re-quested tows, and Home Depot is not a towing operator. Based on this finding, this Court need not reach Home Depot's re-maining argument that Plaintiff failed to satisfy the statutory requirements enunci-ated in § 505-17(D)(2).

## B. New Jersey Consumer Fraud Act

Home Depot next claims that Plaintiff's allegations, pursuant to the New Jersey Consumer Fraud Act ("NJCFA"), N.J. STAT. ANN. § 568-2.26, must be dismissed because (1) Plaintiff lacks standing to pursue such claims against Home Depot; (2) Plaintiff fails to allege that Home Depot engaged in the unlawful conduct complained of; (3) Plaintiff fails to allege that Home Depot proximately caused his injury; and (4) Plaintiff has not alleged violation of the NJCFA with the requisite level of specificity. (Def.'s Br. in Supp. of Mot. to Dismiss 7.)

Plaintiff argues that he has standing to pursue his claims against Home Depot because the Towing Defendants acted as agents of Home Depot, and Home Depot is responsible for the actions of its agents. (Pl.'s Br. in Resp. to Def.'s Mot. to Dismiss 6-7.) Plaintiff also claims that he has pleaded the NJCFA count with sufficient specificity. (Id. at 7-8, 130 A.2d 1.)

The New Jersey Consumer Fraud Act was designed to protect consumers. *Hundred E. Credit Corp. v. Eric Schuster Corp.,* 212 N.J.Super. 350, 515 A.2d 246, 248 (N.J.Super.Ct.App.Div.1986). Although "consumer" is not defined in the Act, "its generally recognized meaning is one who uses (economic) goods, and so diminishes or destroys their utilities."*Id.* (internal citation omitted). Plaintiff has not alleged that he purchased, or used, in any meth-od, goods or services provided by Home Depot. *(See generally,* Compl.) Plaintiff has not alleged that he is a consumer within the meaning of the

NJCFA. Such a deficiency in the pleading requires this Court to find that Plaintiff lacks standing to pursue a claim under the NJCFA against Home De-pot.

Assuming, *arguendo,* that Plaintiff has standing to pursue his NJCFA claim against Home Depot, Plaintiff's claim still fails because he neglected to allege that Home Depot engaged in the unlawful practices prohibited by the Act. Section 56:8-2.26 of the NJCFA provides that "[i]t shall be an unlaw-ful practice and a violation ... for any person to *charge* rates which are discriminatory or are not usual, customary and reasonable rates for the tow-ing and storage of motor vehicles ..."N.J. STAT. ANN. § 56:8-2.26 (emphasis added).

**\*5** In order to state a claim for violation of this Act, "[Plaintiff] must allege each of three elements (1) unlawful conduct by the defendants; (2) an ascer-tainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlaw-ful conduct and the plaintiff's ascertainable loss." *N.J. Citizen Action v. Schering-Plough Corp.,* 367 N.J.Super. 8, 842 A.2d 174, 176 (N.J.Super.Ct.App.Div.2003). Plaintiff has not al-leged the first element. There is no allegation that Home Depot charged the allegedly excessive tow-ing and storage fees. *(See generally,* Compl.) In fact, Plaintiff alleges that the Towing Defendants, and not Home Depot, charged such fees. *(See id.* at ¶ 12, 842 A.2d 174) ("*Certain of defendants* have towed hundreds of vehicles from private property and charged the vehicle owners exorbitant and il-legal rates ...") (emphasis added); *(see also id.* at ¶ 14, 842 A.2d 174) (*"The Towing Defendants* charge towed vehicles at rates as high as $6350.00 ...") (emphasis added); *(id.* at ¶ 23, 842 A.2d 174) ("*The Towing Defendants* acted in concert in overchar-ging Plaintiff and members of the class.") (emphasis added); *(id.* at ¶ 32, 842 A.2d 174) ("*The Towing Defendants* have charged hundreds of indi-viduals' [sic] excessive truck and car towing charges over the past six years.") (emphasis added);

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*(id.* at ¶ 33, 842 A.2d 174) ("The common questions of law and fact to the class are (i) whether the *Towing Defendants* violated the Union Municipal Ordinance § 401-10; (ii) whether the *Towing Defendants* charged excessive and exorbitant fees to those whose vehicles it towed; (iii) whether the *Towing Defendants* kicked back money to individual property owners in connection with the towing of vehicles; (iv) whether the *Towing Defendants* should be ordered to pay compensatory damages to all victims of its overcharges; (v) whether the fees are unconscionable; (vi) whether *BRPM converted property;* and (vii) whether the *Towing Defendants* should be enjoined from further violations of Union Municipal Ordinance § 401-10, New Jersey Consumer Fraud Act § 56:8-2.26 and from price gouging.") (emphasis added); *(id.* at ¶ 34, 842 A.2d 174) ("An examination of the *Towing Defendants* and any of their invoices will determine liability.") (emphasis added).

Based on the Plaintiff's pleading deficiency, the NJCFA claim shall be dismissed.

**C. Implied Covenant of Good Faith and Fair Dealing**

Next, Home Depot argues that Plaintiff fails to establish a claim for breach of the implied covenant of good faith and fair dealing. Home Depot claims that "Plaintiff does not allege the existence of a contract between himself and Home Depot, and [ ] Plaintiff does not allege that Home Depot acted with malice."(Def.'s Br. in Supp. of Mot. to Dismiss 11.) Plaintiff, however, does claim that he is a third-party beneficiary to the alleged contract between Home Depot and BRPM; as such, he should be permitted to sue on the contract. (Pl.'s Br. in Resp. to Def.'s Mot. to Dismiss 8.)

*6 [A] covenant of good faith and fair dealing is implied in every contract in New Jersey, but consequently, a contract must exist between two parties before a court will infer this covenant. Moreover, the contention that a breach of the implied covenant may arise absent an express or implied contract ... finds no support in New Jersey case law.

*Material Techs., Inc. v. Carpenter Tech. Corp.,* No. 01-2965, 2004 U.S. Dist. LEXIS 28892, *31 (D.N.J. Dec. 14, 2004) (internal citations omitted); *see also Overseas Food Trading, Ltd. v. Agro Acietunera S.A.,* No. 06-800, 2006 U.S. Dist. LEXIS 60814, *7, 2006 WL 2482580 (D.N.J. Aug. 28, 2006) (citing *Wade v. Kessler Inst.,* 343 N.J.Super. 338, 778 A.2d 580, 584 (N.J.Super.Ct.App.Div.2001) (stating that "[i]n the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing.")). New Jersey law requires Plaintiff to allege the existence of a contractual relationship between himself and Home Depot to survive a motion to dismiss.

Alternatively, "[a] person for whose benefit a contract is made ... may sue thereon in any court ..."N.J. STAT. ANN. § 2A15-2 (2007)."This statute merely restates established New Jersey law that third-party beneficiaries may sue upon a contract made for their benefit without privity of contract." *Rieder Cmtys., Inc. v. Twp. of N. Brunswick,* 227 N.J.Super. 214, 546 A.2d 563, 566 (N.J.Super.Ct.App.Div.1988). When determining third-party beneficiary status, courts consider "whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts. Unless such a conclusion can be derived, a third party has no cause of action despite the fact that it may derive an incidental benefit from the contract's performance." *Id.* at 566-67 (internal citations omitted).

Here, Plaintiff does not allege that there is a contractual relationship between himself and Home Depot. *(See generally,* Compl.) Instead, Plaintiff alleges that he

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4570157 (D.N.J.)
(Cite as: 2007 WL 4570157 (D.N.J.))

and members of the class are third-party beneficiaries of any contractual agreement entered into between BRPM and Home Depot and Expo Design and other private property owners in that they are entitled to be charged only reasonable and conscionable rates charged in good faith which are an implied or express part of such contracts or agreements.

(*Id.* at ¶ 47, 546 A.2d 563.) However, while alleging that he is a third-party beneficiary to any contract between Home Depot and any of the Towing Defendants, Plaintiff fails to allege that Home Depot and the Towing Defendants intended for Plaintiff to derive a benefit from the alleged contract. (*See generally,* Compl.) In fact, Plaintiff consistently alleges the opposite. Plaintiff claims that "[t]he Home Depot and/or Expo Design agreed to terms that expressed or implied that the Towing Defendants could charge excessive, unconscionable and exorbitant rates." (*Id.* at ¶ 24, 546 A.2d 563.)

Taking all of the allegations in the Complaint as true, it is illogical for Plaintiff to allege, in one instance, the existence of a contract or agreement authorizing the Towing Defendants to charge excessive fees, and in the next instance allege that Plaintiff is an intended beneficiary of such contract or agreement. Assuming that such contract or agreement exists, it cannot be said to have been made for the benefit of Plaintiff. No other conclusion can be derived. *Rieder Cmtys.,* 546 A.2d at 567.[FN5]

> FN5. To the extent that Plaintiff raises a claim for unconscionability, such claim must also be dismissed for similar reasons.

**D. Conversion**

**\*7** Finally, Home Depot argues that Plaintiff fails to state a cause of action for conversion. (Def.'s Br. in Supp. of Mot. to Dismiss 15.) Plaintiff, on the other hand, claims that he sufficiently alleges that

"the towing Defendants and Home Depot are guilty of converting Plaintiff's property."(Pl.'s Br. in Resp. to Def.'s Mot. to Dismiss 9-10.)

Conversion is the intentional exercise of dominion or control over personal property that seriously interferes with the right of another to control it. The essence of a conversion claim is that one party exercises the right of ownership over property belonging to another without that person's permission. To prove a claim for conversion, a plaintiff must prove (1) that the alleged offender assumed and exercised the right of ownership over the party's goods or chattels without permission, and (2) excluded the owner from exercising dominion over them.

*Pollen v. Comer,* No. 05-1656, 2007 U.S. Dist. LEXIS 46906, \*31-32, 2007 WL 1876489 (D.N.J. June 28, 2007) (internal citations omitted). Plaintiff must, therefore, allege that (1) he is the owner of the tractor trailer truck and empty flat bed trailer that was towed from the parking lot located at 2465 Springfield Avenue, Union, New Jersey; (2) Home Depot towed the vehicle and retained control over it; and (3) Home Depot prevented Plaintiff from recovering the vehicle. Plaintiff fails to meet this burden.

While Plaintiff sufficiently alleges ownership over the truck and trailer (*see generally,* Compl. ¶ 15), Plaintiff does not allege that Home Depot "exercised the right of ownership ... [or] excluded [Plaintiff] from exercising dominion" over the vehicle. (*See generally,* Compl.) At most, Plaintiff alleges that "[t]he Towing Defendants *with the knowledge and authorization of Home Depot and Expo Design,* converted the property of the plaintiff and the class by unreasonably withholding trucks and cars from them."(*Id.* at ¶ 50) (emphasis added).

Similarly, Plaintiff alleges throughout the Complaint, as noted *supra* III.B., that the Towing Defendants towed his vehicle and charged allegedly

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4570157 (D.N.J.)
**(Cite as: 2007 WL 4570157 (D.N.J.))**

excessive rates. Home Depot, therefore, cannot be said to have assumed and exercised the right of ownership over Plaintiff's vehicle, or to have excluded Plaintiff from exercising dominion. *See Pollen,* 2007 U.S. Dist. LEXIS 46906, at *31-32, 2007 WL 1876489.

## IV. CONCLUSION

For the reasons stated above, Home Depot's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to FED.R.CIV.P. 12(b)(6), is granted. All counts in the Complaint against Defendant Home Depot are dismissed, without prejudice.

D.N.J.,2007.
Space v. BRPM Towing Service, Inc.
Not Reported in F.Supp.2d, 2007 WL 4570157 (D.N.J.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.