

## SELF-CONTAINED APPRAISAL REPORT

Beach Creek Marina, Inc. v. City of North Wildwood
Docket No. 000229-07, 001843-2007, and 003414-2008
North Wildwood Marina
610 New York Avenue
Block 152, Lot 1
North Wildwood, New Jersey 08260

### PREPARED FOR

William Henfey, Mayor
City of North Wildwood
901 Atlantic Avenue
North Wildwood, NJ 08260

### EFFECTIVE DATES

October 1, 2005, 2006, 2007, and 2008

### PREPARED BY

J. P. Bainbridge & Associates, Inc.
*Real Estate Appraisers ♦ Consultants*
6 Woodland Road
Cape May Court House, NJ 08210

**J. P. BAINBRIDGE & ASSOCIATES, INC.**
*Real Estate Appraisers ♦ Consultants*
6 Woodland Road, Cape May Court House, NJ 08210
Tel 609-465-9978 ♦ Fax 609-465-9969

March 12, 2009

William Henfey, Mayor
City of North Wildwood
901 Atlantic Avenue
North Wildwood, NJ 08260
Attn: William Kaufmann, Solicitor

Re:     Beach Creek Marina, Inc. v. City of North Wildwood
        Dockets No. 000229-07, 001843-2007, and 003414-2008
        North Wildwood Marina
        610 New York Avenue
        Block 152, Lot 1
        North Wildwood, New Jersey

Dear Mr. Kaufmann:

According to your request, I have appraised the above captioned property for the purpose of estimating the retrospective market value of the fee simple interest in the real estate. The intended use of the appraisal is to serve as a guide in tax appeal. The client and intended user is the City of North Wildwood, their legal counselor, and no other party without authorization of the appraiser.

The subject consists of a 166-slip marina, two marina buildings, and parking. The site contains 2.9 acres of upland and 0.597 acres of riparian grant area. A 99-year ground lease to the Marina Bay Towers Senior Housing Project encumbers the southwest 1.24 acres of the site. There is a reciprocal right of way easement encumbering 0.7 acres as well as utilities easements.

As a result of my investigation and analysis, I have formed an opinion that, subject to the attached assumptions and limiting conditions, the estimated retrospective market value of the real estate for 2006-2009 tax years is:

FOUR MILLION SIX HUNDRED THOUSAND DOLLARS
($4,600,000)

The attached **self-contained** appraisal report sets forth the pertinent facts about the subject and the procedure, data, and reasoning leading to the conclusions.

Respectfully submitted,

*J. Paul Bainbridge*

J. Paul Bainbridge, MAI, SCGREA
State Certified General Real Estate Appraiser
RG00735

## J. P. BAINBRIDGE & ASSOCIATES, INC.

TABLE OF CONTENTS

PHOTOGRAPHS ................................................................................................................ 1
REGIONAL LOCATION MAP ......................................................................................... 9
LOCATION MAP ............................................................................................................ 11
COMMERCIAL DISTRICT MAP.................................................................................. 12
PROPERTY TAX MAP ................................................................................................... 13
PROPERTY SURVEY ..................................................................................................... 14
REPORT SUMMARY...................................................................................................... 15
CERTIFICATION OF VALUE........................................................................................ 17
ASSUMPTIONS AND LIMITING CONDITIONS ....................................................... 20
TYPE AND DEFINITION OF MARKET VALUE......................................................... 20
CLIENT AND INTENDED USER AND INTENDED USE........................................... 21
SCOPE OF WORK........................................................................................................... 22
PROPERTY RIGHTS APPRAISED ............................................................................... 22
DATE OF VALUE, DATE OF INSPECTION, DATE OF REPORT ........................... 22
IDENTIFICATION OF THE PROPERTY ..................................................................... 22
OWNERSHIP AND HISTORY ....................................................................................... 24
DEEDS OF EASEMENT AND RESTRICTIVE COVENANTS.................................... 25
AREA ANALYSIS............................................................................................................ 34
ZONING ........................................................................................................................... 34
FLOOD ZONE.................................................................................................................. 35
ASSESSMENT AND REAL ESTATE TAXES .............................................................. 36
DESCRIPTION OF LAND .............................................................................................. 37
GROUND LEASE............................................................................................................. 37
RIGHT OF WAY EASEMENT ....................................................................................... 37
ADVERSE PHYSICAL CONDITIONS.......................................................................... 38
DESCRIPTION OF IMPROVEMENTS......................................................................... 40
HIGHEST AND BEST USE ............................................................................................ 43
VALUATION PROCESS................................................................................................. 45
INCOME CAPITALIZATION APPROACH .................................................................. 59
THE SALES COMPARISON APPROACH .................................................................... 75
RECONCILIATION.........................................................................................................

ADDENDA

CONTRACT AND RESOLUTION
SUBJECT PRIOR DEEDS INCLUDING RIPARIAN GRANT
RECIPROCAL RIGHT OF WAY EASEMENT
MAP OF RIGHT OF WAY EASEMENT
RIPARIAN LICENSES AND SURVEY
RESTAURANT LEASE
APPRAISER QUALIFICATIONS

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                              1

PHOTOGRAPHS



View of Docks A and B



View of Docks B and C

Photos taken by Donna Dougherty on February 8, 2009

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    2

<u>PHOTOGRAPHS</u>



**View of Dock D**



**View of Dock E**

**Photos taken by Donna Dougherty on February 8, 2009**

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    3

PHOTOGRAPHS



View of Dock F



View of Dock G

Photos taken by Donna Dougherty on February 8, 2009

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                         4

<u>PHOTOGRAPHS</u>



**View of marina buildings**



**View of marina buildings**

**Photos taken by Donna Dougherty on February 8, 2009**

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    5

<u>PHOTOGRAPHS</u>



**View of marina walkway and building**



**View of marina building**

**Photos taken by Donna Dougherty on February 8, 2009**

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    6

PHOTOGRAPHS



View of marina building



View of marina building

Photos taken by Donna Dougherty on February 8, 2009

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    7

PHOTOGRAPHS



View of boat storage area



View of boat storage area

Photos taken by Donna Dougherty on February 8, 2009

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    8

PHOTOGRAPHS



Street view, Fifth Avenue facing west



Street view, New York Avenue facing south

Photos taken by Donna Dougherty on February 8, 2009

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    9

REGIONAL LOCATION MAP



CAPE MAY COUNTY
NEW JERSEY
Prepared By The Cape May County Planning Board



**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    10

<u>LOCATION MAP</u>



**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                11

COMMERCIAL DISTRICT MAP
*The commercial district is considered the Bayside Business zone highlighted in yellow.*



**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    12

PROPERTY TAX MAP
*Lot 1 is fee title.  Riparian licenses are reflected in Lots 1.01, 1.02, 1.03 & 1.04*



**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    13

PROPERTY SURVEY
*This survey reflects conditions in 1995 prior to the ground lease and development of Marina Bay Towers*





**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    14

<u>REPORT SUMMARY</u>

| | |
|---|---|
| Type of report: | Self-contained appraisal report |
| Purpose: | Estimate retrospective market value |
| Intended use: | Guide in tax appeal |
| Docket No. | 000229-07, 001843-2007, and 003414-2008 |
| Client and Intended user: | City of North Wildwood and their legal counsel |
| Property rights appraised: | Fee simple and riparian leasehold |
| Identification: | North Wildwood Marina<br>610 New York Avenue<br>Block 152, Lot 1<br>North Wildwood, New Jersey 08260 |
| Riparian leasehold: | Block 152, Lots 1.01, 1.02, 1.03, 1.04 |
| Owner: | Beach Creek Marina, Inc. |
| Site: | 2.9 acres upland with 470 LF on New York Avenue 224 LF on 5th Avenue, and 420 LF on 7th Avenue, **plus** .597 acres riparian license area |
| Improvements: | 166 slip marina, two marina buildings, and parking |
| Highest and best use: | Continued use |

Value conclusions (the same for all four tax years):

| | |
|---|---|
| Cost approach: | NA |
| Sales comparison approach: | Inconclusive |
| Income approach: | $4,600,000 |
| Final value estimate: | $4,600,000 |
| Date(s) of value: | October 1, 2005, 2006, 2007 and 2008 |
| Date of inspection: | May 2, 2008 |
| Date of report: | March 12, 2009 |

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    15

CERTIFICATION OF VALUE

I certify that to the best of my knowledge and belief:

> The statements of fact contained in this report are true and correct.

> The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions.

> I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

> I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

> My engagement in this assignment was not contingent upon developing or reporting predetermined results.

> My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value, or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly resulted to the intended use of this appraisal.

> My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

> The use of this appraisal is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

> As of the date of this report, I, J. Paul Bainbridge, MAI, SCGREA, have completed the continuing education program of the Appraisal Institute.

> J. Paul Bainbridge, MAI, State Certified General Real Estate Appraiser, inspected the subject on May 2, 2008.  Donna M. Dougherty, State Certified General Real Estate Appraiser, inspected the subject on May 2, 2008 and provided significant real property appraisal assistance in the preparation of this appraisal.

> This appraisal was not based on a requested minimum valuation, a specified valuation, or the approval of a loan.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    16

As a result of my investigation and analysis, I have formed an opinion that, subject to the attached assumptions and limiting conditions, the estimated retrospective market value of the real estate for 2006-2009 tax years is:

FOUR MILLION SIX HUNDRED THOUSAND DOLLARS
($4,600,000)

Donna M. Dougherty
State Certified General Real Estate Appraiser
RG No. 01886

J. Paul Bainbridge, MAI
State Certified General Real Estate Appraiser
RG No. 00735

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    17

ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal has been made with the following general assumptions:

1. LIMIT OF LIABILITY: Liability of J. Paul Bainbridge, MAI, SCGREA, and sub-contractors and employees are limited to the fee collected for the appraisal. There is no accountability or liability to any third party.

2. COPIES, PUBLICATION, DISTRIBUTION, USE OF APPRAISAL REPORT: Possession of this report or any copy thereof does not carry with it the right of publication, nor may it be used for other than its intended use; the physical report remains the property of the appraiser for the use of the client, the fee being for the analytical services only. The report may not be used for any purpose by any person or corporation other than the client or the party to whom it is addressed or copied without the written consent of J. Paul Bainbridge, MAI, SCGREA, and then only in its entirety.

3. INFORMATION USED: No responsibility is assumed for accuracy of information furnished by or from others, the client, his agent, or public records. We are not liable for such information. The comparable data relied upon in this report has been confirmed with one or more parties familiar with the transaction or from the deed affidavit; all are considered appropriate for inclusion to the best of our factual judgment and knowledge.

4. TESTIMONY, CONSULTATION, COMPLETION OF CONTRACT FOR APPRAISAL SERVICES: The contract or appraisal, consultation or analytical service, is fulfilled and the total fee payable upon completion of the report. The appraiser or those assisting in the preparation of the report will not be asked or required to give testimony in court or hearing because of having made the appraisal, in full or in part, nor engage in post appraisal consultation with client or third parties except under separate and special arrangement and at additional fee.

5. EXHIBITS: The sketches and maps in this report are included to assist the reader in visualizing the property and are not necessarily to scale. Various photos, if any, are included for the same purpose and are not intended to represent the property in other than actual status, as of the date of the photos.

6. LEGAL, ENGINEERING: No responsibility is assumed for the legal description or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

7. PROPERTY TITLE: The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

The legal description is assumed to be correct as used in this report as furnished by the client, his agent, or as derived by the appraiser.

## J. P. BAINBRIDGE & ASSOCIATES, INC.

18

8. HIDDEN COMPONENTS: It is assumed that there are no hidden or unapparent conditions of the property, subsoil or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

The appraiser has inspected as far as possible, by observation, the land and the improvement thereon; however it was not possible to personally observe conditions beneath the soil or hidden structural, or other components, or any mechanical components within the improvements; no representation is made herein as to these matters unless specifically stated and considered in the report; the value estimate considers there being no such conditions that would cause a loss of values unless otherwise stated. The land or the soil of the area being appraised appears firm unless otherwise noted, however subsidence in the area is unknown. The appraiser does not warrant against this condition or occurrence of problems arising from soil or environmental conditions.

9. MECHANICAL: The appraiser does not warrant nor represent that plumbing, air conditioning, electrical, heating, ventilation, insulation, intercom, well and pump systems, and septic systems, if applicable, are in working order. It is assumed that such items are in satisfactory and working condition, unless otherwise indicated. It is the responsibility of the client to ascertain the working condition of such items. If a question arises over any of the mechanical systems mentioned above, a licensed inspector should be employed.

10. LEGALITY OF USE: It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined and considered in the appraisal report; further, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority from any local state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

It is assumed that the utilization of the land and the improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

11. DISTRIBUTION OF VALUES: The distribution of the total valuation in this report between land and improvements applies only under the existing program of utilization. The separate valuations for land and building must not be used in conjunction with any other appraisal and are invalid if so used.

12. MANAGEMENT: Responsible ownership and competent management are assumed.

13. FRESHWATER WETLANDS: No representation is made concerning possible Freshwater Wetlands. If such conditions exist, it could significantly affect value, and in that case, the appraiser reserves the right to revise the appraisal.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    19

14. ENVIRONMENTAL:  No expertise in the area of toxic waste, pollution or contaminants is claimed.  Physical inspection and observation of the subject and surrounding properties has been made and any condition or situation warranting further investigation by the client will be reported.

- the appraiser is not an expert in the field of hazardous materials;

- the appraisal was made for valuation purposes and does not constitute an expert inspection of the property;

- the only way to be certain as to the condition of the property with respect to "environmental hazards" is to have an expert in the field inspect the property;

- the appraisal should not be relied upon as to whether or not environmental hazards actually exist on the property.

15. THE AMERICANS WITH DISABILITIES ACT (ADA), effective January 26, 1992. A specific analysis to determine compliance is not within the scope of this appraisal. Compliance matches each property owner's financial ability with the cost to cure.  As such, the appraisal assumes the subject is in compliance with ADA.

16. ACCEPTANCE OF, AND/OR USE OF THIS APPRAISAL REPORT CONSTITUTES ACCEPTANCE OF THE ABOVE CONDITIONS.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                20

TYPE AND DEFINITION OF MARKET VALUE

The purpose of the appraisal is estimating the retrospective market value of the fee simple interest in the real estate.

Market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

> Buyer and seller are typically motivated;
>
> Both parties are well informed or well advised, and acting in what they consider their own best interests;
>
> A reasonable time is allowed for exposure in the open market;
>
> Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
>
> The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

CLIENT AND INTENDED USER AND INTENDED USE

The client and intended user is the City of North Wildwood and their legal counsel, and representatives, and no other party without the authorization of the appraiser.

The intended use of the appraisal is to serve as a guide in tax appeal.

---

[1] The Office of the Controller of Currency under 12 CFR, Part 34, Subpart C-Appraisals 34.42 Definitions [g]

J. P. BAINBRIDGE & ASSOCIATES, INC.                              21

## SCOPE OF WORK

William Kaufmann, Esquire requested a proposal for a self-contained appraisal report of the subject property on behalf of the City of North Wildwood for tax appeal purposes. The appraisal was authorized by City Council under Resolution 44-08 dated March 17, 2008, a copy of which is in the addenda. A professional services contract was executed and is also copied in the addenda.

### Scope of work

The scope of the appraisal provides an outline of the appraisal process for the client, as follows:

1. Identify the appraisal problem: Identification of the property, type of value, and property rights appraised. The market value is estimated for the 2006 through 2008 tax years, relative to a pending tax appeal. Fee simple value is estimated.

2. Inspection of the property: A personal inspection of the property was conducted on May 2, 2008 by J. Paul Bainbridge, MAI, SCGREA and Donna M. Dougherty, SCGREA.

3. Research, analysis and reporting: Collection, verification and communication of all relevant facts related to the subject property, including but not limited to zoning, utilities, land areas, restrictions, demographic, economic and environmental factors, easements and other pertinent factors which are considered germane to the assignment.

4. Consideration of the highest and best use of the subject and other factors affecting value.

5. Consideration of the recognized and accepted approaches to value and other analytical techniques, and the explanation and application of those which are considered to be the most appropriate to utilize in estimating value as well as providing the rationale for not utilizing those considered the least appropriate.

6. Verification of the comparable data with one or more of the parties who have knowledge of the transactions including but not limited to buyers, sellers, brokers and lawyers of record, lenders, appraisers and government transfer and property records.

7. Conclusion: Reconciliation of the value estimates resulting from the utilization of the various approaches into a final value conclusion

8. Reporting options: In accordance with the Uniform Standard of Professional Appraisal Practice, appraisal report options are classified as "self-contained", "summary" and "restricted". The essential difference among the three options is

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    22

in the level of detail in the explanation throughout the report. This is a self-contained report.

PROPERTY RIGHTS APPRAISED

This appraisal is made with the understanding that the present ownership of the subject property includes all of the rights that may be lawfully owned and is, therefore, titled in "fee simple" and appraised accordingly.

DATE OF VALUE, DATE OF INSPECTION, DATE OF REPORT

Dates of value:                    October 1, 2005, 2006, 2007 and 2008

Date of inspection:                May 2, 2008

Date of report:                    March 12, 2009

IDENTIFICATION OF THE PROPERTY

Property address:                  610 New York Avenue
                                   North Wildwood, New Jersey 08260

Tax map identification:            Block 152, Lot 1

Riparian license areas are depicted on the tax map as Block 152, Lots 1.01, 1.02, 1.03, and 1.04.

OWNERSHIP AND HISTORY

Title is in the name of:

                       Beach Creek Marina, Inc.
                       11-43 W. Raymond Plaza Suite 920
                       Newark, New Jersey 07102

The subject property was acquired in four transactions between 1987 and 1988, reflecting a total of $1,875,000 in deed consideration. The deeds are copied in the addenda and summarized as follows. The designated lot numbers reflect the old tax map (pre-2003).

Block 152, Lot 1 on the current tax map

Block 152, Lots 401, 403, 405, 407, and 409 transferred on October 28, 1988 from Scott P. Barnes, Laurel P. Barnes, and Barnes Enterprises, LP for $275,000, as recorded in Deed Book 1837, Page 278 at the Cape May County records room.

## J. P. BAINBRIDGE & ASSOCIATES, INC.                                           23

Block 152, Lots 400, 402, 404, and 418 transferred on June 2, 1987 from Philomena DiMauro for $100,000.

Block 152, Lots 406, 408, 410 – 415, inclusive, and 417, and Block 153, Lots 400 to 413 transferred from the DiMauro Family Partnership for $750,000. A portion of these lands are covered by a riparian license copied in the addenda, indicating annual rent of $4,665.

Block 152, Lot 1.02 on the current tax map (riparian grant)

The Riparian Grant is the area of Lot 1.02 that was deeded from the State of New Jersey on May 22, 1973 to Joseph V. DiMauro, a Roman Catholic priest. Father DiMauro deeded the same to Beach Creek Marina, Inc. for $750,000 on June 2, 1987. A copy of the deed is in the addenda.

Block 152, Lot 1.01, 1.03 and 1.04 on the current tax map (riparian lease)

A revocable riparian license that describes Lots 1.01, 1.03 and 1.04 is copied in the addenda. It provides for annual rent of $6,480 and 111 slips.

Ground lease extracted

On August 15, 1996 Beach Creek Marina, Inc. leased for a term of 99 years the southern 1.24-acre portion of the site to St. Anne's Urban Renewal, LP. The lease is recorded in Deed Book 2831, Page 246 at the Cape May County records room.

The lessee assigned the lease to Marina Bay Towers Urban Renewal, LP. A seven-story low-and-moderate-income senior citizen housing project was developed over the ground lease area. The building contains 142 one-bedroom units plus a superintendent's unit, and first floor commercial space, constructed over parking.

The construction debt was restructured and the ground lease was re-assigned to Marina Bay Towers Urban Renewal II, LP.

The ground lease was again assigned by the lessee to the Marina Bay Towers Condominium Association, LP on October 5, 1999, as recorded in Deed Book 2831, Page 373 at the Cape May County records room.

A Master Deed was filed in Deed Book 2831, Page 299 at the Cape May County records room, creating the Marina Bay Towers Condominium.

The ground lease calls for a base rent indexed to personal income growth and is discussed further in the valuation. The actual ground lease is described within easement documents in the addenda, but the document and its two amendments were excluded from the report due the excessive volume and are maintained in the appraisal file memoranda.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                        24

Deeds of easement and restrictive covenants

A Deed of Easement and Restrictive Covenant dated December 20, 2002 to run with the land was granted by Beach Creek Marina, Inc. and Marina Bay Towers Urban Renewal, LP f/k/a St. Anne's Urban Renewal, LP to the New Jersey Housing and Mortgage Finance Agency. It restricts occupancy of the residential condominium building to income eligible occupants for a 30-year period. The Deed of Easement is recorded in Deed Book 2997, Page 331 at the Cape May County records room.

Although this does not impact the use of the subject marina, it does impact the ground lease and the use of that land.

A Deed of Easement and Restrictive Covenant dated November 27, 2006 to run with the land was granted by Marina Bay Towers Urban Renewal, LP and Marina Bay Towers Urban Renewal, II, LP to the Housing Affordability Services, Division of Housing, New Jersey Department of Community Affairs. It serves to satisfy the requirements of the Fair Housing Act and designates the condominium as low and moderate income housing for a period of thirty years, commencing on January 1, 2002. The Deed is recorded in Deed Book 3264, Page 224 at the Cape May County records room.

A reciprocal right-of-way easement between Beach Creek Marina, Inc. and Marina Bay Towers Urban Renewal, L.P., dated October 5, 1999, provides that designated areas remain open as pedestrian walkways and for vehicular ingress and egress. The total area impacted is .82 acres. A copy of the easement and an exhibit are in the addenda and depict the designated walkways.

The aforementioned reciprocal right of way easement contains metes and bounds descriptions of the entire marina site including riparian grant and lease areas. It also includes a metes and bounds description of the ground lease area and the permanent reciprocal right of way. This is followed by a survey of the encumbered areas.

Typical utility easements also encumber the subject property and are maintained in the file memoranda.

J. P. BAINBRIDGE & ASSOCIATES, INC.                                                25

AREA ANALYSIS

New Jersey

*Geographic location*

New Jersey lies in the "northeast corridor" of the United States, which includes the major cities of Boston, New York, Newark, Philadelphia, Baltimore and Washington, D.C. It is bordered by New York and the Hudson River on the north, the Delaware River and Pennsylvania on the west, and the Delaware Bay and Atlantic Ocean on the south and east coast.

There are 21 counties making up five regions described as northern, northwestern, central, coastal and southern. It is one of the most densely populated states in the union with 65% of the population living in the northern, northwestern and central regions closest to New York City.

The northwestern and northern regions are mountainous and the central, coastal and southern sections are mostly coastal plain.

*Population*

The US Census Bureau estimates New Jersey's 2006 population to be 8,724,560, reflecting a 3.7 percent increase over 2000. The coastal region comprised of Atlantic, Cape May, Monmouth and Ocean Counties accounts for 18 percent of the state population, up from 16.5 percent in 1990. Cape May County accounts for only 1.1 percent of the state population.

*Employment trends*

New Jersey's five largest industries based on employment[2] are:

        1.  Services
        2.  Retail trade
        3.  Manufacturing
        4.  Government & education
        5.  Wholesale trade

Retail trade, services and government industries dominate the coastal region, which has a tourist-based economy that peaks in the summer months.

*Government*

New Jersey State government is comprised of an executive branch (Governor), assembly and senate, much like the federal government. The counties are governed by a "Board of

---

[2] New Jersey Department of Labor

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    26

Chosen Freeholders" or elected commissioners who manage county property such as roads, bridges, social services, etc. "Freeholder" is a name carried down through the years, which described one who owns real estate free and clear. Years ago, one could not hold office unless one was a freeholder. Each municipality has a town council or committee form of government and a mayor either appointed or elected.

*Traffic and road amenities*

The New Jersey Turnpike (Interstate 95) connects the New York area with Philadelphia and Wilmington, Delaware. The Garden State Parkway runs along the coast from the north border to the southern tip of New Jersey (Cape May County). State Highway 9 is a commercial highway that runs parallel to the Garden State Parkway.

Passenger bus and train service is well established in the north with many lines connecting the northern suburbs with New York City. Mass transportation in the southern and coastal region is adequate for the needs of the population.

Cape May County

Cape May County, the southernmost county in the state of New Jersey, is a peninsula bounded on the east by the Atlantic Ocean and on the west by the Delaware Bay. Atlantic and Cumberland counties are on the north.

The area covers 454 square miles with a usable land surface of only 263 square miles, the balance being flood plains and marsh.

Large areas of undeveloped land, a state forest, two wildlife management areas and a much lower population density characterize the western section of the county.

It is about 75 to 80 miles southeast of Philadelphia, 130 to 140 miles south of the New York metropolitan area and 20-25 miles south of Atlantic City.

Cape May County resources are reflected in the tourist economy. Highly regarded beaches, bays, inlets and protected open space are within a day's drive of New York City, Boston, Newark, Philadelphia, Pittsburgh, Baltimore and Washington, D.C., and are Cape May County's natural assets.

The transportation network is centered on the Garden State Parkway, State Highways 9 and 47, and County Roads 619 and 621 (Ocean Drive) which all lie in a north-south direction. The Cape May-Lewes Ferry provides passenger and vehicular transportation across the Delaware Bay. There is a small public airport in Lower Township and several small airfields scattered throughout the county.

New Jersey Route 55 and Alternate Route 347 were completed in 1990 and provide a more direct roadway to the Philadelphia Metropolitan area. The net effect was to re-direct traffic from old, single lane Route 47 to Route 55, a multi-lane freeway. The new

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                     27

route, combined with a 1997 increase in the speed limit from 55 to 65 MPH, reduces the Philadelphia commute by fifteen to twenty minutes when compared with the Atlantic City Expressway-Garden State Parkway circuit.

Commerce is centered on seasonal vacation and tourism activity, which occurs mostly in the barrier island vacation communities. This sustains secondary industries such as retail, service, construction, commercial fishing, government and professional.

The tourist economy consists of small to mid-size businesses, contractors and the government. Businesses and business activity are concentrated on the barrier islands. Next to tourism, county and local governments account for a third of all employment.

Significant employers are:

> Cape Regional Medical Center in Cape May Court House
> Woodbine Developmental Center in Woodbine
> Superfresh and Acme supermarkets throughout the county
> WaWa Convenience Stores throughout the county
> Cold Spring Fish and Supply Company, Lower Township
> Delaware River Bay Authority, Lower Township
> US Post Office, throughout the county
> Shop Rite Supermarket, Rio Grande

The burgeoning Atlantic City Casino industry, which is at most forty minutes from Cape May County residents, is also a significant employment center.

Agriculture consists of small farms, typically with less than 100 acres. Fresh produce is harvested for local consumption. Most farms concentrate in sod and salt marsh hay.

*Population[3]*

The county permanent population data is listed below:

| Year | Population | Increase |
|------|-----------|----------|
| 1970 | 59,613 | - |
| 1980 | 82,266 | 38% |
| 1990 | 95,089 | 15.6% |
| 2000 | 102,326 | 7.6% |
| 2007 | 96,422 | -5.8% |

The rate of growth in population slowed considerably in the 1990's. Demographic trends, retrenchment in the real estate market in the early 1990's, and the impact of land preservation programs of the Federal, State and County governments limited new construction.

---

[3] US Census Bureau

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                          28

The population decline from 2000-2007 is attributed to an increase in the number of second homeowners, particularly on the barrier islands.

Much of the County's growth has been concentrated on the mainland and attributed to an immigration of retirees from metropolitan Philadelphia and northern New Jersey. Lower land values and quality of life factors have attracted many families to Upper, Middle and Lower Townships. The expansion of the Atlantic City metro area work force has also contributed to growth, particularly in Upper Township.

The summer population[4] expands dramatically with the influx of vacationers and tourists. According to the Cape May County Planning Board, the 2005 summer population was estimated to be 634,532.

Population growth trends are expected to continue to reflect a steady migration of retirees from the Greater Philadelphia and Northern New Jersey areas over the next decade.

*Government*

The Board of Chosen Freeholders, previously discussed, governs the county. The county government complex is centrally located off mile marker 11 on the Garden State Parkway in Cape May Court House.

The Cape May County Department of Tourism monitors and promotes the tourist industry.

The Cape May County Municipal Utilities Authority is an independent agency created to oversee the water and sewerage management for the county.

The County Parks Department oversees County parks and recreation facilities, featuring the Cape May County Zoo, which is popular with the tourists, particularly on rainy days.

The Cape May County Bridge Commission oversees a series of bridges that connect the barrier islands and Ocean Drive in a north-south direction.

The county provides many programs operated in conjunction with federal and state mandates and funding, i.e. meals on wheels, fare free transportation, open space and farmland preservation, etc. Open Space and Farmland Preservation has worked along with state and federal funded preservation programs to acquire environmentally sensitive land and development rights from farms for preservation.

The County Court House is located on Main Street in Cape May Court House, NJ, which is the County seat. The Board of Taxation, Elections and the County Clerk operate adjacent to the courthouse.

*Income, employment, and wages*

---

[4] CMC Planning Board

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    29

Labor market reviews are periodically published by the New Jersey Department of Labor and are available on the NJDOL website at:

www.wnjpin.state.nj.us/OneStopCareerCenter/LaborMarketInformation/lmi12/index.html

The most recent report is October 2006 and describes income and employment trends from 2000 to 2005. Based on this report, the following conclusions are summarized.

The county's dependence on tourism and its large elderly population living off of investment income, social security, unemployment and welfare tends to skew personal income or wage data. However, personal income growth in Cape May County from 1999-2004 was almost a third greater than percentage growth in State personal income data. This reverses past trends, wherein growth in personal income in Cape May County was slightly less than that of the State or nation from 1990-2000. Similarly, average annual wage data has increased at a greater rate than the State, reflecting $27,236 per capita.

Labor market conditions vary greatly from summer to winter. Unemployment rates soar in the winter (off-season), pushing the average annual unemployment rate up to 11 to 13 percent. Near full employment exists from May to September. The annual unemployment rate continued to decline from 1995 to 2005, narrowing the gap between the State and the County. The 2005 County unemployment rate was about 6.5 percent, whereas the State's was about 4.5 percent.

Income and employment characteristics are not expected to change. However, the data is expected to show continued growth, parallel to that of the state and nation.

The wealth that drives the tourist economy originates from outside of the county and does not impact the income data for Cape May County. The wealth that is generated by tourist business owners is not measured by these statistics. This is the nature of a tourist destination such as Cape May County

*Real estate trends*

Real estate trends throughout the County mirror regional and national trends, wherein a surge in new construction and sales volume in general was observed, along with a rise in demolitions and significant appreciation. The market peaked in 2005 and leveled in 2006. Certain locations considered overbuilt with condominiums were experiencing value declines in 2007, particularly the residential condominium market. Commercial real estate values stabilized in 2007 following a period of moderate growth and sales activity.

J. P. BAINBRIDGE & ASSOCIATES, INC. 30

*County summary*

Cape May County is likely to remain a tourist destination for the long term due to its geographic characteristics and regional resources. Population, economic, income, and employment data reflect the seasonal nature of the tourist destination. Governmental services are efficiently adapted to meet the summer tourist population that is over six times the permanent population.

Real estate values reflect the premium placed on the county's resources, i.e. the beaches, bays, inlets and protected open space. The greatest wealth is concentrated in the barrier islands where these resources are concentrated, which creates a favorable environment for tourist-oriented businesses, i.e. gift shops, restaurants, etc.

Employment reflects the permanent population's dependence on government, schools, the hospital and a few large employers for steady employment. The county lacks a significant industrial base. Small businesses represent a large share of the working population.

The credit crisis and stock market crash of 2008 does not directly impact the subject property value. Based on experience, economic recession can boost the domestic resort economy as people forego more expensive travel plans. Short-term expectations are for a stable tourist economy.

North Wildwood

North Wildwood is one of a group of communities known as the Wildwoods located on a barrier island called Five Mile Beach. The Wildwoods include North Wildwood, West Wildwood, Wildwood City, Wildwood Crest, and Lower Township's unincorporated section called Diamond Beach.

North Wildwood is almost surrounded by water. Hereford Inlet is on the north, Beach Creek, Grassy Sound, and the Intercoastal Waterway are on the west, and the Atlantic Ocean is on the east.

The topography is level and the municipality is fully (95 percent) developed.

Population trends illustrate a slow migration of the permanent population to the developing offshore communities. U.S. Census population trends are summarized as follows.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                     31

*Permanent population*

| Municipality | 1980 | 1990 | 2000 | 2007 | 2000-2007 % Change |
|--------------|------|------|------|------|--------------------|
| North Wildwood | 4,714 | 5,017 | 4,988 | 4,849 | -2.8% |
| West Wildwood | 360 | 453 | 448 | 403 | -10.0% |
| Wildwood | 4,913 | 4,484 | 5,436 | 5,291 | -2.7% |
| Wildwood Crest | 4,149 | 3,631 | 3,980 | 4,053 | 1.8% |
| Total | 14,136 | 13,585 | 14,852 | 14,354 | -3.4% |

The permanent population decline reflects the increase in second homeowners that corresponds with the recent real estate redevelopment cycle. The summer population is stable.

The motel district is broadly defined as the development along the North Wildwood beachfront. It stretches from Second Avenue to 26th Avenue and from the beach westward two blocks. The westerly boundary steps from Surf Avenue to Atlantic Avenue as the coastline tapers westward.

The tourism and rental season begins in May around Memorial Day weekend and ends in October. Peak activity occurs during the last two weeks of July and the first two weeks of August.

The Wildwood boardwalk runs along the beach with stores facing eastwardly and amusement piers extending toward the ocean. It a major attraction in the area and benefits most other businesses and motels. It stretches from the border of Wildwood and Wildwood Crest to 16th Avenue in North Wildwood and draws tens of thousands on any given night during the vacation season. It is almost two miles long, situated on the beach and constructed with wood planks on pilings. Piers lay perpendicular to the boardwalk and hold major amusement rides, such as water slides, roller coasters and Ferris wheels. The boardwalk is lined with retail stores, game rooms, arcades, small restaurants and gift shops all facing the ocean.

North Wildwood, like the balance of the island, experienced significant redevelopment over the past seven years favoring residential condominiums. Value appreciated significantly from 2000-2005, before stabilizing in 2006 and actually declining in 2007.

Bay commercial areas are developed with marinas, waterfront restaurants, marine-related activities, and waterfront condominiums. They are major attractions for boating, fishing and entertainment enthusiasts.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    32

The beaches are known for their above average size and do not suffer from erosion. Distance from the beach and boardwalk generally affects value.

*Real estate trends*

The strong national and regional economy pushed real estate values up in Cape May County's other resorts to unexpected levels. However, Wildwood's real estate values were at a historical low until 1998 and as such, caught the attention of investors, speculators and developers. From 2000 until 2005, there was a significant increase in values and redevelopment activity; however this growth has resulted in a current oversupply of properties for sale. This, combined with similar national and regional real estate trends, has resulted in market stabilization in the form of longer marketing times, reduced asking prices, depreciation for residential condominium values, and sales concessions.

Commercial sales activity and values moved upward at a moderate pace from 2000 to 2005 and reflect stability from 2006 to the present

The following table summarizes relevant residential building permit activity[5]:

Building Permit Data

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| **Wildwood City** | | | | | | | | | |
| Single Family | 0 | 1 | 5 | 2 | 48 | 46 | 61 | 25 | 3 |
| Multi Family | 13 | 42 | 94 | 87 | 301 | 250 | 114 | 72 | 16 |
| Total | 13 | 43 | 99 | 89 | 349 | 296 | 175 | 97 | 19 |
| | | | | | | | | | |
| **North Wildwood** | | | | | | | | | |
| Single Family | 44 | 53 | 17 | 29 | 65 | 33 | 55 | 10 | 5 |
| Multi Family | 26 | 75 | 47 | 77 | 170 | 283 | 253 | 60 | 0 |
| Total | 70 | 128 | 64 | 106 | 235 | 316 | 308 | 70 | 5 |
| | | | | | | | | | |
| **Wildwood Crest** | | | | | | | | | |
| Single Family | 11 | 6 | 25 | 49 | 96 | 88 | 53 | 9 | 10 |
| Multi Family | 24 | 27 | 30 | 60 | 98 | 261 | 207 | 0 | 6 |
| Total | 35 | 33 | 55 | 109 | 194 | 349 | 260 | 9 | 16 |

The preceding data illustrates the surge in building activity from 2000 to 2008. Activity abruptly dropped off in 2007 to pre-2003 levels. An oversupply of new-construction condominiums has resulted in bank liquidations and lower values.

Commercial District (see map on page eleven)

The subject is situated in the Bayside Business district, bordering Beach Creek on the intercoastal waterway due west of North Wildwood. The district is delineated as those

---

[5] NJ Department of Labor

J. P. BAINBRIDGE & ASSOCIATES, INC.                                    33

similarly zoned properties bordering the waterfront from Ash Avenue southeast to Seventh Avenue. The subject is at the southern end of the commercial district.

The district is developed with commercial and residential waterfront uses, including marinas, restaurant, condominiums, and single and multi-family dwellings.

A public parking lot and boat ramp occupy the block across the street between Third and Fourth Avenues.

Marinas are specialized properties that are not affected by broad market trends. Values are generally stable, despite the residential market. Local marinas within a three mile radius include:

| | |
|---|---|
| Hereford Marina | Grassy Sound Marina |
| Dad's Place Marina | South Dock Marina |
| Bridgeport Marina | Sterling Harbor |
| West Bay Marina | Spray Dock |
| Gallo's Marina | B & E Marina |
| Schooner Island Marina | Pier 47 Marina |

Most marinas in Cape May County are along the intercoastal waterway. They have been prime targets for redevelopment for twenty years. However, zoning and State regulations have been changed to protect existing marinas and discourage new marine development. As such, supply is limited.

Historically, many marine redevelopment projects included replacing marina service facilities with residential condominiums, increasing demand for existing marina properties.

The Income Capitalization Approach contains a marina survey including rates and occupancy for competing marinas.

Overall market area conclusions

In summary, the subject commercial district is in an established resort area characterized by a wide variety of transient housing and commercial uses designed to profit on the surge of tourists and vacationers visiting between May and October.

The real estate cycle peaked in 2005 consistent with regional and national trends. Retrenchment in the residential market from 2006 through 2007 has lead to reduced prices in 2007-2008. Local commercial real estate values have been stable and sales activity is below average.

Generally, the subject greater market area has not experienced as great a decline relative to real estate as markets to the north and west with a few exceptions. Short-term

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    34

expectations are for continued retrenchment in the residential market and stability in the commercial market.

The current credit crisis impacting national and global financial markets has not had a measurable impact on the Cape May County market area. The related sub-prime lending housing crisis has had modest impact on the local market and foreclosure activity is relatively low compared with other regions of the State, although it has increased in the last year. Real estate sales and development activity is at a historical low, which has adversely impacted real estate related professions, builders, the trades, and suppliers. However, in recent history, such as the S & L Bailout of the early 1990s, the County tourism economy benefited as vacationers opted to stay local, as opposed to traveling abroad.

ZONING

The subject is in the BB, Bayside Business zoning district.

Permitted uses include:

      1.      Water dependent uses
      2.      Water oriented uses as conditional uses
      3.      Public utilities as conditional uses
      4.      Apartments/townhouses as conditional uses

Status

The subject represents a legal, non-conforming use. Zoning variances were obtained permitting the construction of the seven-story condominium project constructed on the southern portion of the site. (City of North Wildwood Zoning Board of Adjustment Resolution No. 95-11-1)

Other Land Use Regulations

CAFRA Regulations and Policies:

In addition to municipal zoning, North Wildwood City is under the jurisdiction of the New Jersey Coastal Area Facility Review Act (CAFRA). This act is administered by the Division of Coastal Resources of the New Jersey Department of Environmental Protection. A CAFRA permit is required for development.

FLOOD ZONE

The subject is located in zone AE, Base flood elevation ten feet, as designated on the flood insurance rate map for North Wildwood, community panel no. 345308 0001 E, published by the Federal Emergency Management Agency, dated January 6, 1998.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                      35

ASSESSMENT AND REAL ESTATE TAXES

The subject is assessed and taxed as follows:

| Tax year | 2006 | 2007 | 2008 |
|---|---|---|---|
| Land | $13,681,300 | $13,681,300 | $13,681,300 |
| Improvements | 607,600 | 607,600 | 607,600 |
| Total | $14,288,900 | $14,288,900 | $14,288,900 |
| Taxes | $100,022 | $104,309 | $112,168 |
| Tax rate | 0.70 | 0.73 | 0.785 |
| Mills | 0.007 | 0.0073 | 0.00785 |

The 2006 taxes were $100,022, based on the tax rate of 70 cents per $100 of assessed value. The 2006 County equalization ratio for North Wildwood is 162.08 percent.

The 2007 taxes were $104,309, based on the tax rate of 73 cents per $100 of assessed value. The 2007 County equalization ratio for North Wildwood is 122.73 percent.

The 2008 taxes were $112,168, based on the tax rate of 78.5 cents per $100 of assessed value. The 2008 County equalization ratio for North Wildwood is 112.45 percent.

The 2009 taxes are currently billed at the 2008 tax rate until the new rate is set later in the year.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                              36

DESCRIPTION OF LAND

The subject site consists of two city blocks bordering Beach Creek, plus riparian lease areas.

The upland portion of the site, Block 152, Lot 1, contains approximately 470 feet of frontage on New York Avenue, 224 feet on Fifth Avenue, 420 feet on Seventh Avenue, and 2.9 acres of land area.

The riparian lease area, Block 152, Lots 1.01, 1.02, 1.03, 1.04, measures approximately 235 feet along the bulkhead line, and 0.597 acres of riparian area.

There are two revocable license/lease agreements with the State of New Jersey. Copies of the riparian leases are in the addenda.

A copy of the property tax map is on page twelve and property survey is on page thirteen.

Topography

The upland portion of the site is level and on grade with surrounding streets. The northwestern corner of the site slopes and drains toward the bay.

Site improvements and utilities

The marina portion of site is improved with approximately 590 lineal feet of bulkhead, seven fixed and floating piers with ramps, and 166 boat slips.

There are concrete, brick, and wooden walkways along the bay and surrounding the buildings.

There are asphalt paved driveways and parking areas surrounded by concrete curbing around the condominium building.

The northern portion of the site is covered with crushed clamshells and gravel and utilized for boat storage in the winter and parking in the summer. There are some concrete curbs.

There is a concrete driveway at the northwestern corner near the marina building.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    37

Available utilities include:

| | |
|---|---|
| Public water | Wildwood MUA |
| Sewer | Cape May County MUA |
| Electric | Atlantic City Electric Company |
| Telephone | Verizon |
| Gas | South Jersey Gas Company |
| Cable TV | AT & T Cable Company |

Municipal services include police protection through a paid police department and fire protection through a paid fire department.

<u>Streets, curbs, sidewalks and off site improvements</u>

The site is improved with approximately 1,114 lineal feet concrete curbs or aprons along the abutting streets. There are concrete and brick sidewalks, and concrete driveway aprons along New York and Seventh Avenues.

The streets are paved with asphalt. New York Avenue has a 70-foot right of way. Fifth Avenue and Seventh Avenue each have a 70-foot right of way.

The southeastern 1.24-acre corner of the site is leased and developed with a seven-story condominium building.

<u>Ground lease</u>

A 99-year ground lease encumbers 1.24 acres of the subject site. It is dated August 15, 1996 and a seven story senior housing complex was later developed within the lease area. See the Ownership and History section for more details. A copy of the lease is in the addenda.

<u>Right of way easement</u>

A right of way was established to facilitate pedestrian and vehicular access and circulation to and about the residential condominium building and remainder of Beach Creek Marina. See the Ownership and History section for more details. A copy of the lease is in the addenda.

Beach Creek Marina, Inc. reserved the right to restrict use of the northwestern portion of the site (including the right of way area) for the storage of boats, trailers, or other marina equipment from October 1 to May 15.

<u>Adverse physical conditions</u>

There are <u>no</u> adverse physical conditions impacting the site.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    38

DESCRIPTION OF IMPROVEMENTS

The subject improvements are summarized:

- 166 boat slips, seven piers, bulkhead, 133 pilings
- 1,920 square feet ships store and small restaurant
- 4,760 square feet marina building with store, garage, offices, guest bathrooms and an apartment
- 120 square feet shed

The marina contains 166 total boat slips, including 51 slips for jet skis. There are seven fixed and floating docks, approximately 590 linear feet of bulkhead, and 133 pilings.

Ships store and restaurant

The ships store and small restaurant building is located on the north side of the site near the docks.

The ships store is to the street side and contains approximately 1,120 square feet (28 x 40 = 1,120 square feet). Interior finish consists of an exposed concrete floor, wood paneled walls, and drop ceilings with fluorescent lighting. There are two rear offices and one powder room.

The restaurant faces the bay and contains approximately 800 square feet (20 x 40 = 800 square feet). There is a counter with an open cooking area and a small eating area. There is a covered porch that wraps the southwest corner of the building and is used as an outdoor dining area with an open grill and brick oven. It is 14 feet wide and 50 linear feet with a gross area of 700 square feet.

Marina building

The marina building is unfinished. It contains approximately 1,720 square feet on the first level including retail, office, garage, and restrooms.

The second floor contains 1,720 square feet including a large open room with some cabinets, a rear room with wood paneling and recessed lights, and one powder room.

The third floor contains 1,320 square feet designed as a small apartment with a living room, kitchen, two bedrooms, and 1.5 bathrooms. There are two fireplaces, a whirlpool tub, wood paneling, recessed lights, and some built-in shelving.

The garage has approximately 20 feet of clearance with a 16' X 18' overhead door with automatic opener. There is a suspended heater, concrete floor and unfinished masonry walls.

There are two guest bathrooms with showers with exterior access.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                      39

The detached shed is masonry and fashioned into a small lighthouse.  It contains approximately 120 square feet.

Condition and depreciation

The ships store and restaurant are in average condition.  At the time of inspection, they were winterized and not operational.

The marina building was not in use at the time of inspection as the interior finish and decking was incomplete.  There was some evidence of vandalism with broken glass sliders on the second floor.  The docks and slips were operational and reflect average maintenance.

Depreciation is not estimated because the subject is not valued using the cost approach.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    40

HIGHEST AND BEST USE

Highest and best use is defined as that use from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in the highest value.

Highest and Best Use is typically considered under two scenarios; Once, assuming the site is vacant and ready for development to its highest and best use, and a second time, recognizing the site as improved.

Based on the definition cited above, four criteria are considered:

> *Legally permissible     Physically possible*
> *Financially feasible    Maximally productive*

Highest and best use as vacant

The subject is in the BB, Bayside Business zoning district, detailed on page 32. Permitted uses include water dependent uses. Water oriented uses, public utilities, and apartments/townhouses are permitted as conditional uses.

The site conforms to area and bulk requirements for development.

In addition to municipal zoning, North Wildwood City is under the jurisdiction of the New Jersey Coastal Area Facility Review Act (CAFRA). This act is administered by the Division of Coastal Resources of the New Jersey Department of Environmental Protection. A CAFRA permit is required for development.

The site contains approximately 2.9 acres of upland area. The southwestern 1.24 acres is encumbered by a 99-year ground lease and that land is restricted to low and moderate income housing development per separate easement.

A reciprocal right of way easement was established to facilitate pedestrian and vehicular access and circulation to and about the condominium improvements and marina. The right of way contains 35,772 square feet (0.82 acres) of total site area.

After considering the ground lease and right of way easement, the remainder of the site available for development is approximately 0.84 acre.

Riparian lease areas that facilitate the boat slips and water access contain 0.597 acres.

There are no physical impediments to development.

J. P. BAINBRIDGE & ASSOCIATES, INC.                                                41

*Economically Feasible*

Due to the regulatory climate of waterfront properties, there has been minimal new development or expansion of existing marina property. Many marine properties have been redeveloped with waterfront residential condominiums since the 1980s.

Water dependent uses, including marinas, in the area have experienced stable rates and full occupancy over the past ten years.

*Maximally productive*

The maximally productive use of the site is development with a water dependent use on the remaining usable site, utilizing the riparian areas established by lease with the State.

Highest and Best Use As Vacant Conclusion

As vacant and unencumbered by leases and easements, local and State land use regulations set forth restrictions that would encourage a water dependent use of the land, perhaps with a low-density apartment to the land side of the site.

The 99 year ground lease is analogous to fee title as it grants the rights of use and occupancy for a "lifetime" to the lessee. Access easements and other use restrictions that encumber property rights narrow the development options for the remaining undeveloped portion of the land, being .84 acres of upland accompanied by riparian leases. As such, the highest and best use as vacant is the development of the site with a water dependent use.

Highest and best use as improved

*Legally Permissible and Physically Possible*

The subject consists of 2.9 acres of which 43 percent is encumbered by a 99 year ground lease. The balance is used as a marina with another 28 percent encumbered by a reciprocal access easement. All of the subject land is bound by a 1995 site plan approved by North Wildwood Planning Board and the State that recognizes these encumbrances and effectively relegates the use of the land to the current situation.

The existing marina is a legal use and it is physically possible to continue the use.

Any alterations or expansions or alternative uses would require local and state approval.

*Economically Feasible*

Water dependent uses, including marinas, in the area have experienced stable rates and full occupancy over the past ten years. It is economically feasible to continue the present use. This includes the completion of the marina building.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    42

*Maximally productive*

The current use represents the most productive use of the site. Any alterations or expansions would require local and state approval. However, maximally productive use includes the full operation of boat storage during the winter.

Highest and Best Use As Improved Conclusion

The highest and best use as improved is the continued utilization of the existing improvements, assuming continued normal repairs and maintenance, and competent management.

Highest and best use conclusion

The highest and best use is the continued use. This assumes normal repairs and maintenance, and competent management.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                            43

VALUATION PROCESS

The appraisal problem is ordinarily solved through the use of three generally accepted valuation techniques. These methods address the basic value concepts of cost, substitution and income, each providing a value indication. These separate estimates set a range of value and through correlation provide the basis for a final value estimate.

1. The cost approach involves estimating the fair market value of the land independently of the improvements as though vacant and available for its most probable and profitable use. This involves utilization of the same process used in the sales comparison approach for land valuation. Next, the replacement cost is estimated as though the improvements were new on the effective date of the appraisal from which accrued depreciation from physical, functional and economic sources is deducted indicating a depreciated improvement value. This is added to the estimated land value for a total value estimate.

2. The sales comparison approach utilizes a process of comparing the most recent sales of similar properties with the subject. Such factors as location, construction, age and condition, utility, equipment, layout, and marketability are considered. Adjustments to the sales for differences indicate a range of value for the subject. This approach is the most reliable because it represents value based on the typical buyer's best substitute choice.

3. The income capitalization approach is concerned with the future benefits of ownership. Economic income, expenses, replacement reserves, management and the capitalization rate for processing income are estimated. First, gross annual income that the property should produce under normal circumstances to attract investors is estimated. Second, expenses are deducted to obtain an estimate of net income. Expenses consist of taxes, insurance, operating and maintenance costs and management. In some cases, there is a separate deduction for replacement of furniture, fixtures, and equipment. The final step is rate selection, which requires market scrutiny for a capitalization rate reflective of current conditions. An applicable capitalization technique is then asserted, and the net income estimate is processed by the proper rate for a value estimate of the property.

The discounted cash flow analysis (DCF) is an alternative valuation method that, like capitalization, converts income to value.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    44

Valuation Rationale

The income approach is the primary method of valuation because it reflects the nuances of the subject's income producing capability and expenses, and converts it to value. It is the best measure of value and is sensitive to the various components of value.

The sales approach is unlikely to produce comparable sales with complete income and expense data that would facilitate a thorough analysis and the ability to estimate a point value. However, sales of marinas are reviewed and analyzed to the extent that they provide a range of value per slip. This is discussed in relation to the income approach valuation.

There is a scarcity of bay front land sales that would reflect value for marina use. Therefore, the cost approach was not used.

The valuation proceeds as follows:

      1. Income Capitalization Approach
      2. Sales Comparison Discussion

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                           45

INCOME CAPITALIZATION APPROACH

The income capitalization approach is defined in the previous section entitled valuation process.

The income capitalization approach, as applied to a business property, is different from that of the typical income property because income is generated collectively by the real estate, furniture, fixtures and equipment, and entrepreneurial or managerial skill.

This approach to value separates income attributable to the real estate from income attributable to furniture, fixtures and equipment and the business.

The subject consists of a marina facility with profit centers including the following:

> 1. Boat slip rentals
> 2. Boat storage
> 3. Ships store and restaurant rental
> 4. 99 year ground lease

Financial statements and rent rolls were not provided for review, although they were requested through interrogatories. This approach relies on market data and the existing ground lease.

The valuation first addresses stabilized slip and storage rental income.

Boat Slip and Storage Income

The marina contains 166 boat slips, including 51 utilized for jet skis.

There is on site winter boat storage for approximately 75 boats.

The boat storage capacity is based on an estimated 30,000 square feet of unencumbered site area extending from Fifth and New York Avenues (150 x 200 feet = 30,000 SF). The average boat length is 28 feet and the allowance per boat is 300 SF. A 25 percent allowance for a driveway and setbacks indicated 22,500 square feet net area; divided by 300 equals 75 boats.

The potential gross income and effective gross income from boat slip rentals is estimated in the following steps:

> 1. Estimate the subject's slip rates based on the schedules of competitive marinas, slip size, and the quality of the navigable waterways and proximity to closest inlets. Estimate economic rent and gross potential income.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    46

> 2. Estimate occupancy rates for the subject based on competitive marinas.
> Estimate effective gross income by multiplying the estimated occupancy
> rate by the potential gross income.

A survey of competing marina facilities rates and occupancy follows.

J. P. BAINBRIDGE & ASSOCIATES, INC.

47

Boat slip rental and storage survey

## MARINA SURVEY

| Marina | Schooner Island | Avalon Pt Marina | Stone Harbor | Bridgeport | Pier 47 | Hereford |
|---|---|---|---|---|---|---|
| Address | Lake Road | Old Avalon Blvd | Stone Harbor Blvd | 227 Avenue R | Route 47 | Ash Avenue |
| | Wildwood | Middle Twp | Middle Twp | West Wildwood | Middle Twp | North Wildwood |
| Nearest Inlet | Cape May | Townsend/ Hereford | Townsend/Hereford | Cape May | Hereford | Hereford |
| No. Slips | 300 | 98 | 166 | 96 | 150' | 88 |
| Slip size | 36-60' | 22-44' | 20-50' | 20-40' | 12-40' | 20-31' |
| Amenities: Elec/water | Good | Average | Good | Average | Average | Good |
| Condition | Good | Average | Good | Average | Average | Good |
| Boat slip occupancy | 90% | 90% | 100% | 100% | 90% | 100% |
| Slip rates Jet ski slip rates | $115 | $100 | $120 | $83-100 | $60-110 $800 | $70 |
| Winter Storage/Foot Inside Outside | - $40 | $48 $35 | $65 $33 | $40 $20 | - $19-21 | - $18 |

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    48

<u>Boat slip and storage income estimate - Correlation</u>

The key differences among the marinas are location, proximity to certain inlets, slip sizes and rates, amenities and condition.

*Access to Inlets*

The subject and comparable marinas utilize the Cape May, Hereford, and Townsend Inlet's. Hereford is less navigable than Townsend's and Cape May.

*Slip Sizes and Rates*

The rates reflect price per boat foot. The marinas surveyed reflect a range from $60 to $120 per linear foot. Slips sizes are comparable, except that Schooner Island, Avalon Point, and Stone Harbor marinas have a extra large slips.

*Amenities and Condition*

The marinas surveyed are generally similar in terms of location and condition. Each provides water and electric to most or all of their slips. Marina services generally include repairs, hauling, launching, winterization, parts, etc.

*Boat slip and storage income estimate*

The subject is considered most competitive with Bridgeport, Pier 47, and Hereford marinas, which reflect a range from $60 to $110 per linear foot. If the high and low are removed, the range tightens to $70 to $100 per linear foot. Among these facilities, Hereford marina is considered the best comparison and reflects $70 per linear foot, although it lacks service and storage amenities.

The estimated boat slip rental rate is $80 per foot. The average boat length is 28 feet, based a data accumulated through past appraisals of local marinas. Given this, the estimated rate is $2,240 per slip.

Jet-ski slip income is estimated to be $800 per slip.

The subject has the capacity to store approximately 75 boats outside.

Emphasis was previously placed on Bridgeport, Pier 47, and Hereford marinas, which reflect outside storage rates of $18 to $21 per foot for winter storage. Based on this, the estimated boat storage rate is $20 per foot. The average boat length is 28 feet. Based on this, the average boat storage fee is $560 for the winter.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                  49

Occupancy

Boat slip occupancy is normalized at 95 percent, based on the prior survey results
indicating 90 to 100 percent occupancy with an average of 95 percent.

The estimated occupancy for winter boat storage is 80 percent, which is derived from the
same sources.

Effective gross income from boat slips and storage

The effective gross income from boat slips and storage is estimated in the following table

**Potential and effective gross income from boat slips and storage**

|  | No slips | No boats | Rate | Potential Gross Income (**PGI**) | Occupancy | Effective Gross Income (**EGI**) |
|---|---|---|---|---|---|---|
| Slips | 115 | | $2,240 | $257,600 | | |
| Jet ski slips | 51 | | $800 | $40,800 | | |
| Total slip income | | | | $298,400 | 95% | $283,480 |
| Storage | | 75 | $560 | $42,000 | 80% | $33,600 |

The marina building and restaurant rental estimates are next.

Ships store, restaurant, and marina building rent

The ship's store contains approximately 1,120 square feet. The restaurant contains
approximately 800 square feet, plus outside eating and cooking areas under a covered
porch.

The marina building contains approximately 1,720 square feet of first floor area, upper
level lounge and apartment area. Income is estimated for the first floor commercial
portion of the building. The upper levels are an amenity to the marina, but would not
typically add to the income.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                              50

The rent for the ship's store area and first floor of the marina building is estimated using known leases of commercial property within other marinas previously appraised. Such leases are scarce and so, other retail and office leases were also considered.

*Dad's Place Marina* is located about a mile north of the subject at Hereford Inlet. It is a small boat marina with an above average service, jet-ski rental, and storage business. The service building is rented to Performance Watercraft, LLC, who services boats, motors, and other watercraft. The premises includes a 6,000 square foot metal service building and the surrounding storage yard. The lease commenced in April 2004 for three years with a three year option. The first three years the rent was $84,000 annually and the second term rent was $92,400. The tenant did renew then lease. The landlord pays for real estate taxes and insurance. The tenant pays for utilities. The lease reflects $15.40 per square foot plus utilities. The subject ship store and office are similar marina related units that compare well with this lease, although the lease includes the storage yard. A general adjustment of ten percent to the comp rent indicates $13.86 per square foot.

*By the Sea Realty* is a real estate office about three miles south of the subject at 6201 New Jersey Avenue. It is a typical 1,595 square foot, one story office. By the Sea Realty, Inc. leased the premises, commencing in 2006 for three years with five percent annual increases. There is a two year option that will not be exercised. The scheduled rent was $30,000 for 2006, $31,500 for 2007, and $33,075 for 2008, reflecting from $18.81 to $20.74 per square foot. The tenant pays utilities and the landlord pays taxes and insurance. The subject ship store and office rental is considered inferior due to limited exposure. A general adjustment of 30 percent to the range indicates $13.17 to 14.52 per square foot.

Based on the preceding survey, the estimated rental income for the 1,120 square feet ship's store is $15,680 (1,120 square feet X $14 per square foot). The estimated rent for the first floor of the marina building is $24,080 (1,720 X $14 per square foot).

<u>Restaurant rent</u>

A restaurant lease for the 2008 season was provided for review and is copied in the addenda. No other leases were provided.

The lease is dated May 13, 2008 and is between Beach Creek Marina, Inc. and Joseph Pannullo d/b/a Coco's Dockside Caffe & Restaurant. The lease term is from June 15, 2008 to October 14, 2008 and is inclusive of all furniture, fixtures and equipment.

The lease amount is $35,000. The tenant is responsible for all utilities and liability insurance.

Three comparable restaurant rentals are summarized on the next page. This is followed by the rental estimate.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                              51

<u>Restaurant lease summary table</u>

| <u>Comparable rental</u> | <u>1</u> | <u>2</u> | <u>3</u> |
|---|---|---|---|
| Commencement date | 6/25/05 | 6/23/05 | 4/5/06 |
| Term | Yr/yr | Yr/yr | 5 years |
| Expiration | Yr/yr | Yr/yr | 2010 |
| Base rent | $35,000 | $35,500 | $60,000 |
| Escalation clauses | 10% of gross sales | None | 10% of gross or $60,000 |
| Landlord pays | RE taxes, insurance | RE taxes, insurance | RE taxes, insurance |
| Tenant pays | Utilities | Utilities | Utilities |
| Taxes & ins overage | None | None | None |
| Rent on a gross basis | $35,000 | $35,500 | $60,000 |
| Rental area | 3,051 | 2,496 | 3,591 |
| Seats | 85 | 85 | 87 |
| <u>Adjustments</u> | | | |
| Location | Superior | Superior | Superior |
| Adjustment | -20% | -20% | -20% |
| Facility | Similar | Similar | Superior |
| Adjustment | 0% | 0% | -20% |
| Use of liquor license | No | No | Yes - not part of rent |
| Adjustment | 0% | 0% | 0% |
| Net adjustements | -20% | -20% | -40% |
| Indicated rent | $28,000 | $28,400 | $36,000 |

*Lease one*

This is an 85-seat restaurant within a hotel, located on the beachfront in Wildwood Crest.
There is additional seating on a patio. The hotel provides patronage for the restaurant and
it does not have a liquor license. It is leased year to year for ten percent of the gross sales
with a minimum rent of $35,000. The landlord owns the equipment and the tenant
maintains it. The rent reflects a modified gross, wherein the tenant pays for only utilities.
The landlord pays taxes and insurance.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                      52

*Lease two*

This is an 85-seat restaurant within a hotel, located on the beachfront in Wildwood Crest. The hotel provides patronage for the restaurant and it does not have a liquor license. It is leased year to year for $35,500. The landlord owns the equipment and the tenant maintains it. The rent reflects a flat rent. The landlord pays taxes and insurance.

*Lease three*

This is an 87 seat freestanding restaurant located in the bar district in Wildwood. It was leased for five years for $60,000. The landlord owns the equipment and the tenant maintains it. The rent reflects a modified gross, wherein the tenant pays for only utilities. The landlord pays taxes and insurance.

The rent is actually 10 percent of gross or $60,000, whichever is greater. The landlord indicates the rent has never exceeded $60,000. Prior restaurant tenants who vacated leased along the same terms. This tenant vacated in 2008.

All of the leased restaurants are furnished and equipped by the landlord, who owns the personal property. Only lease three includes the use of a liquor license, which does not impact rent because there is a separate management agreement that compensates the license.

Lease one reportedly did not pay more than $35,000. Lease two was a flat rental.

The primary factors impacting the rentals are location and liquor sales. Leases one and two are in beachfront motels in Wildwood Crest, which is superior to the subject. Comparable three includes liquor sales and is on a busy street near area motels.

The leases reflect average dining facilities. However, comparables one and two are limited by their location within mid size motels. Their business is largely shaped by the motel operation. Comparable three is a freestanding restaurant and has greater potential.

Restaurant rental estimate

The comparable rentals indicate $28,000 to $36,000 including the use of the landlord's equipment. The subject is expected to be leased in 2009 for $35,000 including the use of the equipment. This is corroborated by the comparable rental data and considered at market.

Service revenue, winterizing and hauling

There is a service component to the boat storage business relating to hauling and winterizing the boat that will be derived from a review of operating data from competitive marinas. No actual data was provided.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    53

The service component is limited to storage and light service work due to a lack of facilities. Generally, the profit margin on the service business is relatively low, but it serves to maximize slip rental and storage occupancy, which has higher profit margins.

A confidential review of financial statements for recently appraised Avalon Point Marina in Middle Township and Schooner Island Marina in Lower Township/Wildwood provides some basis for estimating service income for the subject. An estimated $100,000 in service revenues is projected for the subject to be generated largely from the storage operation. The related cost of labor, parts, and miscellaneous costs are normalized at 55 percent of the service revenue, reflecting $55,000 and a net income from service operations of $45,000.

Effective gross income summary

| Item | Potential Gross Income (PGI) | Occupancy Rate | Effective Gross Income (EGI) |
|---|---|---|---|
| Boat slips | $298,400 | 95% | $283,480 |
| Boat storage | $44,800 | 80% | $35,840 |
| Ship's store rent | $15,680 | 95% | $14,896 |
| Restaurant rent | $35,000 | 95% | $33,250 |
| Marina building rent | $24,080 | 95% | $22,876 |
| Marina service revenue | | | $100,000 |
| Total | | | $490,342 |

The effective gross income from the marina operation is $490,342.

Normalized expenses

The subject property includes a marina facility with 166 boat slips, boat storage, ship's store, restaurant, and marina building.

Economic rent is estimated for the ship's store, marina building and restaurant. The tenants are responsible for utilities.

Operating expenses include advertising, riparian license, insurance, real estate taxes, utilities, repairs and maintenance, management, and reserves.

Financial statements were not provided for review. Expenses are based on the actual expenses of competing marinas reviewed.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    54

Operating expenses

*Advertising*

Advertising expenses are estimated to be $2,000, based on the marina survey.

*Riparian license*

The subject has two riparian license/leases. The annual expense is $11,145 in accordance with the leases.

*Insurance*

The insurance costs of similar smaller scale marinas suggest a general range from $5,000 to $15,000 and an average of $9,000 per marina. The subject's insurance is estimated to be $9,000.

*Legal and professional*

Legal and professional fees are estimated at $2,500, based on the costs of other marinas reviewed.

*Real estate taxes*

Real estate taxes are incorporated into the overall rate in the context of a tax appeal.

*Service business costs*

As was previously indicated, the service component of the marina as it relates to hauling and winterizing for storage boats has an estimated gross sales of $100,000 with an estimated overhead attributed mostly to labor and materials of 55 percent. As such, service business costs are normalized at $55,000.

*Utilities*

Utilities include water and electric for the marina. The tenants would be responsible for their individual units.

The estimated utility expense is $5,000.

*Repairs and maintenance*

Repairs and maintenance expense is stabilized at two percent of the effective gross income from the marina.

Management or income to the business

According to John A. Simpson, MAI, author of "Valuation of Marinas"[1], managing a marina requires more than general real estate knowledge.  The manager needs specialized insight about the business.  The same management ratios used for most commercial properties will understate the true costs of marina management.  Management expenses may be difficult to gauge because many marina owners are mom-&-pop family businesses where the owners do most or all of the work.  For this reason, the *Financial & Operational Benchmark Study for Marinas Operators* does not list management as a single line item.

It is difficult to determine exactly where the income attributed to the business stops and the income from the real estate begins.  The most common theory is to presume that a professional agent is employed to take over the day-to-day operation of the marina, thereby allowing the owner to maintain only a passive interest.  Thus, the income attributed to the business is taken in the form of a management fee.

Most marinas are owner managed and data on management fees is scarce.  A management fee of **ten percent** of the effective gross income from the marina is estimated.  This reflects the owner's time and profit expectations, making the net operating income truly reflective of the real estate.

Reserves for Replacement

Replacement reserves are not recognized separately, but do affect cash flow.  It is common that such expenditures are paid for in a lump sum or financed.  However, they are accounted for in the analysis by a reserve, which has the affect of stabilizing the impact of such costs.

Reserves for replacement are appropriate for the short-lived components of the marina and are estimated to be three percent of the effective gross income from the marina.

Additional income – ground lease

Additional income is derived through the 99-year ground lease dated, copied in the addenda.

The lease income is $42,600 per year, commencing July 1, 2005 per second amendment to the original lease.

Proposed increases to the rent are estimated based on the increases in the "Cape May County area median income".  The property owner has not provided income and expenses or rent roll to ascertain what the annual increases have been or what specific

[1] "Valuation of Marinas"  - John A. Simpson, MAI, The Appraisal Institute,  p. 34.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                  56

data they used. The New Jersey Department of Labor reports Per Capita Personal Income for Cape May County from 1997 to 2005, increasing from $27,371 to $39,563 and reflecting a total of about 45 percent. Annual increases are from one to eight percent and the average annual increase is five percent.

The following table uses the NJDOL personal income per capita data to approximate the rental increase in accordance with the lease.

| Ground lease rent estimate | |
|---|---|
| 2005 | $42,600 |
| | 5% |
| 2006 | $44,730.00 |
| | 5% |
| 2007 | $46,966.50 |
| | 5% |
| 2008 | $49,314.83 |
| | 5% |
| 2009 | $51,780.57 |

Capitalization rate

The capitalization rate converts net income to value.

*Mortgage-equity analysis*

The capitalization rate is estimated using a mortgage equity technique based on typical financing terms available in the local market for this type of property.

This estimate is based on a 6.5 percent interest rate, a seventy percent loan to value ratio, and a twenty year amortization with monthly payments. A five-year holding period is assumed to estimate equity build-up. An annual constant represents the mortgage position on these terms.

The equity position is the balance of thirty percent of the value at an equity yield rate of 11 percent.

A deduction is made to recognize equity build-up expected over an assumed five-year holding period. It is estimated by multiplying the loan position against the part of the loan amortized in five years multiplied against a sinking fund factor for five years at 11 percent equity yield.

A deduction is sometimes made to recognize expected change in income/value during the holding period. The stabilized income incorporates the expected growth of the business over the next several years. Beyond the development of the business, the subject's income/value is not expected to change in the short term due to external forces.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**    57

The capitalization rate calculations are as follows:

| | | | |
|---|---|---|---|
| Mortgage | 0.7000 x | 0.0895 = | 0.0626 |
| Equity | 0.3000 x | 0.1100 = | 0.0330 |
| Basic rate | | | 0.0956 |

Equity build-up (M X PPO X SFF)

| | M | PPO | SFF | |
|---|---|---|---|---|
| | 0.70 | 0.1441 | 0.1606 = | 0.0162 |
| | | | | 0.0794 |
| Capitalization rate | | | | 8.00% |

M = loan to value ratio, PPO = part paid in year 5, SFF = sinking fund factor

The estimated capitalization rate is eight percent.

The mortgage equity parameters used above have held steady from 2006 to 2009, despite variations in the federal funds rate and prime lending rate. This is particularly true of specialized properties such as marinas. Therefore, the overall rate to be applied for each tax year of the appeal is the same, eight percent.

**The overall rate applied to the ground rent is adjusted to five percent to recognize the much lower risk/return characteristics of the 99 year lease and the expected growth indexed to personal income.**

Tax rates

The Director's Ratio for all tax years exceeds 100 percent.

Tax rates are summarized:

| | |
|---|---|
| 2006 | 70 cents |
| 2007 | 73 cents |
| 2008 | 78.5 cents |
| 2009 | Estimated 82 cents |

Overall rates are summarized:

| | |
|---|---|
| 2006 | 8.70 percent |
| 2007 | 8.73 percent |
| 2008 | 8.785 percent |
| 2009 | Estimated 8.820 percent |

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    58

The income capitalization approach is summarized in the following table.

| Tax year | | | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| Effective Gross Income from marina | | | $490,342 | | | |
| | | | | | | |
| Less operating expenses | | | | | | |
| Advertising | | $2,000 | | | | |
| Repairs & maintenance | 2% | $10,000 | | | | |
| Riparian license/lease | | 11,145 | | | | |
| Service labor and materials | | 55,000 | | | | |
| Insurance | | 9,000 | | | | |
| Legal and professional | | 2,500 | | | | |
| Utilities | | 5,000 | | | | |
| Less total operating expenses | | | $94,645 | | | |
| Gross profit | | | $395,697 | | | |
| | | | | | | |
| Less management and reserves | | | | | | |
| Management | 10% | $49,034 | | | | |
| Reserves | 3% | 14,710 | | | | |
| Less total management and reserves | | | $63,744 | | | |
| | | | | | | |
| Net operating income from the marina | | | $331,953 | $331,953 | $331,953 | $331,953 |
| Capitalization | | 8% | 0.08000 | 0.08000 | 0.08000 | 0.08000 |
| Tax rate | | | 0.00700 | 0.00730 | 0.00785 | 0.0082 |
| Adjusted cap rate | | | 0.08700 | 0.08730 | 0.08785 | 0.08820 |
| | | | | | | |
| Indicated marina real estate value | | | $3,815,546 | $3,802,435 | $3,778,629 | $3,763,634 |
| | | | | | | |
| Ground lease income | | | $44,730 | $46,966.50 | $49,314.83 | $51,780.57 |
| Capitalization | | 5% | 0.05000 | 0.05000 | 0.05000 | 0.05000 |
| Tax rate | | | 0.00700 | 0.00730 | 0.00785 | 0.0082 |
| Adjusted cap rate | | | 0.05700 | 0.05730 | 0.05785 | 0.05820 |
| | | | | | | |
| Indicated ground rent - real estate value | | | $784,737 | $819,660 | $852,460 | $889,700 |
| | | | | | | |
| Total value of ground lease and marina | | | $4,600,283 | $4,622,094 | $4,631,089 | $4,653,335 |
| Rounded | | | $4,600,000 | $4,600,000 | $4,600,000 | $4,600,000 |

The income capitalization approach concludes a rounded value of $4,600,000 for all four years.

Normalized net operating income is not expected to change between 2006 and 2009. Growth in the ground rent offsets rising expenses.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    59

## THE SALES COMPARISON APPROACH

The sales comparison approach is explained in the preceding section entitled Valuation Process. The sales data is described in detail in the following pages.

As previously discussed, marinas are complex properties where values are impacted by riparian leases, sales and service businesses, etc. These factors make adjustments difficult to estimate.

The sales analysis does not result in a clear indication of value because marinas generate income in a complex manner that is difficult to analyze in a traditional way. Therefore, the sales data is summarized to provide a range of unit values.

The sales discussions are followed by a sales summary grid, sales location map and discussion of the sales.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                          60

Comparable Sale 1



| | |
|---|---|
| Marina | Hidden Mill |
| Location: | 176 Thompsons Lane |
| | Egg Harbor Township, NJ 08232 |
| Legal identification: | Block 8301/25 |
| Sale price: | $650,000 |
| Deed date: | September 13, 2002 |
| Deed Book/Page: | 7301/82664 |
| Grantor: | Margate Marine, Inc. |
| Grantee: | Gary and Sheri Theno |
| Financing: | Frank and Florence Theno |
| Terms | $175,000: 12yr .04% |
| Confirmed with: | Deed, seller |
| Site: | 30.51 acres total |
| | 1.2 acres uplands, plus |
| | 29.31 acres marshlands |
| Improvements: | Marina buildings 5,325 square feet |
| | 56 Boat slips |

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    61

Comparable Sale 1 (continued)

Comments:  This property is located on Powell Creek with access to the Great Egg Harbor River.

The marina building contains a shop, store, and office.

The marina contains 56 boat slips, fuel dock, ground storage, boat sales, and service garage.

**The buyers received a $175,000 twelve-year mortgage from family members that had a monthly payment of $1,250 reflecting an effective .04% annual interest rate. The mortgage is adjusted to reflect the prevailing market rate of 6% interest.  Based on this, the cash equivalent principal value is $128,093 rounded to $128,000.  The cash equivalent adjustment to the sale price is not made since the mortgage was provided by a third party and the seller received full payment at settlement.**

Reflects:                              $11,607 per boat slip (56 slips)

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    62

Comparable Sale 2



Marina:                           Ocean Heights

Location:                         5001 Ocean Heights Avenue
                                  Egg Harbor Township, NJ
Block/Lot                         6506/01
Sale Price:                       $1,350,000
Deed Date:                        April 26, 2004
Deed book and Page:               7721-39609
Grantor:                          William Krayger and Albert Skallisky
Grantee:                          Ocean Heights Marina LLC
Financing:                        Boardwalk Bank
Mortgage Book and Page            11272/4039812
Confirmed with:                   Deed and Buyer
Site:                             580,655 square feet total
                                  130,680 square feet uplands
                                  449,975 riparian, wetland
Improvements:                     Service garage, Office building, and bath
                                  House, 154 Boat Slips

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    63

Comparable Sale 2 (continued)

Comments: The marina is located on Ocean Heights Avenue in Egg harbor Township just west of Somers Point and Linwood.

The marina contains 154 boat slips. Outside storage capacity is 120 boats and there is rack storage for 24 boats.

The marina building is an old single-family home containing two and half stories. It is converted into an office building. A service garage and bathhouse are behind the office. The summer parking area is used for the storage of boats in the winter

Reflects:                    $8,766 per boat slip (154 Slips)

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    64

Comparable Sale 3



Marina:                              Old Bridge

Location:                            13 North Wildwood Road
                                     Middle Township, NJ
Legal Description:                   Block 1246.01 Lots 1.02 and 1.03 Block
                                     1246.02 Lot 1.01
Sale Price:                          $408,000 (total)
Deed Date:                           November 6, 2003
Deed book and Page:                  3052/287
Grantor:                             William, Richard, and Ronald Walters
Grantee:                             James and Deborah Mooers
Financing:                           Sun National Bank
Mortgage Book and Page               3754/793
Loan to value ratio:                 25%
Confirmed with:                      Deed and Buyer
Site:                                134,255 square feet total
                                     5,690 square feet uplands
                                     128,565 square feet riparian
Improvements:                        Bait and tackle store 900 square feet
                                     54 Boat Slips

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                                    65

Comparable Sale 3

Comments: The marina is located on Old North Wildwood Boulevard. The construction of the new boulevard has changed the flow of traffic and moved the marina off of the busy thoroughfare from the mainland to the island. Access to the ocean is through Hereford inlet, two miles east.

The marina contains 54 boat slips. There is a need for dredging in order to recapture defunct slips and the current owner is beginning the necessary procedures to start dredging.

The marina building contains a retail store. Additionally there are two detached single-family dwellings.

The previous owners never listed the property and sold it to Moorers directly.

Reflects:                          $7,556 per slip (54 slips)

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                66

Comparable Sale 4



Marina:                          Cape May Inlet Marina

Location:                        1001 Ocean Drive
                                 Lower Township, NJ
Legal Description:               Block 820 Lot 8.02
Sale Price:                      $1,800,000 (total sales price)
Deed price:                      $900,000
Deed Date:                       December 1, 2005
Deed book and Page:              3203/310
Grantor:                         Mar-Ryder, LLC
Grantee:                         Cape May Inlet Marina, LLC
Financing:                       Crest Savings Bank
Mortgage Book and Page           4273/1
Loan to value ratio:             78%
Confirmed with:                  Deed and Lawyer
Site:                            895,768 square feet total
                                 17,915 square feet uplands
                                 877,853 square feet riparian and tidal
                                 meadows
Improvements:                    Two-story frame dwelling
                                 80 Boat Slips

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    67

Comparable Sale 4

Comments: The marina is located on Ocean Drive in the Diamond Beach section of Lower Township.   Ocean access is by Cape May Inlet.

The marina contains 80 boat slips.

Reflects:                                    $22,500 per slip (80 slips)

J. P. BAINBRIDGE & ASSOCIATES, INC.                                68

Comparable Sale 5



Marina                              Waterfront Marina

Location:                           1821 Mays Landing-Somers Point Road
                                    Egg Harbor Township, NJ 08232

Legal identification:               Block 9101/34
Sale price:                         $1,100,000
Deed date:                          July 2002
Deed Book/Page:                     6174/262
Grantor:                            RPM Realty Co., Inc.
Grantee:                            Waterfront Power Sports, Inc.
Financing:                          Commerce Bank
Confirmed with:                     Deed, seller
Site:                               31.39 Acres total
                                    4 Acres uplands, plus
                                    1.19 Acres riparian and 26.2 acres wetlands
Improvements:                       Marina buildings 6,729 square feet
                                    52 Boat slips

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                                   69

Comparable Sale 5 (continued)

Comments:  This property is located on Patcong Creek, just west of Somers Point.

The marina building contains a shop and store, plus a second floor apartment.

The marina contains 52 boat slips, 93 boat racks, and fuel dock and ground storage.  The occupancy for 2000 and 2001 was 100% for the boat slips and 70% for the boat racks.

Reflects:                                        $21,153 per boat slip (52 Slips)

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    70

Comparable Sale 6



| | |
|---|---|
| Marina | Hereford Marina |
| Location: | 982 Ash Avenue |
| | North Wildwood, New Jersey 08260 |
| Legal identification: | Block 1.04/1 |
| | Block 1.05, various lots |
| Sale price: | $1,500,000 |
| Deed date: | May 14, 2008 |
| Deed Book/Page: | 3340/157 & 161 |
| Grantor: | Beckman Deluca, LLC |
| Grantee: | 982 Ash Avenue, LLC |
| Financing: | Bancorp, $1,200,000 |
| Confirmed with: | Broker, Deed, and tax records |
| Site: | Common |
| Improvements: | Two story harbormaster building with first floor marina office, retail and restrooms, and upper level apartment |
| Boat slips | 78 Boat slips |

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                                    71

Comparable Sale 6 (continued)

Comments: This marina was purchased in bulk as individual condominium units. The site is shared by residential condominiums and is fully developed.

Parking is available along the north side of the site and there is minimal ground boat storage capacity.

The marina and building improvements are in very good condition. The slips range in size from 20 to 24 feet. The boat slip rental rates are $70 per boat foot.

Reflects:                              $19,231 per boat slip (78 Slips)

J. P. BAINBRIDGE & ASSOCIATES, INC.

72

## SALES SUMMARY AND ADJUSTMENT GRID

| ITEM | SUBJECT | SALE 1 | SALE 2 | SALE 3 | SALE 4 | SALE 5 | SALE 6 |
|---|---|---|---|---|---|---|---|
| Marina name | North Wildwod 610 New York North Wildwood | Hidden Mill 176 Thompson Egg Harbor Twp | Ocean Heights 5001 Ocean Heights Egg Harbor Twp | Old Bridge Marina N. Wildwood Blvd Middle Twp | Cape Inlet Marina 1001 Ocean Drive Lower Twp | Waterfront SP-ML Rd Egg Harbor Twp | Hereford Ash Avenue North Wildwood |
| Sale Price | - | $650,000 | $1,350,000 | $408,000 | $1,800,000 | $1,100,000 | $1,500,000 |
| Date of Sale | - | Sep-02 | Apr-04 | Nov-03 | Dec-05 | Jul-02 | May-08 |
| Property Rights | Fee simple | Fee simple | Fee simple | Fee simple | Fee simple | Fee simple | Fee simple |
| Financing | - | Normal | Normal | Normal | Normal | Normal | Normal |
| Adjustment | - | - | - | - | - | - | - |
| Condition of Sale | - | Normal | Normal | Normal | Normal | Normal | Normal |
| Market Conditions | - | 15% | 10% | 10% | 0 | 20% | 0% |
| Adjusted Sale Price | - | $747,500 | $1,485,000 | $448,800 | $1,800,000 | $1,320,000 | $1,500,000 |
| Closest Inlet | Hereford | Powell Creek- Egg Harbor | Patcong Creek- Egg Harbor | Hereford | Cape May | Patcong Creek- Egg Harbor | Hereford |
| Adjustment | - | 0% | 0% | 0% | 0% | 0% | 0% |
| Site size (SF) | 152,329 | 1,329,016 | 580,655 | 134,255 | 895,768 | 1,367,348 | Common |
| uplands | 126,324 | 52,272 | 130,680 | 5,690 | 17,915 | 174,240 | Common |
| riparian, wet | 26,005 | 1,276,744 | 449,975 | 128,565 | 877,853 | 1,193,108 | Common |
| Improvements | Store, restaurant, marina building | Store, service building | Service, Storage and office | Store | Store, office, ticket booth | Shop, Store, Living Quarters | Marina building, Living quarters |
| Adjustment | - | 0% | 0% | 0% | 0% | 0% | 0% |
| Number of boat slips | 166 | 56 | 154 | 54 | 80 | 52 | 78 |
| Net Adjustments | - | 0% | 0% | 0% | 0% | 0% | 0% |
| Adjusted Price | - | $747,500 | $1,485,000 | $448,800 | $1,800,000 | $1,320,000 | $1,500,000 |
| Adj. SP/Slip | - | $13,348 | $9,643 | $8,311 | $22,500 | $25,385 | $19,231 |

**J. P. BAINBRIDGE & ASSOCIATES, INC.**                    73

COMPARABLE SALES LOCATION MAP



J. P. BAINBRIDGE & ASSOCIATES, INC.                                    74

Correlation

*Unit value*

The appraisal considers value per slip.

*Property rights conveyed*

Property rights conveyed with comparable sales consist of both fee simple and leased fee interest and no adjustments were required.

*Financing*

All sales reflected transactions where the seller received payment in conventional terms and no financing adjustments were required.

*Condition of sale*

The conditions surrounding each of the sales were investigated for unusual circumstances, motivational premiums or discounts which would affect the sale price.

All sales reflect typical conditions. No other adjustments were necessary.

*Market Conditions, Time of Sale*

All sales occurred between 2002 and 2005 during which time marina values appreciated modestly. Adjustments were made based on five percent annually through the end of 2005.

Value Estimate

After adjusting the comparable sales for market conditions, the sales reflect an adjusted range of value from $8,311 to $25,385 per slip.

The great range in value per slip reflects the variability of each marina.

The estimated going concern value of the subject marina reflects $27,711 per slip ($4,600,000/166 slips). This exceeds the market range due to the ground lease income.

Since the value of the marinas is linked with their respective income producing potential for which there is minimal data, further analysis is not possible. The sales approach is inconclusive.

## J. P. BAINBRIDGE & ASSOCIATES, INC.

75

RECONCILIATION

Since only one approach to value was concluded, there is not need to reconcile various estimates.

Value indications:

| Tax year | 2006 | 2007 | 2008 | 2009 |
|----------|------|------|------|------|
| Value | $4,600,000 | $4,600,000 | $4,600,000 | $4,600,000 |

The income capitalization best reflects the motivations of the typical buyer who is interested in future income benefits. This method is sensitive to current market conditions and the individual character of the subject and the anticipated income. It is best suited to incorporate the value of the ground rent.

Given the complex nature of marina properties, the sales comparison approach is inconclusive.

The estimated market value for tax years 2006 through 2009 is $4,600,000.

The Director's ratio exceeds 100 percent and therefore, no further adjustments are needed.

The assessed value is $14,288,900 for all four years.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

ADDENDA

CONTRACT AND RESOLUTION
SUBJECT PRIOR DEEDS INCLUDING RIPARIAN GRANT
RECIPROCAL RIGHT OF WAY EASEMENT
MAP OF RIGHT OF WAY EASEMENT
RIPARIAN LICENSES AND SURVEY
RESTAURANT LEASE
APPRAISER QUALIFICATIONS

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

**CITY OF NORTH WILDWOOD**
**CAPE MAY COUNTY, NEW JERSEY**

RE: J.P. BAINBRIDGE & ASSOCIATES, INC.
AS AUTHORIZED BY RESOLUTION 44-08

THIS AGREEMENT is made this _19th_ day of _MARCH_, 2008, by and between the **CITY OF NORTH WILDWOOD**, a municipality organized and existing in accordance with the laws of the State of New Jersey, hereinafter referred to as **"City"** and **J.P. BAINBRIDGE & ASSOCIATES, INC.**, with principal offices located at 300 Goshen Road, Cape May Court House, New Jersey, 08210, hereinafter referred to as **"Contractor"** or **"Consultant"**.

**WITNESSETH:**

**WHEREAS,** the City desires to retain the services of the Consultant to perform real estate appraisal services; and

**WHEREAS,** the Mayor and City Council has authorized the execution of a contract for real estate appraisal services with J.P. Bainbridge & Associates, Inc. with principal offices located at 300 Goshen Road, Cape May Court House New Jersey, pursuant to Resolution No. 44-08, duly adopted by the City Council and approved by the Mayor on February 6, 2008 for the provision of real estate appraisal services that more particularly are described in the proposal of J.P. Bainbridge & Associates, Inc. of January 15, 2008, annexed hereto as Exhibit "A".

**WHEREAS,** the **"Contractor"** is experienced in and capable of providing such services; and

**WHEREAS,** the Municipal Chief Financial Officer has certified the availability of funds for the within Contract; and

**WHEREAS,** the City Solicitor of the City of North Wildwood has opined that the within Contract may be awarded without competitive bidding, in accordance with the provisions of the

Page 1 of 5

LAW OFFICES
*Infiero and Balliette*
303 NEW JERSEY AVENUE
P.O. BOX 789
WILDWOOD, N.J. 08260

## J. P. BAINBRIDGE & ASSOCIATES, INC.

Local Public Contracts Law of the State of New Jersey by reason of having a value that is less than the current bid threshold;

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, it is agreed as follows:

1.  **SCOPE OF SERVICES:** **"City"** hereby employs and retains the services of **"Contractor"**, for the term hereinafter specified, to provide such services to **"City"** as specifically set forth in a certain proposal from **"Contractor"**, which is reproduced and attached hereto as Exhibit "A" and which is incorporated herein by reference and made a part hereof.

2.  **TERM:** This Contract shall be for the specific services set forth in Exhibit "A" which shall be performed until such time as the tax appeal litigation in connection with the services are to be performed is concluded.

3.  **PAYMENT FOR WORK:**

    The Owner shall pay and the Contractor shall accept as full compensation for all work performed by the Contractor under this Contract, and also for all loss or damage arising out of the nature of the work aforesaid, or from any unforeseen obstruction or difficulty encountered in the prosecution of the work, and for all rights of every description connected with the work and for all expenses incurred by or in consequence of the suspension or discontinuance of the work as herein specified and for well and faithfully completing the work and the whole thereof as herein provided, at the prices set forth in the proposal annexed hereto as Exhibit "A".

    The Contractor shall provide the Owner's Chief Financial Officer with written notification of Contractor having billed Owner 75% of the amount appropriated for the work in the municipal budget. In the event that a portion

    Page 2 of 5

LAW OFFICES
*afiere and Ballotte*
303 NEW JERSEY AVENUE
P O BOX 789
WILDWOOD, N J 08260

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

of the amounts due to the Contractor are to be paid from funds appropriated in one municipal budget and another portion of the amounts due to the Contractor are to be paid from funds appropriated in the next succeeding municipal budget then the Contractor shall be obliged to provide the Owner's Chief Financial Officer with written notification of the Contractor having billed Owner 75% of the amount appropriated for the work in the first municipal budget and again when the Contractor has billed Owner 75% of the amount appropriated for the work in the next succeeding municipal budget. In the event that the Contractor fails to provide to the Owner's Chief Financial Officer the 75% notifications as aforesaid, there shall be no obligation on the Owner's part to pay to Contractor any amount billed in excess of 75% of the amount appropriated for the work in the municipal budget.

Unless provided elsewhere in the contract documents, the sums due to Contractor during the term of this Contract shall be paid in periodic installments upon the Contractor submitting properly executed vouchers to the Owner's Chief Financial Officer in accordance with the contract documents and upon the approval of such by the Owner's Governing Body. All such requests for progress payments shall be in accordance with the rules, regulations and customary procedures established by Owner. Such vouchers will, under normal circumstances, be processed and paid by the Owner within forty five (45) days of receipt; however, no services shall be rendered, nor charges made, which exceed either the purchase order amount or the amount appropriated for such services in the Municipal Budget.

4.    **INDEPENDENT CONTRACTOR STATUS: CONTRACTOR TO PROVIDE INSURANCE:** The services to be provided by **"Contractor"** shall be performed as an Independent Contractor. It is understood, agreed and acknowledged that **"Contractor"** is not an employee of the **"City"** and shall not

Page 3 of 5

LAW OFFICES
*Gafers and Belletti*
1303 NEW JERSEY AVENUE
P O BOX 750
WILDWOOD, N J 08260

## J. P. BAINBRIDGE & ASSOCIATES, INC.

be considered as such for any remunerative purpose. All payments made by the **"City"** to **"Contractor"** pursuant to this Contract shall be gross payments. No deductions shall be made therefrom for taxes or payroll deductions. **"Contractor"** represents and warrants that he will maintain in full force and effect workers' compensation coverage and disability coverage for all of **"Contractor's"** employees.

5. **TERMINATION:** **"City"** may terminate this Contract for cause at any time, in which event, **"Contractor"** shall be entitled to be compensated for all services performed up to the date of termination; otherwise, either party may terminate this Contract upon 60 days written notice to the other party in which event **"Contractor"** shall be entitled to be compensated for all services performed up to the date of termination.

6. **ANTI-DISCRIMINATION REQUIREMENTS:** **"Contractor"** acknowledges that this Contract must be carried out in accordance with the provisions of *N.J.S.A. 10:2-1* and *N.J.S.A. 10:5-53* and the language of those statutes is deemed incorporated herein by this reference thereto and **"Contractor,"** in contracting with the **"City,"** is bound by said language together with the other provisions of the Anti-Discrimination Laws of the State of New Jersey, Chapter 127 of the Laws of 1975.

7. **AMENDMENTS:** Any amendment to this Contract must be in writing and signed by the parties hereto. Oral amendments shall have no force or effect.

8. **MISCELLANEOUS:**

   A. This Contract shall be construed in accordance with the laws of the State of New Jersey.

   B. This Contract shall be binding upon the parties hereto, their heirs, successors, administrators and assigns.

   C. Paragraph headings are intended solely for the convenience of the parties and shall not be used in construing the provisions of the paragraph.

Page 4 of 5

LAW OFFICES
*Lifano and Bellitto*
303 New Jersey Avenue
P O Box 780
Wildwood, N J 05260

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

FROM : J P BAINBRIDGE & ASSOC. INC. !  PHONE NO. :  609 465 9969      MAR. 11 2008 09:37AM P2
05/19/2008  10:15   6097233441              CAFIERO                    PAGE  02/02

    D.   Reference to the masculine gender shall be deemed to include all other genders.

    E.   Reference to the singular shall be deemed to include the plural.

    F.   Resolution 44-08 annexed hereto as Exhibit "B" is incorporated herein and made apart hereof.

9.   **NOTICES:.** All notices to be given shall be given in writing and shall be delivered personally or by registered or certified mail, return receipt requested, as follows:

    A.  If to "City", address to Raymond A. Townsend, Administrator, City of North Wildwood, 901 Atlantic Avenue, North Wildwood, New Jersey 08260, with a copy to William J. Kaufmann, Esq., 2303 New Jersey Avenue, Wildwood, New Jersey 08260.

    B.  If to "Contractor", address to J. Paul Bainbridge, MAI, of J.P. Bainbridge & Associates, Inc. 300 Goshen Road, Cape May Court House, New Jersey, 08210.

IN WITNESS WHEREOF, the parties have signed this Contract the day and year first above written.

Attest:

_____
Janet Harkins, City Clerk

Witness:

_____

CITY OF NORTH WILDWOOD

_____
William Henfey, Mayor

J.P. BAINBRIDGE & ASSOCIATES, INC.

_____
J. Paul Bainbridge, President

## J. P. BAINBRIDGE & ASSOCIATES, INC.

### J. P. BAINBRIDGE & ASSOCIATES, INC.
*Real Estate Appraisers* ✦ *Consultants*
300 Goshen Road, Cape May Court House, NJ 08210
(609) 465-9978 (Tel) • (609) 465-9969 (Fax)

January 15, 2008

William Kaufman, Solicitor
City of North Wildwood
901 Atlantic Avenue
P.O. Box 499
North Wildwood, NJ  08260-0499

RE:    Marina Bay- Marina and Parking Lots
610 New York Avenue
Block 152, Lot 1
North Wildwood, New Jersey
Owner - Beach Creek Marina, Inc.

Dear Mr. Kaufman:

I will appraise the above-captioned property for the purpose of estimating the market value for the tax appeals dated October 1, 2005; October 1, 2006; and October 1, 2007. The intended use is for tax appeal. The client and intended user is the City of North Wildwood and no other without the consent of the appraiser.

The subject property consists of a marina improved with 110 slips, parking, a restaurant and a bait and tackle shop. The site contains 2.94 acres of upland, including lands occupied by Marina Bay Tower, which is a leasehold interest and *not included* in the property to be appraised. Adjacent riparian land is .346 acres for a total of 3.286 acres of land area.

The appraisal will consist of a self-contained report prepared in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

The appraisal fee is based on an hourly rate for the principal appraiser of $140 and associate appraiser of $80. The estimated fee is $9,500. Additional consultation and testimony, if needed, will be billed hourly.

Thank you for your consideration.

Sincerely,

*J. Paul Bainbridge*

J. Paul Bainbridge, MAI
SCGREA RG00735

JPB:ar                    Exhibit "A"

J. P. BAINBRIDGE & ASSOCIATES, INC.

# CITY OF NORTH WILDWOOD

## Cape May County, New Jersey

# RESOLUTION

### AWARDING A PROFESSIONAL SERVICES CONTRACT TO J. P. BAINBRIDGE & ASSOCIATES, INC.

**WHEREAS,** the City of North Wildwood is in need of professional real estate valuation and consulting services for the purposes of preparing an appraisal of various parcels of property that are identified on the North Wildwood Tax Map Lot 1, in Block 152 known as 610 New York Avenue in connection with litigation that presently is pending in the Tax Court of New Jersey and, therefore, has a need for expert real estate appraisal services;

**WHEREAS,** the North Wildwood Purchasing Agent has determined and certified in writing that the value of the acquisition of those services will not exceed $17,500.00 and, therefore, the proposed contract would not fall within the scope of NJSA 19:44A-20.5; and

**WHEREAS,** J.P. Bainbridge & Associates, Inc. has the credentials and abilities to perform such services and has submitted a proposal dated January 15, 2008 indicating it will provide the required real estate appraisal services at a cost estimated to be $9,500.00; and

**WHEREAS,** the Local Public Contracts Law, R.S. 40A:11-1, *et seq.*, provides that contracts for "Professional Services" may be awarded without public advertisement for bids; and

**NOW, THEREFORE, BE IT RESOLVED,** by the Members of Council of the City of North Wildwood, in the County of Cape May and State of New Jersey that a contract hereby is authorized to J.P. Bainbridge & Associates, Inc. for real estate appraisal services at a cost not to exceed $9,500.00 without further approval from Council, as set forth in the proposal (a copy of which is annexed hereto) and the Mayor and City Clerk be and they hereby are authorized to execute a contract for said services.

**BE IT FURTHER RESOLVED** that this contract has been awarded without competitive bidding for the following reasons:

(A) Professional services of the type herein sought are of such a nature as to require a high degree of trust or confidence in the individual providing the service and, in fact, may require the creation of a confidential or fiduciary relationship between that individual and the municipality;

(B) The services required are highly specialized or technical in nature;

(C) The services require peculiar ability or skill, and demand a high degree of specialized knowledge or expertise;

(D) The services are such that their relative worth must be judged by subjective considerations that are not susceptible of valuation by competitive bidding;

(E) The individual or entity who will provide these services has demonstrated competence and particular expertise in the services required;

(F) The individual or entity who will perform these services is held to and fully adheres to, the strict ethical standards that govern the involved profession;

(G) The services include advice to and consultation with the municipality that require both knowledge and judgment on the part of the individual or entity providing services, as well as the confidence of the municipal officials, such that competitive bidding is feasible or practical;

(H) The services to be provided are such that their nature, scope and duration are not capable of precise measurement, but rather require a flexibility and discretion that render competitive bidding impractical and inefficient.

**BE IT FURTHER RESOLVED** that the statutory language required by N.J.S.A. 10:2-1 and 10:5-33 are hereby incorporated into the specifications and this contract by reference, and the contractor contracting with the City is bound by said language, together with the other provisions of the Anti-Discrimination Laws of the State of New Jersey, Chapter 127 of the Laws of 1975.

Exhibit "B"

## J. P. BAINBRIDGE & ASSOCIATES, INC.

BE IT FURTHER RESOLVED that this Resolution shall only become effective when a copy of the Certification of Availability of Funds prepared by the Chief Financial Officer of this City is attached hereto.

BE IT FURTHER RESOLVED that the Business Entity Disclosure Certification and the Determination of Value be placed on file with this resolution.

BE IT FURTHER RESOLVED that Notice of the Letting of this contract be published in the Gazette Leader within ten (10) days of the date of this Resolution, which notice shall state that this Resolution and the contract are on file and available for public inspection in the office of the City Clerk.

BE IT FURTHER RESOLVED that the Mayor and City Clerk be and they are hereby authorized, empowered and directed to execute and deliver the contract to **J.P. Bainbridge & Associates, Inc.**

OFFERED BY: _____DUNCAN_____          SECONDED BY: _____KOEHLER_____
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Janet H. Harkins, City Clerk of the City of North Wildwood, in the County of Cape May, State of New Jersey, do hereby certify that the foregoing is a correct and true copy of a Resolution adopted by the Mayor and Council of the City of North Wildwood at a meeting duly held on the __6th__ day of __February___, 2008.

Dated:   February 6, 2008

Signed: _Janet H. Harkins_, City Clerk

APPROVED: _William J. Henfey_, Mayor

| | Aye | Naye | Abstain | Absent | | | Aye | Naye | Abstain | Absent |
|---|---|---|---|---|---|---|---|---|---|---|
| Ogen | ✓ | | | | Koehler | | ✓ | | | |
| Tolomeo | ✓ | | | | Maschio | | ✓ | | | |
| Rosenello | ✓ | | | | Duncan | | ✓ | | | |
| McCullion | ✓ | | | | | | | | | |

\# 44-08

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

FEB 21 2008

STATE OF NEW JERSEY

BUSINESS REGISTRATION CERTIFICATE

FOR STATE AGENCY AND CASINO SERVICE CONTRACTORS

DEPARTMENT OF TREASURY/
DIVISION OF REVENUE
PO BOX 252
TRENTON, N J 08646-0252

TAXPAYER NAME:

J.P. BAINBRIDGE & ASSOC. INC.

TRADE NAME:

TAXPAYER IDENTIFICATION#

223-522-571/000

CONTRACTOR CERTIFICATION#

0086016

ADDRESS
300 GOSHEN ROAD
CAPE MAY COURT HO NJ 08210

ISSUANCE DATE:

09/13/01

EFFECTIVE DATE:

05/08/97

Director, Division of Revenue

This Certificate is NOT assignable or transferable.  If must be conspicuously displayed at above address.

FORM-BRC(08-01)

## J. P. BAINBRIDGE & ASSOCIATES, INC.

# DEED

Prepared by:

THOMAS ROSSI, ESQUIRE

This Deed is made on  October 28, 19 86 .

BETWEEN  SCOTT P. BARNES and LAUREL P. BARNES, his wife,
Individually and t/a BARNES ENTERPRISES, a Limited Partnership,

whose address is  7 Ashbridge Lane, Linwood, NJ 08221,

referred to as the Grantor.

AND  BEACH CREEK MARINA, INC., a New Jersey Corporation,

whose post office address is  395 Pleasant Valley Way, W. Orange, NJ 07052,

referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

Transfer of Ownership.  The Grantor grants and conveys ownership of the property described below to the Grantee. This transfer is made for the sum of TWO HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($275,000.00).

The Grantor acknowledges receipt of this money.

Tax Map Reference.  (N.J.S.A. 46:15-2.1) Municipality of City of North Wildwood
Block No. 152      Lot No. 401,403,405,407 & 409 Account No.
☐  No property tax identification number is available on the date of this deed. (Check box if applicable.)

Property.  The property consists of the land and all the buildings and structures on the land in
the  City  of  North Wildwood
County of  Cape May  and State of New Jersey. The legal description is:

TRACT #1 - BEGINNING at the intersection of the Northwesterly line of New York Avenue with the Northeasterly line of Seventh Avenue, extending Northwestwardly along the Northeasterly line of Seventh Avenue 100 feet, and of that width extending Northeastwardly between parallel lines, one being the Northwesterly line of New York Avenue 100 feet in length or depth.

BEING Lots 401 and 403 Block 152 on the current tax map of the City of North Wildwood.  ALSO BEING the same lands and premises which Solar Trans, Inc., a corporation of New Jersey, by Deed dated July 13, 1979 and recorded July 30, 1979 in the Office of the Clerk of Cape May County in Deed Book 1431, page 206, granted and conveyed unto Barnes Enterprises, a Limited Partnership, one of the within grantors.

TRACT #2 - BEGINNING at a point in the Northeasterly side line of 7th Avenue at a distance of 150 feet Northwestwardly from the intersection of said Northeasterly side line of 7th Avenue with the Northwesterly side line of New York Avenue, said beginning point being also at the division line between Lots 405 and Lots 407, Block 152; thence extending Northwestwardly along the Northeasterly side line of 7th Avenue; a distance of 100 feet to the division line between Lot 409 and Lot 411; and thence at right angles to said line of 7th Avenue between parallel lines (with a width of 100 feet), in length or depth Northeastwardly a distance of 100 feet.  Containing within the above described bounds 10,000 square feet of land be the same more or less.

BEING Lots 407 and 409 Block 152 as shown on the current tax map of the City of North Wildwood.  ALSO BEING the same lands and premises which Joseph V. DiMauro, a Roman Catholic Priest, by Deed dated May 18, 1979 and recorded May 21, 1979 in the Office of the Clerk of Cape May County in Deed Book 1426, page 611, granted and conveyed unto Scott P. Barnes and Laurel P. Barnes, his wife, two of the within grantors.

DB1837P0278

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

TRACT #3 - BEGINNING at a point in the Northeasterly line of 7th Avenue 100 feet Northwestwardly from the Northwesterly line of New York Avenue, extending Northwestwardly along the Northeasterly line of 7th Avenue 50 feet; and of that width extending Northeastwardly between parallel lines 100 feet in length or depth.

BEING Lot 405 Block 152 on the current tax map of the City of North Wildwood.  ALSO BEING the same Lands and premises which Philomena DiMauro, widow, by Deed dated May 18, 1979 and recorded May 21, 1979 in the Office of the Clerk of Cape May County in Deed Book 1426, page 602, granted and conveyed unto Scott P. Barnes and Laurel P. Barnes, his wife, two of the within grantors.

UNDER AND SUBJECT TO valid covenants, conditions, reservations and restrictions of record.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

**Promises by Grantor.** The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6) This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

**Signatures.** The Grantor signs this Deed as of the date at the top of the first page.

Witnessed by:

_Barbara J. House_ ............................(Seal)
/BARBARA J. HOUSE                  SCOTT F. BARNES

..................................................(Seal)
LAUREL F. BARNES

BARNES ENTERPRISES, a Limited
Partnership,

SCOTT F. BARNES, Partner
LAUREL F. BARNES, Partner

STATE OF NEW JERSEY, COUNTY OF CAPE MAY        SS.:

I CERTIFY that on _October 28_, 19 88      Scott F. Barnes and Laurel F. Barnes, individually and t/a Barnes Enterprises, personally came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):

(a) is named in and personally signed this Deed;

(b) signed, sealed and delivered this Deed as his or her act and deed; and

(c) made this Deed for $ 275,000.00     as the full and actual consideration paid or to be paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.).

Prepared by:

_Barbara J. House_
Barbara J. House
(Print name if not typed)

BARBARA J. HOUSE
Notary Public of New Jersey
My Comm. Expires April 12, 1992

N.J.S.A. 46:15-13  (Print signer's name below signature)

0B1837P0279

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



12-20-08  11:30 FAX 973 323 1508      THE RUBICON COMPANIES                      ☒005/017

# DEED

Record and return to:

SCOTT P. BARNES and LAUREL P. BARNES, his wife, Individually and t/a BARNES ENTERPRISES, a Limited Partnership,

Grantor,

TO

BEACH CREEK MARINA, INC., a New Jersey Corporation,

Grantee.

Saul Zimmerman, Esquire
Podvey, Sachs, Meanor & Catenacci
One Gateway Center
Newark, New Jersey   07102
(201) 622-4702



L269208

DB1837P0280

## J. P. BAINBRIDGE & ASSOCIATES, INC.

12-20-06   14:30 FAX 973 325 1508          THE RUBICON COMPANIES

TO    TEED - PARGAIN AND SALE -Cove-nad as to Grantor's Acht          Cop     THE 1982 by ALL-STATE LEGAL SUPPLY CO
      IND. TO IND, OR CORP — Plain Language          A D C H  5 7 a 1       — One Commerce Drive, Cranford, N J 07016

Prepared by/ (employee's name below reference)

## DEED

This Deed is made on          June 2          , 1987

ROBERT P. ERIC, ESQ.

BETWEEN    PHILOMENA DIMARKS, Widow,

whose address is    125 West Sixth Avenue, North Wildwood, New Jersey 08260,
referred to as the Grantor.

AND        BEACH CREEK MARINA, INC.

whose post office address is    395 Pleasant Valley Way, West Orange, New Jersey 07052,
referred to as the Grantee.
The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

Transfer of Ownership.  The Grantor grants and conveys (transfers ownership of) the property
described below to the Grantee. This transfer is made for the sum of One Hundred Thousand
($100,000.00).
The Grantor acknowledges receipt of this money.

Tax Map Reference.  (N.J.S.A. 46:15-2.1) Municipality of          North Wildwood
Block No. 152          Lot Nos. 400, 402, 404 & 418   Account No.
☐ No property tax identification number is available on the date of this deed. (Check box if applicable.)

Property.  The property consists of the land and all the buildings and structures on the land in
the          City          of          North Wildwood
County of          Cape May          and State of New Jersey. The legal description is:

BEGINNING at the intersection of the Northwesterly line of New York Avenue
with the Southwesterly line of Sixth Avenue; extending thence

(1)  Northwestwardly along the Southwesterly line of Sixth Avenue, 150 feet to
     the division line between Lots 404 and 406, Block and Plan hereinafter
     mentioned; thence

(2)  Southwestwardly along said division line between Lots 404 and 406 and
     further along the division line between Lots 405 and 407, 200 feet to the
     Northeasterly line of Seventh Avenue; thence

(3)  Southeastwardly along the Northeasterly line of Seventh Avenue, 50 feet
     to the division line between Lots 403 and 405, Block and Plan hereinafter
     mentioned; thence

(4)  Northeastwardly along said division line 100 feet to a corner common to
     Lots 402, 403, 404 and 405, Block and Plan hereinafter mentioned; thence

(5)  Extending Southeastwardly parallel with Sixth Avenue, 100 feet to the
     Northwesterly line of New York Avenue; thence

(6)  Northeastwardly along the Northwesterly line of New York Avenue 100 feet
     to the place of BEGINNING.

COMPRISING Lots 400, 402, 404 and 405, Block 152 on Rice Map 1900 and filed.

EXCEPTING THEREFROM AND THEREOUT Lot 405 in Block 152 of the Official Tax Map
of the City of North Wildwood, more particularly described as follows:

BEGINNING at a point in the Northeasterly line of Seventh Avenue 100 feet
Northwestwardly from the Northwesterly line of New York Avenue, extending
Northwestwardly along the Northeasterly line of Seventh Avenue 50 feet — and
of that width extending Northeastwardly between parallel lines 100 feet in
length or depth.

## J. P. BAINBRIDGE & ASSOCIATES, INC.

12/20/06  14:36 FAX 073 325 1508          THE RUBICON COMPANIES

BEING a part of the same land and premises conveyed unto Philomena DiMauro, Widow, from Vincent J. DiMauro and Louise A. DiMauro, his wife, by Deed dated January 4, 1974, and recorded on January 7, 1974 in Cape May County Deed Book 1322, Page 515, et seq.

SAID PREMISES are conveyed together with the lands to former center line of Sixth Avenue abutting the same as vacated in Vac Book 2, Page 235, by Ordinance #547 dated July 27, 1970, same being Lot 418 in Block 152.

UNDER AND SUBJECT TO such a state of facts as an accurate survey of the property may disclose, and further

UNDER AND SUBJECT TO all covenants, easements, and restrictions of record.-

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

Promises by Grantor.   The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

Signatures.   The Grantor signs this Deed as of the date at the top of the first page.

Witnessed by:

PHILOMENA DIMAURO
_____ (Seal)

_____ (Seal)

ROBERT P. LANG, ESQUIRE
An Attorney at Law of the State
of New Jersey

STATE OF NEW JERSEY, COUNTY OF Essex                    SS.:

I CERTIFY that on _____ , 1987 .
Personally appeared Vincent DiMauro as
attorney in fact for Philomena DiMauro
                                                     personally came before me
and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):
   (a)  is named in and personally signed this Deed;
   (b)  signed, sealed and delivered this Deed as his or her act and deed; and
   (c)  made this Deed for $ 100,000.00            as the full and actual consideration paid or to be
        paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

_____
(Print name of title below signature)

ROBERT P. LANG
ATTORNEY-AT-LAW
STATE OF NEW JERSEY

## J. P. BAINBRIDGE & ASSOCIATES, INC.



12-20/05  14:37 FAX 073 325 1595

THE RUBICON COMPANIES

DEED

PHILOMENA DiMAURO, Widow,

TO

BEACH CREEK MARINA, INC.,

Grantor.

Grantee.

*Dated:*   June 2   , 1961

*Record and return to:*

Saul Zimmerman, Esquire
Podvey, Sachs, et al
One Gateway Center
Newark, New Jersey   07102

# J. P. BAINBRIDGE & ASSOCIATES, INC.

12.20/06  14.38 FAX 073 325 1508          THE RUBICON COMPANIES

DEED - BARGAIN AND SALE (Covenant as to Grantor's Acts)
IND TO IND. OR CORP — Plain LANGUAGE          AUGR 37-1

© 1983 By ALL-STATE LEGAL SUPPLY CO
One Commerce Drive, Cranford, N.J. 07016

## DEED

Prepared by: (print signer's name below signature)

ROBERT P. LANG, ESQ.

This Deed is made on          June 2          , 19₈7

BETWEEN   THE DIMAURO FAMILY PARTNERSHIP, A New Jersey General Partnership,

whose address is 6th and New York Avenues, North Wildwood. New Jersey 08260,
referred to as the Grantor.

AND   BEACH CREEK MARINA, INC.

whose post office address is 395 Pleasant Valley Way, West Orange, New Jersey 07052,
referred to as the Grantee.
The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

Transfer of Ownership.  The Grantor grants and conveys (transfers ownership of) the property
described below to the Grantee. This transfer is made for the sum of Seven Hundred Fifty Thousand
Dollars ($750,000.00).

The Grantor acknowledges receipt of this money.

Tax Map Reference.  (N.J.S.A. 46:15-2.1) Municipality of          North Wildwood
Block Nos. 152 & 153          Lot Nos. 406, 408, 410 to 415, inclusive, & 417; and
☐  No property tax identification number is available on the date of this Deed. (Check box if applicable.)          406 to 415 inclusive respectively.

Property.  The property consists of the land and all the buildings and structures on the land in
the          City          of          North Wildwood          ,
County of          Cape May          and State of New Jersey. The legal description is:

### TRACT #1

BEGINNING in the Southwesterly line of Sixth Avenue 150 feet Northwestwardly
from the Northwesterly line of New York Avenue; extending Southwestwardly
parallel with New York Avenue 200 feet to the Northeasterly line of Seventh
Avenue; and of that width extending Northwestwardly between parallel lines,
one being the Southwesterly line of Sixth Avenue and the other being the
Northeasterly line of Seventh Avenue, be the distance what it may, to the
Southeasterly line of Beach Creek.

EXCEPTING THEREFROM AND THEREOUT all those tracts, parcels of land and
premises situate, lying and being in the City of North Wildwood, County of
Cape May and State of New Jersey, more particularly described as follows:

BEGINNING at a point in the Northeasterly side line of Seventh Avenue at a
distance of 150 feet Northwestwardly from intersection of said Northeasterly
side line of Seventh Avenue with Northwesterly side line of New York Avenue,
said beginning point being also at division line between Lot 405 and Lot 407
Block 152; thence extending Northwestwardly along Northeasterly side line of
Seventh Avenue, distance of 100 feet to division line between Lot 409 and
Lot 411; and thence at right angles to said line of Seventh Avenue between
parallel lines (with a width of 100 feet) in length or depth Northeastwardly
distance of 100 feet.

BEING Lots 406, 408, 410 to 415 inclusive, and 417, Block 152 on Official Tax
Map of the City of North Wildwood.

### TRACT #2

BEGINNING at the intersection of the Northwesterly line of New York Avenue
with the Southwesterly line of Fifth Avenue, extending

(1)  Northwestwardly along the Southwesterly line of Fifth Avenue, 345 feet
more or less to Beach Creek; thence

## J. P. BAINBRIDGE & ASSOCIATES, INC.

(2) Southwestwardly, along Beach Creek, to the Northeasterly line of Sixth Avenue; thence

(3) Southeastwardly, along the Northeasterly line of Sixth Avenue 345 feet more or less to the Northwesterly line of New York Avenue; thence

(4) Northeastwardly, along the Northwesterly line of New York Avenue, 200 feet to the place of BEGINNING.

BEING Lots 400 to 413, inclusive, Block 153 on the Official Tax Map of North Wildwood 1931.

BEING the same land and premises conveyed by Joseph V. DiMauro, a Roman Catholic priest, to the DiMauro Family Partnership, a New Jersey General Partnership, by Deed dated August 1, 1980 and recorded in the Cape May County Clerk's Office on August 8, 1980, in Deed Book 1454, Page 1069, et seq.

SAID PREMISES are conveyed together with the lands to former center line of Sixth Avenue abutting the same as vacated in Vac Book 2, Page 236, by Ordinance #547 dated July 27, 1970.

UNDER AND SUBJECT TO such a state of facts as an accurate survey of the property may disclose, and further

UNDER AND SUBJECT TO all covenants, easements, and restrictions of record.

# J. P. BAINBRIDGE & ASSOCIATES, INC.

12/20/06  14:39 FAX 973 325 1508          THE RUBICON COMPANIES

**Promises by Grantor.** The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

**Signatures.** The Grantor signs this Deed as of the date at the top of the first page.

Witnessed by:

_____
ROBERT P. LANG, ESQUIRE
An Attorney at Law of the
State of New Jersey

THE DiMAURO FAMILY PARTNERSHIP
A New Jersey General Partnership

By _____(Seal)
JOSEPH DiMAURO

By _____(Seal)
VINCENT DiMAURO

By ANGELA SACCHET, by her Attorney-In-
Fact, Vincent DiMauro
attorney — in — fact Vincent DiMauro

By _____(Seal)
MICHAELANGELO DiMAURO

STATE OF NEW JERSEY, COUNTY OF     ESSEX          SS.:

I CERTIFY that on June 2 , 19 87 . Joseph DiMauro, Vincent DiMauro individually and as attorney in fact for Angela Sacchet and Michaelangelo DiMauro + Vincent DiMauro individually

personally came before me

and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):
(a)  is named in and personally signed this Deed;
(b)  signed, sealed and delivered this Deed as his or her act and deed; and
(c)  made this Deed for $750,000.00          as the full and actual consideration paid or to be
    paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

_____
ROBERT P. LANG
ATTORNEY-AT-LAW
STATE OF NEW JERSEY

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



12/20/06  14:39 FAX 973 325 1508          THE RUBICON COMPANIES

# DEED

THE DIMAURO FAMILY PARTNERSHIP,
A New Jersey General Partnership,

                                        Grantor,

            TO

BEACH CREEK MARINA, INC.

                                        Grantee.

*Dated:*          June 2          , 19 87

*Record and return to:*
Saul Zimmerman, Esquire
Podvey, Sachs, et al.
One Gateway Center
Newark, New Jersey    07102

## A TRUE COPY



## J. P. BAINBRIDGE & ASSOCIATES, INC.

12/20/92  14:37 FAX 973 325 1508          THE RUBICON COMPANIES

TO:  TO - BARGAIN AND SALE (Covenant as to Grantor's Acts)
     NO TO IND OR CORP — Plain Language          ADGR  S 1—1

CORP:  © 1982 by ALL-STATE LEGAL SUPPLY CO
       One Commerce Drive, Cranford, N.J. 07016

DEED

Prepared by: (print name's name below signature)
ROBERT F. LANG, ESQ.

This Deed is made on       June 2       , 19 87 ,

BETWEEN    JOSEPH V. DiMAURO, A Roman Catholic priest,

whose address is    Sixth and New York Avenues, North Wildwood, New Jersey 08260,
                                                          referred to as the Grantor,

AND        BEACH CREEK MARINA, INC.,

whose post office address is  395 Pleasant Valley Way, West Orange, New Jersey 07052,
                                                          referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

Transfer of Ownership.  The Grantor grants and conveys (transfers ownership of) the property
described below to the Grantee. This transfer is made for the sum of Seven Hundred Fifty Thousand
Dollars ($750,000.00).
                                        The Grantor acknowledges receipt of this money.

Tax Map Reference.  (N.J.S.A. 46:15-2.1) Municipality of        North Wildwood
Block No.                        Lot No.                          Account No.
[X] No property tax identification number is available on the date of this deed. (Check box if applicable.)

Property.  The property consists of the land and all the buildings and structures on the land in
the                          City                  of          North Wildwood
County of        Cape May          and State of New Jersey. The legal description is:


BEGINNING at a point in the Easterly mean high water line of Beach Creek where
the same is intersected by the Southwesterly side line of Fifth Avenue, 70 feet
wide, said point being distant, along the said Southwesterly side line of Fifth
Avenue, 217 feet, more or less, on a bearing of North 45 degrees 00 minutes
00 seconds West from the intersection formed by the aforesaid Southwesterly
side line of Fifth Avenue with the Northwesterly side line of New York Avenue,
and running

(1)  North 45 degrees 00 minutes 00 seconds West, a distance of 111.00 feet,
     more or less, to a point in the New Jersey Pierhead Line, last mentioned
     point being distant 328.00 feet on a bearing of North 45 degrees 00 min-
     utes 00 seconds West from the aforesaid intersection formed by the
     Southwesterly side line of Fifth Avenue with the Northwesterly side line
     of New York Avenue; thence

(2)  Along the said New Jersey Pierhead Line South 45 degrees 00 minutes
     00 seconds West, a distance of 235.00 feet to a point; thence

(3)  South 45 degrees 00 minutes 00 seconds East, a distance of 109.49 feet,
     more or less, to a point in the aforesaid Easterly mean high water line
     of Beach Creek; thence

(4)  Along the aforesaid Easterly mean high water line of Beach Creek in a
     general Northeastwardly direction the various courses thereof, a distance
     of 235 feet, more or less, to the point and place of BEGINNING.

FRONTAGE involved measures approximately 235.92 feet, more or less, along the
New Jersey Bulkhead Line herein established.

TOTAL AREA INVOLVED measures approximately 0.597 acre, more or less, which is
delineated within the dashed lines on the aforesaid map attached hereto and
made a part hereof.

## J. P. BAINBRIDGE & ASSOCIATES, INC.

12/20/06  14:37 FAX 973 325 1508          THE RUBICON COMPANIES

BEING the same land and premises conveyed unto Joseph V. DiMauro, a Roman Catholic priest, by Riparian Grant dated May 22, 1973 from the State of New Jersey and recorded in Liber T-6 of Grants and Leases of Lands Under Water at Folio #213-220, etc., in the records of the Department of Environmental Protection, Division of Marine Services, and also intended to be recorded simultaneously herewith in the Cape May County Clerk's Office.

UNDER AND SUBJECT TO all of the terms, conditions, and obligations as contained in said Riparian Grant.

UNDER AND SUBJECT TO such a state of facts as an accurate survey of the property may disclose, and further

UNDER AND SUBJECT TO all covenants, easements, and restrictions of record.

## J. P. BAINBRIDGE & ASSOCIATES, INC.

12.20/06  14:38 FAX 973 325 1506          THE RUBICON COMPANIES
                                              1

Promises by Grantor.  The Grantor promises that the Grantor has done no act to encumber the
property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that
the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making
a mortgage or allowing a judgment to be entered against the Grantor).

Signatures.  The Grantor signs this Deed as of day date at the top of the first page.

Witnessed by:                                    _____(Seal)
                                                  JOSEPH V. DINAURO
_____                          _____(Seal)
ROBERT P. LANG, ESQUIRE
An Attorney at Law of the
State of New Jersey

STATE OF NEW JERSEY, COUNTY OF     ESSEX          SS.:

    I CERTIFY that on  _____ , 1987  . Joseph V. D. Nauro

                                                  personally came before me
and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):
    (a)  is named in and personally signed this Deed;
    (b)  signed, sealed and delivered this Deed as his or her act and deed; and
    (c)  made this Deed for $750,000.00          as the full and actual consideration paid or to be
         paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

                                   _____
                                   (Print name and title below signature)
                                   ROBERT P. LANG
                                   ATTORNEY-AT-LAW
                                   STATE OF NEW JERSEY

## J. P. BAINBRIDGE & ASSOCIATES, INC.



12·20·06  14:35 FAX 973 325 1500       THE RUBICON COMPANIES

DEED

JOSEPH V. DiMAURO, A Roman Catholic
Priest

                                    Grantor.

TO

BEACH CREEK MARINA, INC.,

                                    Grantee.

Dated:       June 2       .19 87

Record and return to:

Saul Zimmerman, Esquire
Podvey, Sachs, et al.
One Gateway Center
Newark, New Jersey  07102

A TRUE COPY

## J. P. BAINBRIDGE & ASSOCIATES, INC.



See File 6022 *

### DEED OF EASEMENT

This Deed of Easement and right-of-way is made this 5th day of October, 1999 by and between Beach Creek Marina, Inc., a New Jersey corporation ("Beach Creek"), and Marina Bay Towers Urban Renewal, L.P., a New Jersey limited partnership ("Marina Bay").

### BACKGROUND

Beach Creek is the owner of certain real estate located in the City of North Wildwood, Cape May County, New Jersey, as more particularly described in Schedule "A" attached hereto (the "Beach Creek Property"); and

A portion of the Beach Creek Property has been ground leased to Marina Bay, as more particularly described in Schedule "B" attached hereto (the "Marina Bay Property") and, pursuant to a Master Deed of even date herewith, Marina Bay has established a leasehold condominium on the Marina Bay Property comprised of two units, a Residential Unit and a Commercial Unit; and

In order to facilitate pedestrian and vehicular access and circulation to and about said Residential Unit, said Commercial Unit and the remainder of the Beach Creek Property, Beach Creek and Marina Bay desire to grant to each other a reciprocal right-of-way over certain portions of the property of each.

Now, therefore, in consideration of such reciprocal rights and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  Each party hereto, their successors and assigns, their tenants, servants, visitors and licensees, shall forever have the full and free right to pass and repass along and over the area identified as the Permanent Reciprocal R.O.W. on the plan attached hereto as Exhibit A, as further described on Schedule C hereto, for the purpose of gaining access to the above-referenced Residential Unit, Commercial Unit and Beach Creek Property. Such right, however, shall be limited to the uses for which a given portion of the Permanent Reciprocal R.O.W. area is intended, i.e., pedestrian use on sidewalks and stairs, vehicular use on driveways and parking areas.

2.  Notwithstanding the foregoing, Beach Creek reserves the right to restrict the use of that portion of the Permanent Reciprocal R.O.W. not located within the Residential Unit or the Commercial Unit as may be necessary for storage of boats, trailers and other equipment during the period from October 1 through May 15.

3.  Maintenance of that portion of the Permanent Reciprocal R.O.W. located within the Residential Unit and the Commercial Unit shall be the responsibility of Marina Bay Towers Condominium Association, Inc. (the "Association"). Maintenance of that portion of the Permanent Reciprocal R.O.W. not located within the Residential Unit or the Commercial Unit shall be the responsibility of Beach Creek, provided, however, that the Association shall be responsible for snow removal and de-icing on the entire Permanent Reciprocal R.O.W.

40033773:1

DB2831P0381

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

SCHEDULE A

 **SCHOOR DEPALMA**
Engineers and Design Professionals

JOB NO. S96121A
July 15, 1999
Revised: October 28, 1999
Page 1 of 3

### DESCRIPTION OF PROPERTY OF BEACH CREEK MARINA, INC.

Description of delineation of entire tract, being residential, commercial, reciprocal and Marina / Restaurant leased areas combined, as shown on a map entitled "Survey Of And Leased Area Plan For Marina Bay Towers, Block 152 & 153, City Of North Wildwood, Cape May County, New Jersey". Prepared by Schoor Depalma, Manalapan, New Jersey. Dated July 15,1999.

Beginning at the point, said point being the intersection of the northwesterly line of New York Avenue (70' R.O.W.) where the same is intersected by the northeasterly line of Seventh Avenue (70' R.O.W.), thence;

1.   Along the northeasterly line of Seventh Avenue, North forty-five degrees zero minutes zero seconds West (N 45°00'00" W), a distance of four hundred twenty-three and forty-nine hundredths feet (423.49') to a point, thence:

2.   South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of thirteen and ninety-five hundredths feet (13.95') to a point, thence;

The Following sixteen (16) courses are along riparian grant line;

3.   North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of one hundred seventy and zero hundredths feet (170.00') to a point, thence;

4.   North forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of fifty and seventy-three hundredths feet (50.73') to a point, thence;

5.   North seventy-five degrees fifty-five minutes zero seconds East (N 75° 55' 00" E), a distance of two hundred sixty-three and sixty-six hundredths feet (263.66') to a point, thence;

6.   South fourteen degrees five minutes zero seconds East (S 14° 05' 00" E), a distance of thirty-five and zero hundredths feet (35.00') to a point, thence;

Justin Corporate Center, 200 State Highway Nine, P.O. Box 900, Manalapan, NJ 07726-0900 Tel: 732.577.9000 Fax: 732.577.9988
Manalapan ■ Brick ■ Parsippany ■ Phillipsburg ■ Voorhees ■ Cape May Court House ■ Philadelphia
www.schoordepalma.com

DB2831P0384

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 28, 1999
Revised: October 28,1999
Page 2

7.  North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a
    distance of five and zero hundredths feet (5.00') to a point, thence;

8.  South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a
    distance of one hundred  and zero hundredths feet (100.00') to a point, thence;

9.  North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a
    distance of forty-five and zero hundredths feet (45.00') to a point, thence;

10. North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a
    distance of seventy-four and zero hundredths feet (74.00') to a point, thence;

11. North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a
    distance of fifty-five and zero hundredths feet (55.00') to a point, thence;

12. South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a
    distance of seventy-four and zero hundredths feet (74.00') to a point, thence;

13. North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a
    distance of twenty-five and zero hundredths feet (25.00') to a point, thence;

14. North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a
    distance of forty-four and zero hundredths feet (44.00') to a point, thence;

15. North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a
    distance of fifty and zero hundredths feet (50.00') to a point, thence;

16. South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a
    distance of twenty-seven and zero hundredths feet (27.00') to a point, thence;

17. North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a
    distance of eighty and zero hundredths feet (80.00') to a point, thence;

18. South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a
    distance of fifty-five and zero hundredths feet (55.00') to a point, thence;

19. South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a
    distance of five and zero hundredths feet (5.00') to a point, thence;

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 28, 1999
Revised: October 28,1999
Page 3

20.    South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a
       distance of forty-two and zero hundredths feet (42.00') to a point, thence;

21.    South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a
       distance of thirty and zero hundredths feet (30.00') to a point, thence;

22.    South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a
       distance of two hundred forty-eight and zero hundredths feet (248.00') to a point
       in the northwesterly line of New York Avenue, thence;

23.    Along the northwesterly line of New York Avenue, South forty-five degrees zero
       minutes zero seconds West (S 45° 00' 00" W), a distance of four hundred
       seventy and zero hundredths feet (470.00') to the point and place of beginning.

Containing 250,053 square feet (5.74 Acres)

Being also known as all of Blocks 152,153 and water rights as shown on a map entitled,
"Map Of Property Of North Wildwood Marina Housing, Blocks 152 & 153, City Of North
Wildwood, Cape May County, New Jersey". Prepared by McCumsey-Petry, P.C., West
Orange, New Jersey. Dated October 24,1995, and revised through December 15,1999.

Also being known and designated as Lots 400 through 418 in Block 152 & Lots 400
through 414 in Block 153, as shown on Sheet No. 7 of the tax map of the City Of North
Wildwood, Cape May County, New Jersey.

Martin F. Tirella
New Jersey P.L.S.
License No. 27477

CJK
N:\project\s\s-priv\s96121\a\Descriptions\10-28-396.doc

BB2831P0386

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

In witness whereof, the parties hereto have set their hand and seal the day and year above first written.

Attest: _____

BEACH CREEK MARINA, INC.
By: _____
Name: Paul Cocoziello
Title: Its Authorized Agent

MARINA BAY TOWERS URBAN RENEWAL, L.P.
BY:     FIRST COMMUNITY DEVELOPMENT
        CORP., ITS GENERAL PARTNER

Attest: _____

By: _____
Name: Rocco J. Meola
Title: President

Marina Bay Towers Condominium Association, Inc. signs this Deed of Easement in acknowledgment of its obligations hereunder.

MARINA BAY TOWERS CONDOMINIUM
ASSOCIATION, INC.

By: _____
Name: Paul Cocoziello
Title: Vice President

40033773:1

DB2831P0382

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

STATE OF NEW JERSEY   :
                          :   ss.:
COUNTY OF  ESSEX

BE IT REMEMBERED, that on this 21st day of September   , 1999, before me, the

subscriber, the undersigned authority, personally appeared Rocco J. Meola, president of First

Community Development Corporation, general partner of MARINA BAY TOWERS URBAN

RENEWAL, L.P., a New Jersey limited partnership, who I am satisfied is the person named in

and who executed the within instrument, and thereupon he acknowledged that he signed, sealed

and delivered the same as his act and deed for the uses and purposes therein expressed.  All of

which is hereby certified.

                                      SHEILA D. GRAHAM
                          A NOTARY PUBLIC OF NEW JERSEY
                          My Commission Expires June 28, 2001

STATE OF NEW JERSEY   :

COUNTY OF  ESSEX   :   ss.:

BE IT REMEMBERED, that on this 23rd day of September   , 1999, before me, the

subscriber, the undersigned authority, personally appeared Paul Cocoziello, authorized agent of

BEACH CREEK MARINA, INC., a New Jersey corporation, who I am satisfied is the person

named in and who executed the within instrument, and thereupon he acknowledged that he

signed, sealed and delivered the same as his act and deed for the uses and purposes therein

expressed.  All of which is hereby certified.

                                        SHEILA D. GRAHAM
                          A NOTARY PUBLIC OF NEW JERSEY
                          My Commission Expires June 28, 2001

40033773:1

## J. P. BAINBRIDGE & ASSOCIATES, INC.

SCHEDULE B



SCHOOR DEPALMA
Engineers and Design Professionals

JOB NO. S96121A
July 15, 1999
Revised: October 28, 1999
Page 1 of 5

## LEASE DESCRIPTION FOR GROUND LEASE AREA

Description of delineation of leased areas for ground lease area, being residential and commercial units leased area combined, as shown on a map entitled "Survey Of And Leased Area Plan For Marina Bay Towers, Blocks 152 & 153, City Of North Wildwood, Cape May County, New Jersey". Prepared by Schoor Depalma, Manalapan, New Jersey. Dated July 15, 1999.

### TRACT I

Beginning at the point, said point being the intersection of the northwesterly line of New York Avenue (70' R.O.W.) where the same is intersected by the northeasterly line of Seventh Avenue (70' R.O.W.), thence;

1. Along the northeasterly line of Seventh Avenue, North forty-five degrees zero minutes zero seconds West (N 45°00'00" W), a distance of two hundred fifty-five and fifty-one hundredths feet (255.51') to a point, thence:

2. North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of one hundred forty-one and eighteen hundredths feet (141.18') to a point, thence;

3. South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of sixteen and fifty hundredths feet (16.50') to a point, thence;

4. In a southeasterly direction, along a curve to the left, having a radius of two and fifty hundredths feet (2.50') and an arc length of three and ninety-three hundredths feet (3.93') to a point, thence;

5. North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of thirteen and seventeen hundredths feet (13.17') to a point, thence;

6. South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of eighty-one and one hundredths feet (81.01') to a point, thence:

Justin Corporate Center, 200 State Highway Nine, P.O. Box 900, Manalapan, NJ 07726-0900 Tel: 732.577.9000 Fax: 732.577.9688
Manalapan ■ Brick ■ Parsippany ■ Phillipsburg ■ Voorhees ■ Cape May Court House ■ Philadelphia
www.schoordepalma.com

DB2831P0387

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 2

7.    North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of fifty-three and fifteen hundredths feet (53.15') to a point, thence;

8.    South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of sixteen and fifty hundredths feet (16.50') to a point, thence;

9.    North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of twenty-one and zero hundredths feet (21.00') to a point, thence;

10.    South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of one hundred thirty-nine and zero hundredths feet (139.00') to a point in the northwesterly line of New York Avenue, thence;

11.    Along the northwesterly line of New York Avenue, South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of two hundred thirty-one and zero hundredths feet (231.00') to the point and place of beginning.

Containing 50,965 square feet (1.17 Acres).

Being intended to describe part of Blocks 152 & 153 as shown on a map entitled, "Map Of Property Of North Wildwood Marina Housing, Blocks 152 & 153, City Of North Wildwood, Cape May County, New Jersey". Prepared by McCumsey-Petry, P.C., West Orange, New Jersey. Dated October 24,1995, and revised through December 15,1997

Also being known and designated as Lots 400 through 405, 407, 409 and Part of Lots 406, 408, 410, 411 and 418 in Block 152 & Part of Lot 414 in Block 153 as shown on Sheet No. 7 of the tax map of the City Of North Wildwood, Cape May County, New Jersey.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 3

<u>TRACT II</u>

Beginning at the point, said point being the following two (2) courses from the northwesterly line of New York Avenue (70' R.O.W.), where the same is intersected by the northeasterly line of Seventh Avenue (70' R.O.W.).

   a) Along the northeasterly line of Seventh Avenue, North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of two hundred fifty-five and zero hundredths feet (255.00') to a point, thence;

   b) North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of forty-nine and fifty hundredths feet (49.50'), to the said beginning point running, thence;

1. North forty-five degrees zero minutes zero seconds West (N 45°00'00" W), a distance of seventy-three and zero hundredths feet (73.00') to a point, thence;

2. North forty-five degrees zero minutes zero seconds East (N 45°00'00" E), a distance of sixteen and fifty hundredths feet (16.50') to a point, thence;

3. South forty-five degrees zero minutes zero seconds East (S 45°00'00" E), a distance of seventy-three and zero hundredths feet (73.00') to a point, thence;

4. South forty-five degrees zero minutes zero seconds West (S 45°00'00" W), a distance of Sixteen and fifty hundredths feet (16.50') to the point and place of beginning.

Containing 1,205 square feet (0.03 Acres).

Being intended to describe part of Block 153 as shown on a map entitled, "Map Of Property Of North Wildwood Marina Housing, Blocks 152 & 153, City Of North Wildwood, Cape May County, New Jersey". Prepared by McCumsey-Petry, P.C., West Orange, New Jersey. Dated October 24,1995, and revised through December 15,1997.

DB2831P0389

## J. P. BAINBRIDGE & ASSOCIATES, INC.



S96121A
October 29, 1999
Revised: October 28, 1999
Page 4

Also being known and designated as Part of Lots 401, 403, 405 and 414 in Block 153 as shown on Sheet No. 7 of the tax map of the City Of North Wildwood, Cape May County, New Jersey.

### TRACT III

Beginning at the point, said point being the following two (2) courses from the northwesterly line of New York Avenue (70' R.O.W.), where the same is intersected by the northeasterly line of Seventh Avenue (70' R.O.W.).

   a) Along the northeasterly line of Seventh Avenue, North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of two hundred fifty-seven and fifty hundredths feet (257.50') to a point, thence;

   b) North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of six and fifty hundredths feet (6.50'), to the said beginning point running, thence;

1. North forty-five degrees zero minutes zero seconds West (N 45°00'00" W), a distance of sixteen and fifty hundredths feet (16.50') to a point, thence;

2. North forty-five degrees zero minutes zero seconds East (N 45°00'00" E), a distance of one hundred and zero hundredths feet (100.00') to a point, thence;

3. South forty-five degrees zero minutes zero seconds East (S 45°00'00" E), a distance of sixteen and fifty hundredths feet (16.50') to a point, thence;

4. South forty-five degrees zero minutes zero seconds West (S 45°00'00" W), a distance of one hundred and zero hundredths feet (100.00') to the point and place of beginning.

Containing 1,650 square feet (0.04 Acres).

Being also known as part of Block 153 as shown on a map entitled, "Map Of Property Of North Wildwood Marina Housing, Blocks 152 & 153, City Of North Wildwood, Cape May County, New Jersey". Prepared by McCumsey-Petry, P.C., West Orange, New Jersey. Dated October 24,1995, and revised through December 15,1997.

DB2831P0390

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 5

Also being known and designated as Part of Lots 401 and 418 in Block 153, as shown on Sheet No. 7 of the tax map of the City Of North Wildwood, Cape May County, New Jersey.

Total area of all three (3) tracts combined, containing 53,820 square feet (1.24 Acres).

Martin F. Tirella
New Jersey P.L.S.
License No. 27477

CJK
N:\project\s\s-priv\s96121\a\Descriptions\10-28-995.doc

DB2831P0391

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

SCHEDULE C



**SCHOOR DEPALMA**
Engineers and Design Professionals

JOB NO. S96121A
July 15, 1999
Revised: October 28, 1999
Page 1 of 9

## LEASE DESCRIPTION FOR PERMANENT RECIPROCAL R.O.W.

Description of delineation of leased areas for permanent reciprocal right of way to be described with two (2) exceptions, as shown on a map entitled "Survey Of And Leased Area Plan For Marina Bay Towers, Blocks 152 & 153, City Of North Wildwood, Cape May County, New Jersey". Prepared by Schoor Depalma, Manalapan, New Jersey. Dated July 15,1999.

Beginning at the point, said point being the intersection of the northwesterly line of New York Avenue (70' R.O.W.) where the same is intersected by the northeasterly line of Seventh Avenue (70' R.O.W.), thence;

1.   Along the northeasterly line of Seventh Avenue, North forty-five degrees zero minutes zero seconds West (N 45°00'00" W), a distance of fifty-seven and eighty-four hundredths feet (57.84') to a point, thence:

2.   North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of ten and fifty hundredths feet (10.50') to a point, thence;

3.   South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of forty-three and thirty-four hundredths feet (43.34') to a point, thence;

4.   North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of twenty-four and zero hundredths feet (24.00') to a point, thence;

5.   South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of four and zero hundredths feet (4.00') to a point, thence;

6.   North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of forty-nine and thirty-three hundredths feet (49.33') to a point, thence:

7.   North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of four and zero hundredths feet (4.00') to a point, thence;

Justin Corporate Center, 200 State Highway Nine, P.O. Box 900, Manalapan, NJ 07726-0900 Tel: 732.577.9000 Fax: 732.577.9888
Manalapan ▪ Brick ▪ Parsippany ▪ Phillipsburg ▪ Voorhees ▪ Cape May Court House ▪ Philadelphia
www.schoordepalma.com

DB2831P0392

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 2

8.    North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of twenty-three and seventy-nine hundredths feet (23.79') to a point, thence;

9.    North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of thirty-four and forty-two hundredths feet (34.42') to a point, thence;

10.    North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of ten and eighty-seven hundredths feet (10.87') to a point, thence;

11.    South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of one and ninety-two hundredths feet (1.92') to a point, thence;

12.    North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of one hundred twelve and fifty hundredths feet (112.50') to a point, thence;

13.    North forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of one hundred sixteen and zero hundredths feet (116.00') to a point, thence;

14.    North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of twenty-four and zero hundredths feet (24.00') to a point, thence;

15.    South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of fourteen and zero hundredths feet (14.00') to a point, thence;

16.    North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of sixty and zero hundredths feet (60.00') to a point, thence;

17.    South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of one hundred two and zero hundredths feet (102.00') to a point, thence;

18.    North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of forty-eight and zero hundredths feet (48.00') to a point, thence;

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 3

19.  North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a
     distance of ninety-one and zero hundredths feet (91.00') to a point, thence;

20.  In a northeasterly direction, along a curve to the right, having a radius of six and
     zero hundredths feet (6.00') and an arc length of nine and forty-two hundredths
     feet (9.42'), to a point, thence;

21.  North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a
     distance of fifty-four and zero hundredths feet (54.00') to a point, thence;

22.  North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a
     distance of sixty-eight and sixty-eight hundredths feet (68.68') to a point, thence;

23.  South forty-four degrees thirty minutes fifty-six seconds West (S 44° 30' 56" W),
     a distance of one hundred thirty-eight and seventy-eight hundredths feet
     (138.78') to a point, thence;

24.  South fifty-six degrees six minutes twenty-two seconds West (S 56° 06' 22" W), a
     distance of one hundred twenty-nine and eighty hundredths feet (129.80') to a
     point, thence;

25.  South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a
     distance of thirteen and seventeen hundredths feet (13.17') to a point, thence;

26.  In a northwesterly direction, along a curve to the right, having a radius of two and
     fifty hundredths feet (2.50') and an arc length of three and ninety-three
     hundredths feet (3.93'), to a point, thence;

27.  North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a
     distance of sixteen and fifty hundredths feet (16.50') to a point, thence;

28.  South seventy-two degrees eighteen minutes eight seconds West (S 72° 18' 08"
     W), a distance of thirty and forty-nine hundredths feet (30.49') to a point, thence;

29.  South thirty-nine degrees fifty-six minutes fifty-seven seconds West (S 39° 56'
     57" W), a distance of forty-five and nine hundredths feet (45.09') to a point,
     thence;

DB2831P0394

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 4

30. South twenty-nine degrees ten minutes six seconds West (S 29° 10' 06" W), a distance of zero and ninety-eight hundredths feet (0.98') to a point, thence;

31. South twenty-three degrees forty minutes eleven seconds West (S 23° 40' 11" W), a distance of twenty and sixty-one hundredths feet (20.61') to a point, thence;

32. South thirty-seven degrees forty-two minutes thirty-seven seconds West (S 37° 42' 37" W), a distance of three and eighty-nine hundredths feet (3.89') to a point, thence;

33. South thirty-seven degrees fifty-one minutes thirty seconds West (S 37° 51' 30" W), a distance of fourteen and fourteen hundredths feet (14.14') to a point, thence;

34. South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of thirty-one and fourteen hundredths feet (31.14') to a point on the northeasterly line of Seventh Avenue, thence;

35. Along the northeasterly line of Seventh Avenue, North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of nine and forty-seven hundredths feet (9.47') to a point, thence;

36. North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of twenty-six and twenty-seven hundredths feet (26.27') to a point, thence;

37. North thirty-seven degrees fifty-one minutes thirty seconds East (N 37° 51' 30" E), a distance of seventeen and seventy-eight hundredths feet (17.78') to a point, thence;

38. North thirty-seven degrees forty-two minutes thirty-seven seconds East (N 37° 42' 37" E), a distance of two and sixty-four hundredths feet (2.64') to a point, thence;

39. North twenty-three degrees forty minutes eleven seconds East (N 23° 40' 11" E), a distance of nineteen and eighty-six hundredths feet (19.86') to a point, thence;

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 5

40.  North twenty-nine degrees ten minutes six seconds East (N 29° 10' 06" E), a distance of two and forty-one hundredths feet (2.41') to a point, thence;

41.  North thirty-nine degrees fifty-six minutes fifty-seven seconds East (N 39° 56' 57" E), a distance of forty-eight and fifty-four hundredths feet (48.54') to a point, thence;

42.  North sixty-eight degrees seven minutes fifty-one seconds East (N 68° 07' 51" E), a distance of twenty-eight and ninety-five hundredths feet (28.95') to a point, thence;

43.  North sixty-four degrees fifty-six minutes eight seconds East (N 64° 56' 08" E), a distance of four and fifty-nine hundredths feet (4.59') to a point, thence;

44.  North eighty-three degrees seventeen minutes fifteen seconds East (N 83° 17' 15" E), a distance of three and twenty-three hundredths feet (3.23') to a point, thence;

45.  South seventy-three degrees thirty-three minutes fifty-three seconds East (S 73° 33' 53" E), a distance of five and fifty-seven hundredths feet (5.57') to a point, thence;

46.  South sixty-eight degrees twenty-nine minutes fifty-nine seconds East (S 68° 29' 59" E), a distance of fourteen and nine hundredths feet (14.09') to a point, thence;

47.  North fifty-six degrees fifteen minutes nine seconds East (N 56° 15' 09" E), a distance of one hundred thirty and twenty-one hundredths feet (130.21') to a point, thence;

48.  North forty-four degrees thirty minutes fifty-six seconds East (N 44° 30' 56" E), a distance of one hundred eighty-four and eighty-four hundredths feet (184.84') to a point, thence;

49.  South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of thirty-eight and eight hundredths feet (38.08') to a point, thence;

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 6

50. South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of twenty-three and zero hundredths feet (23.00') to a point, thence;

51. South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of one hundred sixty-two and zero hundredths feet (162.00') to a point, thence;

52. South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of one hundred ninety-two and zero hundredths feet (192.00') to a point, thence;

53. South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of twenty-three and zero hundredths feet (23.00') to a point on the northwesterly line of New York Avenue, thence;

54. Along the northwesterly line of New York Avenue, South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of twenty-four and zero hundredths feet (24.00') to a point, thence;

55. North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of twenty-three and zero hundredths feet (23.00') to a point, thence;

56. South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of eighty-six and fifty hundredths feet (86.50') to a point, thence;

57. South forty-five degrees zero minutes zero seconds East (S 45° 00' 00" E), a distance of twenty-three and zero hundredths feet (23.00') to a point on the northwesterly line of New York Avenue, thence;

58. Along the northwesterly line of New York Avenue, South forty-five degrees zero minutes zero seconds West (S 45° 00' 00" W), a distance of one hundred forty-four and fifty hundredths feet (144.50') to the point and place of beginning.

Containing 35,772 square feet (0.82 Acres) TOTAL
Containing 30,372 square feet (0.70 Acres) AFTER EXCEPTIONS

## J. P. BAINBRIDGE & ASSOCIATES, INC.



S96121A
October 29, 1999
Revised: October 28, 1999
Page 7

Being intended to describe part of Blocks 152 & 153 as shown on a map entitled, "Map Of Property Of North Wildwood Marina Housing,  Blocks 152 & 153, City Of North Wildwood, Cape May County, New Jersey". Prepared by McCumsey-Petry, P.C., West Orange, New Jersey.  Dated October 24,1995, and revised through December 15,1999.

EXCEPTION  I

Beginning at the point, said point being the following two (2) courses from the northwesterly line of New York Avenue (70' R.O.W.), where the same is intersected by the northeasterly line of Seventh Avenue (70' R.O.W.).

a) Along the northeasterly line of Seventh Avenue, North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of two hundred fifty-five and zero hundredths feet (255.00') to a point, thence;

b) North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of forty-seven and zero hundredths feet (47.00'), to the said beginning point running, thence;

1. North forty-five degrees zero minutes zero seconds West (N 45°00'00" W), a distance of seventy-eight and zero hundredths feet (78.00') to a point, thence;

2. North forty-five degrees zero minutes zero seconds East (N 45°00'00" E), a distance of thirty-six and zero hundredths feet (36.00') to a point, thence;

3. South forty-five degrees zero minutes zero seconds East (S 45°00'00" E), a distance of seventy-eight and zero hundredths feet (78.00') to a point, thence;

4. South forty-five degrees zero minutes zero seconds West (S 45°00'00" W), a distance of thirty-six and zero hundredths feet (36.00') to the point and place of beginning.

Containing 2,808 square feet (0.06 Acres).

DB2831P0398

## J. P. BAINBRIDGE & ASSOCIATES, INC.



S96121A
October 29, 1999
Revised: October 28, 1999
Page 8

Being intended to describe part of Block 153 as shown on a map entitled, "Map Of Property Of North Wildwood Marina Housing, Blocks 152 & 153, City Of North Wildwood, Cape May County, New Jersey", Prepared by McCumsey-Petry, P.C., West Orange, New Jersey. Dated October 24,1995, and revised through December 15,1999.

### EXCEPTION II

Beginning at the point, said point being the following two (2) courses from the northwesterly line of New York Avenue (70' R.O.W.), where the same is intersected by the northeasterly line of Seventh Avenue (70' R.O.W.).

    c) Along the northeasterly line of Seventh Avenue, North forty-five degrees zero minutes zero seconds East (N 45° 00' 00" E), a distance of three hundred eighty-seven and zero hundredths feet (387.00') to a point, thence;

    d) North forty-five degrees zero minutes zero seconds West (N 45° 00' 00" W), a distance of forty-eight and zero hundredths feet (48.00'), to the said beginning point running, thence;

1. North forty-five degrees zero minutes zero seconds West (N 45°00'00" W), a distance of seventy-two and zero hundredths feet (72.00') to a point, thence;

2. North forty-five degrees zero minutes zero seconds East (N 45°00'00" E), a distance of thirty-six and zero hundredths feet (36.00') to a point, thence;

3. South forty-five degrees zero minutes zero seconds East (S 45°00'00" E), a distance of seventy-two and zero hundredths feet (72.00') to a point, thence;

4. South forty-five degrees zero minutes zero seconds West (S 45°00'00" W), a distance of thirty-six and zero hundredths feet (36.00') to the point and place of beginning.

Containing 2,592 square feet (0.06 Acres).

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



S96121A
October 29, 1999
Revised: October 28, 1999
Page 9

Being also known as part of Block 153 as shown on a map entitled, "Map Of Property Of North Wildwood Marina Housing, Blocks 152 & 153, City Of North Wildwood, Cape May County, New Jersey". Prepared by McCurnsey-Petry, P.C., West Orange, New Jersey. Dated October 24,1995, and revised through December 15,1999.

Also being known and designated as Part of Lots 400, 401, 403, 408, 410, 411 and 418 in Block 152 & Part of Lots 400 through 406, 408, 409 and 414 in Block 153 as shown on Sheet No. 7 of the tax map of the City Of North Wildwood, Cape May County, New Jersey.

Martin F. Tirella
New Jersey P.L.S.
License No. 27477

CJK
N:\project\s\s-priv\s96121\s\Descriptions\10-28-993.doc

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

Exhibit A

Survey

See Survey which is recorded separately in the
Map Room of the Cape May County Clerk's Office

## J. P. BAINBRIDGE & ASSOCIATES, INC.

STATE OF NEW JERSEY   :

COUNTY OF $ESSEX$   :   ss.:

BE IT REMEMBERED, that on this *day of *_____ , 1999, before me, the subscriber, the undersigned authority, personally appeared Paul Cocoziello, Vice President of MARINA BAY TOWERS CONDOMINIUM ASSOCIATION, INC., a New Jersey corporation, who I am satisfied is the person named in and who executed the within instrument, and thereupon he acknowledged that he signed, sealed and delivered the same as his act and deed for the uses and purposes therein expressed. All of which is hereby certified.

SHEILA D. GRAHAM
A NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 28, 2001

WINDELS, MARX, DAVIES & IVES
120 ALBANY STREET PLAZA
NEW BRUNSWICK NJ 08901

40033773:1

99 NOV -5 AM 10:01

R031979

DB2831P0402

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



**J. P. BAINBRIDGE & ASSOCIATES, INC.**

Bk D2953 Pg569 #325

File No.77-0087   RENEWAL

### REVOCABLE LICENSE/LEASE

THE STATE OF NEW JERSEY:

TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN:

GREETING:

WHEREAS, the State of New Jersey owns the lands under tidewater hereinafter described,

AND WHEREAS, the Tidelands Resource Council in the Department of Environmental Protection is empowered under N.J.S.A. 13:1B-13 to approve license/lease of lands now or formerly under tidewater;

AND WHEREAS, the licensee/lessee herein is the record owner of the land abutting and adjoining the said lands under tidewater;

AND WHEREAS, BEACH CREEK MARINA, INC., has applied  to the Tidelands Resource Council in the Department of Environmental Protection,  for a license/lease to an area of land under tidewater for the use and maintenance of a marina in Beach Creek, outshore of Lots 406-417, Block 152 and Lots 400-407, Block 513, on New York Avenue between Fifth and Seventh Avenues in the City of North Wildwood, Cape May County, New Jersey, situate upon the lands of the State hereinafter described;

AND WHEREAS, the said Department of Environmental Protection, by a majority of the members of the Tidelands Resource Council, having due regard for the public interest, have agreed to grant said applicant a license/lease for a period of seven (7) years, revocable at the pleasure of the Tidelands Resource Council of the Department of Environmental Protection as hereinafter described and have determined that the compensation or license/lease fee  shall be  SIX THOUSAND FOUR HUNDRED EIGHTY AND 00/100 DOLLARS ($6,480.00) per annum.  A maximum of 111 rental slips will be allowed within the license/lease area.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**



J. P. BAINBRIDGE & ASSOCIATES, INC.

Bk D2953 Pg571 #325

The yearly license/lease fee is due on or before June 1st each year. All payments received 30 days after the due date shall be assessed a late fee of $25.00. All fees which remain past due for more than 90 days after said due date shall accrue interest therefrom at rate set by the Tidelands Resource Council, until received by the State. Additionally, if a check is returned for non-sufficient funds, a $25.00 charge will be assessed to the licensee.

The maximum number of rental slips within the license/lease area will not include slips (or portions thereof) that may have been previously granted by the State of New Jersey.

NOW THEREFORE, the State of New Jersey acting by and through the said Tidelands Resource Council of the Department of Environmental Protection in consideration of the premises and of the terms, covenants and conditions herein contained, does hereby authorize, allow and license/lease to the said BEACH CREEK MARINA, INC., to use the area of land as described above, said area being shown within the dashed lines on the map attached hereto and made a part hereof, situate upon the lands of the State under tidewater;

This license/lease is made subject to the limitation that the licensee/lessee shall not improve or develop the above described lands flowed by tide nor appropriate said lands to its own exclusive use unless and until a permit, pursuant to N.J.S.A. 12:5-3, is obtained for that purpose.

This license/lease, authority and privilege is to continue for seven (7) years from September 22, 2000 to September 22, 2007 unless revoked or otherwise terminated as hereinafter provided by the said Tidelands Resource Council of the Department of Environmental Protection.

This license/lease is made and accepted upon the express condition that the license may be assigned or otherwise transferred by the said licensee/lessee to any other person or persons, only upon written consent of the Manager of the Bureau of Tidelands Management of the Department of Environmental Protection. Forms are available from the Bureau for this purpose.

It is further understood and agreed upon that the licensee/lessee shall submit reports of actual income to the Bureau of Tidelands Management by September 15 of each year of this license/lease. The actual dockage slip rental income received to date and any additional

J. P. BAINBRIDGE & ASSOCIATES, INC.

Bk  D2953  Pg572  #325

pertinent information during the term of this license/lease. Each report shall be certified as true on a certification form available from the Bureau of Tidelands Management.

      IT SHALL BE THE LICENSEE'S/LESSEES' RESPONSIBILITY

      TO SUBMIT THESE INCOME REPORTS ON TIME WITHOUT ANY

      FURTHER NOTIFICATION FROM THE STATE.

      FAILURE TO SUBMIT TIMELY REPORTS WILL RESULT IN THE COUNCIL'S CONSIDERING REVOCATION OF THE LICENSE AND FORBIDDING THE MARINA'S USE OF THE LICENSED AREA.

      It is distinctly understood and mutually agreed between the parties of these presents that the payment of the annual rentals or fees on the days and times appointed shall be of the essence of this contract. The licensee/lessee may elect to make application for a license/lease renewal at the expiration of the said period of seven (7) years. The State of New Jersey does not covenant and is not bound to make any renewal of the license/lease. If any such renewal is granted, it shall be at such valuation and terms as may be fixed by the said Tidelands Resource Council of the Department of Environmental Protection.

      AND the said BEACH CREEK MARINA, INC., as aforesaid, does hereby agree to and with the State of New Jersey, that it the said BEACH CREEK MARINA, INC., will at the termination thereof, promptly quit, surrender and vacate the above described premises, and remove or cause to be removed therefrom to the satisfaction of the Tidelands Resource Council of the Department of Environmental Protection, of the State of New Jersey aforesaid, any and all structures of whatsoever nature, whether the same be above or beneath the surface of the water, or occasioned by or through the acts of the said BEACH CREEK MARINA, INC., and that should the said BEACH CREEK MARINA, INC., fail and neglect to remove said structures, the Department of Environmental Protection of the State of New Jersey may remove or cause the same to be removed at the expense and cost of the said BEACH CREEK MARINA, INC., and it does hereby agree to reimburse the said Department and/or the State of New Jersey for the full amount of the expense incurred in causing the removal of said structures.

      AND IT IS EXPRESSLY AGREED AND PROVIDED that the said Tidelands Resource Council of the Department of Environmental Protection, Bureau of Tidelands Management, may withdraw, terminate or revoke the license/lease hereby given and all the rights and privileges

J. P. BAINBRIDGE & ASSOCIATES, INC.

Bk D2953 Pg573 #325

adjacent to the land hereby licensed/leased on the date of delivery of this license/lease, then in that event, this license/lease and all of the covenants herein on the part of the State shall be void with respect to the land herein licensed/leased as to which the said licensee/lessee is not the record owner on said date, and the licensed/leased land shall automatically revert to the ownership of the State, but without any diminution of the fees or consideration paid upon the delivery of this instrument.

It is further understood and agreed upon by the licensee/lessee herein and the heirs, successors and assigns, that by acceptance of this document, the licensee/lessee acknowledges that the issuance of this license/lease shall not be construed to in any way affect the State's right, title or ownership of land now or formerly under tidewater lying shoreward of the licensed/leased area.

AND PROVIDED FURTHER that nothing in this instrument contained shall in any manner affect the rights of any shore owner as now existing under the Laws of the State of New Jersey.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

Bk D2953 Pg574 #325

IN WITNESS WHEREOF, the said Tidelands Resource Council of the Department of Environmental Protection, Bureau of Tidelands Management, has caused these presents to be signed by its Manager of the Bureau of Tidelands Management of the Department of Environmental Protection on this 7th day of March in the year Two Thousand Two.



Jo Ann Gubberley, Manager
Bureau of Tidelands Management
Land Use Regulation Program
Department of Environmental Protection

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

```
Bk D2953 Pg575 #325
RECORDED COUNTY OF CAPE MAY
ANGELA F. PULVINO, COUNTY CLERK
Recording Fee 55.00
Date 03-19-2002 @ 03:27p
```

STATE OF NEW JERSEY    )

                   )

COUNTY OF MERCER    )

    BE IT REMEMBERED that on this 7th day of March , 2002, before me a Notary Public of New Jersey, personally appeared Jo Ann Cubberley, Manager, Bureau of Tidelands Management, Land Use Regulation Program, Department of Environmental Protection who being duly sworn on her oath depose and make proof to my satisfaction, that Jo Ann Cubberley is the Manager, Bureau of Tidelands Management, Land Use Regulation Program and she has been duly authorized by proper resolution of the Tidelands Resource Council, and she has signed this document as an act pursuant to said resolution.

Sworn to me and Subscribed
before me the date aforesaid

_Mary Ann Herman_

A Notary Public of New Jersey

```
MARY ANN HERMAN
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES 2/28/07
```

                               (This instrument has been reviewed
                               and approved by the Office of the
                               Attorney General.)

J. P. BAINBRIDGE & ASSOCIATES, INC.

Bk D2953 Pg229 #18

File No.01-0464-T

REVOCABLE LICENSE/LEASE

THE STATE OF NEW JERSEY:

TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN:

GREETING:

WHEREAS, the State of New Jersey owns the lands now or formerly under water hereinafter described,

AND WHEREAS, the Tidelands Resource Council in the Department of Environmental Protection is empowered under N.J.S.A. 13:1B-13 to approve licenses/leases of lands now or formerly under tidewater;

AND WHEREAS, the licensee/lessee herein represents that it is the owner of the land abutting and adjoining the said lands now or formerly under tidewater;

AND WHEREAS, BEACH CREEK MARINA, INC., has applied to the Tidelands Resource Council in the Department of Environmental Protection, for a license/lease to an area of land now or formerly under tidewater for the use and maintenance of a walkway in an area formerly flowed by Beach Creek, within Lots 406 through 417, Block 152 and lots 400 through 407, Block 153, on New York Avenue, as shown on a plan entitled "Map of Property of North Wildwood Marina Housing...., Boundary and Topographic Survey," dated October 24, 1995, last revised April 4, 1996, prepared by McCumsey-Petry, P.C. and located in the City of North Wildwood, Cape May County, New Jersey, situate upon the lands of the State hereinafter described;

AND WHEREAS, the said Department of Environmental Protection, by a majority of the members of the Tidelands Resource Council, having due regard for the public interest, have agreed to grant said applicant a license/lease for a period of seven (7) years, revocable at the pleasure of the Tidelands Resource Council of the Department of Environmental Protection as hereinafter described and have determined that the compensation or license/lease fee shall be FOUR THOUSAND SIX HUNDRED SIXTY FIVE AND 00/100 DOLLARS ($4,665.00) per annum.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

Bk D2953 Pg230 #18

NOW THEREFORE, the State of New Jersey acting by and through the said Tidelands Resource Council of the Department of Environmental Protection in consideration of the premises and of the terms, covenants and conditions herein contained, does hereby authorize, allow and license/lease to the said BEACH CREEK MARINA, INC.to use the area of land as described above, situate upon the lands of the State now or formerly under tidewater;

This license/lease is made subject to the limitation that the licensee/lessee herein shall not improve or develop the above described lands flowed by tide nor appropriate said lands to its own exclusive use unless and until a permit, pursuant to N.J.S.A. 12:5-3, is obtained for that purpose.

This license/lease, authority and privilege is to continue seven (7) years from November 1, 2001 to November 1, 2008 unless revoked or otherwise terminated as hereinafter provided by the said Tidelands Resource Council of the Department of Environmental Protection. The annual rental is due on November 1 in advance of each rental year of the license.

It is recognized that a portion of the licensed/leased area lies channelward of adjacent land not owned by the licensee/lessee. This portion is licensed/leased subject to the licensee/lessee having the consent of the adjacent land owner. The license/lease for this portion remains valid only for such time as the consent remains in effect.

All payments received 30 days after the due date shall be assessed a late fee of $25.00. All fees or partial fees which remain past due for more than 90 days after said due date shall accrue interest therefrom at the rate set by the Tidelands Resource Council, until received by the State. Additionally, if a check is returned for non-sufficient funds, a $25.00 charge will be assessed to the licensee.

This license/lease is made and accepted upon the express condition that the license may be assigned or otherwise transferred by the said licensee/lessee to any other person or persons, only upon written consent of the Manager of the Bureau of Tidelands Management of the Department of Environmental Protection. Forms are available from the Bureau for this purpose.

It is distinctly understood and mutually agreed between the parties of these presents that the payment of the annual rentals or fees on the days and times appointed shall be of the essence of this contract. It is the responsibility of the licensee to remit the annual rental within 30 days of the due date stated above. The licensee/lessee may elect to make application for

J. P. BAINBRIDGE & ASSOCIATES, INC.

Bk D2953 Pg231 #18

thereof, promptly quit, surrender and vacate the above described premises, and remove or cause to be removed therefrom to the satisfaction of the Tidelands Resource Council of the Department of Environmental Protection, of the State of New Jersey aforesaid, any and all structures of whatsoever nature, whether the same by above or beneath the surface of the water, or occasioned by or through the acts of the said BEACH CREEK MARINA, INC., and that should the said BEACH CREEK MARINA, INC., fail and neglect to remove said structures, the Department of Environmental Protection of the State of New Jersey may remove or cause the same to be removed at the expense and cost of the said BEACH CREEK MARINA, INC., and it does hereby agree to reimburse the said Department and/or the State of New Jersey for the full amount of the expense incurred in causing the removal of said structures.

AND IT IS EXPRESSLY AGREED AND PROVIDED that the said Tidelands Resource Council of the Department of Environmental Protection, Bureau of Tidelands Management, may withdraw, terminate or revoke the license/lease hereby given and all the rights and privileges thereunder at any time prior to the expiration of the said terms above, upon notice to the said BEACH CREEK MARINA, INC., by passing a resolution to that effect, and that upon passage of such resolution by the said Tidelands Resource Council of the Department of Environmental Protection, Bureau of Tidelands Management, the said license/lease and all rights and privileges thereupon shall cease and terminate.

IT IS ALSO PROVIDED, that this license/lease is made upon the condition and limitation, that if the said licensee/lessee is not the record owner of any parts of the land adjacent to the land hereby licensed/leased on the date of delivery of this license/lease, then in that event, this license/lease and all of the covenants herein on the part of the State shall be void with respect to the land herein licensed/leased as to which the said licensee/lessee is not the record owner on said date, and the licensed/leased land shall automatically revert to the ownership of the State, but without any diminution of the fees or consideration paid upon the delivery of this instrument.

It is further understood and agreed upon by the licensee/lessee herein and the heirs, successors and assigns, that by acceptance of this document, the licensee/lessee acknowledges that the issuance of this license/lease shall not be construed to in any way affect the State's right, title or ownership of land now or formerly under tidewater lying shoreward of the licensed/leased area.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

Bk D2953 Pg232 #18

IN WITNESS WHEREOF, the said Tidelands Resource Council of the Department of Environmental Protection, Bureau of Tidelands Management, has caused these presents to be signed by its Manager of the Bureau of Tidelands Management of the Department of Environmental Protection on this 6th day of March in the year Two Thousand Two.



Jo Ann Cubberley, Manager
Bureau of Tidelands Management
Land Use Regulation Program
Department of Environmental Protection

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

Bk D2953 Pg233 #18
RECORDED COUNTY OF CAPE MAY
ANGELA F. PULVINO, COUNTY CLERK
Recording Fee 45.00
Date 03-18-2002 @ 09:01a

STATE OF NEW JERSEY      )

                         )

COUNTY OF MERCER         )


BE IT REMEMBERED that on this 6ᵗʰ day of *March* , 2002, before me a

Notary Public of New Jersey, personally appeared Jo Ann Cubberley, Manager, Bureau of

Tidelands Management, Land Use Regulation Program, Department of Environmental

Protection who being duly sworn on her oath depose and make proof to my satisfaction,

that Jo Ann Cubberley is the Manager, Bureau of Tidelands Management, Land Use

Regulation Program and she has been duly authorized by proper resolution of the

Tidelands Resource Council, and she has signed this document as an act pursuant to said

resolution.



Sworn to me and Subscribed
before me the date aforesaid




*Mary Ann Herman*
A Notary Public of New Jersey

MARY ANN HERMAN
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES 2/28/07


**(This instrument has been reviewed
and approved by the Office of the
Attorney General.)**

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

# LEASE AGREEMENT

This Agreement is made on 15th day of May 2008.

BETWEEN:                     Beach Creek Marina, Inc.
                             c/o
renting a building at        11-13 West Raymond Plaza, Suite 320,
                             Newark, New Jersey 07104

referred to as the "Landlord"
AND                          Joseph Panorillo d/b/a Coco's Dockside
                             Cafe & Restaurant
                             c/o
renting or leased at         378 Schuyler Avenue
                             Kearny, New Jersey 07032

referred to as the "Tenant"

1.  Premises. The Landlord does hereby lease to the Tenant and the Tenant does hereby rent from the Landlord, the following described premises: 313 New York Avenue, North Wildwood, New Jersey 08260, and in particular, the existing restaurant areas or the building inclusive of all fixtures, equipment, furnishings and appurtenances together with the trade name of the existing restaurant "Coco's Dockside Cafe & Restaurant" herein after collectively referred to as the "Premises". UPON TERMINATION OF THIS AGREEMENT, TENANT SHALL FOREVER CEASE AND DESIST FROM THE USE OF THE "Coco's Dockside Cafe & Restaurant" TRADE NAME UNLESS OTHERWISE AGREED TO IN WRITING BY LANDLORD AT THE SOLE AND ABSOLUTE DISCRETION OF LANDLORD.

2.  Term.    The term of this lease is for three (3) months commencing on June 15, 2008, and ending on October 14, 2008.

3.  Use.    The Premises are to be used and occupied only and for no other purpose than a restaurant use.

4.  Rent.    The Tenant agrees to pay Thirty Six (\$36,000) Thousand Dollars, as rent, to be paid as follows: Twelve Thousand (\$12,000) Dollars per month, due on the 15th day of each month commencing on June 15, 2008. The first payment of rent and any security deposit is due upon the signing of this Lease by the Tenant. The Tenant must pay a late charge of Two Hundred (\$250) Dollars as additional rent for each payment that is more than 10 days late. This late charge is a fee with the monthly rent payment. The Tenant must also pay a fee of \$35.00 as additional rent for any dishonored check.

5.  Repairs and Care. The Tenant has examined the Premises and has entered into this lease without any representation on the part of the Landlord as to the condition thereof. The Tenant will take good care of the Premises and will at the Tenant's own cost and expense, make all repairs, including painting and decorating, and will maintain the Premises in good condition and state of repair, and at the end or other expiration of the term hereof, will deliver up the Premises in good order and condition, except for reasonable wear and tear, and damage by the elements not resulting from the neglect or fault of the Tenant. The Tenant will neither encumber nor obstruct the sidewalks, driveways, yards, entrances, hallways and stairs, but will keep and maintain the same in a clean condition, free from debris, trash, refuse, snow and ice.

6.  Compliance with Laws etc.    The Tenant will promptly comply with all laws, ordinances, rules, regulations, requirements and directives of the federal, state and municipal governments or public authorities and of all their departments, bureaus and subdivisions, applicable to and affecting the Premises, their use and occupancy, for the correction, prevention and abatement of nuisances, violations or other grievances in, upon or connected with the Premises, during the term hereof, and will promptly comply with all orders, regulations, requirements and directives of the Board of Fire Underwriters or similar authority and of any insurance companies which have issued or are about to issue policies of insurance covering the Premises and its contents, for the prevention of fire or other casualty, damage or injury, at the Tenant's own cost and expense.

7.  Assignment.    The Tenant may not assign, mortgage or hypothecate this lease nor sublet or sublease the Premises or any part thereof without the Landlord's written consent, nor occupy or use the Premises or any part thereof, nor permit or suffer the same to be occupied or used for any purpose other than as permitted by this lease, nor for any purpose deemed unlawful, disreputable, or extra hazardous, on account of fire or other casualty.

8.  Fire and other Casualty.   In case of fire or other casualty the Tenant will give immediate notice to the Landlord. If the Premises be partially damaged by fire, the elements or other casualty, the Landlord will repair the same as speedily as practicable, but the Tenant's obligation to pay the rent hereunder will not cease. If in the opinion of the Landlord, the Premises are so extensively and substantially damaged as to render them untenantable, then the rent will cease until such time as the Premises are made tenantable by the Landlord. However, if in the opinion of the Landlord, the Premises are totally damaged or rendered wholly untenantable by fire or other casualty, and if the Landlord will decide not to restore or rebuild the same, then the rent will be paid up to the time of such destruction and then cease thereafter until the space will come to an end. In any such instance, will the proportion of rent so paid from the respective dates of the term until the fire or other casualty and the rent for any such period of time abates, payment of compensation for rendered of the Tenant or the Tenant's agents employees invitees licensees distributors assignees or successors. In such case the Tenant's liability for the payment of the rent and the performance of all the covenants and conditions and terms hereof on the Tenant's part to be performed will continue and the Tenant will be liable to the Landlord for the damage and

## J. P. BAINBRIDGE & ASSOCIATES, INC.

...within the the Landlord   if the Tenant are insured against any of the risks' persons covered  then the proceeds   if so they become will be paid over to the Landlord to the extent of the Landlord's costs and expenses to make the repairs hereunder   and such insurance carriers will have no recourse against the Landlord for reimbursement.

9. Alterations and/or Improvements  No alterations, additions or improvements may be made  and no fixture equipment  air conditioning, cooling, heating or sprinkler systems, television or radio antennas, heating equipment  signatures   and fixtures, may be installed in or attached to the Premises, without the written consent  of the Landlord.  Unless otherwise provided herein   all such alterations, additions or improvements and systems  when made, installed in or attached to the Premises, will belong to and become the property of the Landlord and will be surrendered with the Premises and no part thereof upon the expiration or sooner termination of the lease, without hindrance, molestation or injury.

10. Inspection and Repair.   The Tenant agrees that the Landlord and the Landlord's agents, employees or other representatives, will have the right to enter into and upon the Premises or any part thereof, at all reasonable hours  for the purpose of examining the same or making such repairs or alterations therein as may be necessary for the safety and preservation thereof  The preceding sentence will not be deemed to be a covenant by the Landlord nor be construed to create an obligation on the part of the Landlord to make such inspection or repairs.

11. Right to Exhibit.   The Tenant agrees to permit the Landlord and the Landlord's agents, employees or other representatives to show the Premises to persons wishing to rent or purchase the same, and Tenant agrees that during the entire term hereof, the Landlord or the Landlord's agents, employees or other representatives will have the right to place notices on the front of the Premises or any part thereof, offering the Premises for rent or for sale and the Tenant hereby agrees to permit the same to remain thereon without hindrance or molestation.

12. Glass, etc. Damage, Repairs,   In case of the destruction of or any damage to the glass in the Premises, or the destruction of or damage of any kind whatsoever to the Premises, caused by the carelessness, negligence or improper conduct on the part of the Tenant or the Tenant's agents  employees  guests, licensees, invitees, sublessees, assignees or successors, the Tenant will repair the said damage or replace or restore any destroyed parts of the Premises  as speedily as possible, at the Tenant's own cost and expense.

13. Signs,   The Tenant may not place nor allow to be placed any signs of any kind whatsoever, upon, in or about the Premises or any part thereof, except of a design and structure and in or at such places as may be  indicated and consented to by the Landlord in writing. If the Landlord or the Landlord's agents  employees or representatives deem it necessary to remove any such sign in order to paint or make any repairs, alterations or improvements in or upon the Premises or any part thereof, they may be so removed, but will be replaced at the improvements in or upon the Premises or any part thereof, they may be so removed, but will be replaced at the Landlord's expense when the said repairs, alterations or improvements are completed. Any signs permitted by the Landlord will at all times conform with all municipal ordinances or other laws and regulations applicable thereto.

14. Non-Liability of Landlord  The Landlord will not be liable for any damage or injury which may be sustained by the Tenant or any other person, as a consequence of the failure, breakage, leakage or obstruction of the water, plumbing, steam, sewer, waste or soil pipes, roof, drains, leaders, gutters, valleys, downspouts or the like or of the electrical, gas, power, conveyor, refrigeration, sprinkler air-conditioning or heating systems, elevators or hoisting equipment or by reason of the elements  or resulting from the carelessness, negligence or in proper conduct on the part of any other tenant or of the Landlord or the Landlord's or the Tenant's or any other tenant's agents, employees, guests, licensees, invitees, sublessees, assignees or successors or attributable to any interference with  interruption of or failure, beyond the control of the Landlord of any services to be furnished or supplied by the Landlord.

15. Mortgage Priority. This lease will not be a lien against the Premises with respect to any mortgages that may hereafter be placed upon the Premises. The recording of such mortgage or mortgages will have preference and precedence and be superior and prior in lien to this lease, irrespective of the date of recording and the Tenant agrees to execute any instruments, without cost, which may be deemed necessary or desirable, to further effect the subordination of this lease to any such mortgage or mortgages. A refusal by the Tenant to execute such instruments will give the Landlord the option of cancelling this lease, and the term hereof is hereby expressly limited accordingly.

16. Security.   The Tenant will return, prepare and communicate if a Premises at its sole cost and expense as security for the payment of the rent hereunder and the full and faithful performance by the Tenant of the covenants and conditions on the part of the Tenant to be performed   Such preparatory work by Tenant shall be performed to the reasonable satisfaction of Landlord  and must be completed no later than June 25, 2008.

17. Increase of Insurance Rates.   In for any reason it is impossible to obtain fire and other hazard insurance upon the building or any improvements on the Premises in an amount and in the form and from insurance companies acceptable to the Landlord, or if the Landlord's rate of insurance increases, the Tenant will within thirty days after reasonable notice and the term hereof, upon being so given the option within thirty days in writing of the Landlord  elect not to so and upon the giving of such notice, this lease and the term thereof will terminate  If at any portion of the use to which the Premises are put or the Tenant to terminate after the giving or acceptance of notice to cancel in, the increased rates for fire and other hazards are deemed to arise by the Landlord, its additional costs, the same may be paid the Tenant ...  ...such payment will be paid with the next instalment of rent but in no event less than ten days after such demand, whichever occurs sooner.

## J. P. BAINBRIDGE & ASSOCIATES, INC.

The text on this page is too faded and low-resolution to read reliably.

## J. P. BAINBRIDGE & ASSOCIATES, INC.

... any applicable law ... will not affect the validity of any other clause or provision will remain in full force and effect.

26. Non-Waiver by Landlord. The various rights, remedies, options and elections of the Landlord, expressed herein, are cumulative, and the failure of the Landlord to enforce strict performance by the Tenant of the conditions and covenants of this lease or to exercise any election or option to re-enter or to take advantage of any remedy herein conferred or use a separation by the Landlord of any install ment of rent after any breach by the Tenant in any one or more instances, will not be construed or deemed to be a waiver or a waiving of part or the future by the Landlord of any such conditions and covenants, options, elections or remedies, but the same shall continue in full force and effect.

27. Notices. All notices required under the terms of this lease will be given and will be complete by mailing such notices by certified or registered mail, return receipt requested, to the address of the parties as shown at the head of this lease, or to such other address as may be designated in writing, which notice of change of address will be given in the same manner.

28. Title and Quiet Enjoyment. The Landlord covenants and represents that the Landlord is the owner of the Premises herein leased and has the right and authority to enter into, execute and deliver this lease, and does further covenant that the Tenant on paying the rent and performing the conditions and covenants herein contained, will and may peaceably and quietly have, hold and enjoy the Premises for the term aforementioned.

29. ~~Energy Well Testing and MLSS ADS 1126-0040000.~~ ...

30. Entire Contract. This lease contains the entire contract between the parties. No representative, agent or employee of the Landlord has been authorized to make any representations or promises with reference to the letting of the Premises or to vary, alter or modify the terms hereof. No additions, changes or modifications, renewals or extensions hereof will be binding unless reduced to writing and signed by the Landlord and the Tenant.

31. Conformity with Laws and Regulations. The Landlord may pursue the relief or remedy sought in any invalid clause or provision of this lease, b) conforming the said clause or provision with the provisions of the statutes or the regulations of any governmental agency in such case made and provided as if the particular provisions of the applicable statutes or regulations were set forth herein at length.

32. Number and Gender. In all references herein to any parties, persons, entities or corporations the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require. All the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the respective parties hereto and their heirs, executors, administrators, personal or legal representatives, successors and assigns.

Witnessed as to Landlord:

_____ (Seal)
Beach Creek Marina, Inc., Landlord

_____
Witness Name 1***

_____
Witness Name 2***

_____
Joseph Reinolds d/b/a Coco's Dockside
Café & Restaurant, Tenant

J. P. BAINBRIDGE & ASSOCIATES, INC.

## APPRAISER QUALIFICATIONS

### DONNA M. DOUGHERTY

<u>EDUCATION</u>

Stockton State College, Pomona, New Jersey
Bachelor of Arts, Business Administration 1988

Appraisal Courses Successfully Completed:
Residential Valuation (AIREA Course 8-2)
Applied Residential Property Valuation
(SREA Course 102)
Standards of Professional Practice Parts A & B
(Appraisal Institute)
Basic Income Capitalization
(Appraisal Institute Course 310)
Standards of Professional Practice Part C
(Appraisal Institute Course 430)
General Applications
(Appraisal Institute Course 320)
Advanced Income Capitalization
(Appraisal Institute Course 510)
Highest and Best Use and Market Analysis
(Appraisal Institute Course 520)

Appraisal Examinations Successfully Challenged:
An Introduction to Appraising Real Property
(SREA Course 101)

### LICENSES AND CERTIFICATIONS

New Jersey State Certified General Real Estate
Appraiser, License RG 01886

### PROFESSIONAL AFFILIATION

Associate Member of the Appraisal Institute
Candidate No. 30562

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

WORK EXPERIENCE

| | |
|---|---|
| 1998 - Present | Associate Appraiser |
| | J P Bainbridge & Associate, Inc. |
| | 300 Goshen Road |
| | Cape May Court House, NJ 08210 |
| 1992 - 1998 | Independent Fee Appraiser |
| | 201 Elmwood Avenue |
| | Marmora, New Jersey 08223 |
| 1991 - 1992 | Associate Appraiser |
| | Scardilli Appraisal Associates |
| | Absecon, New Jersey |
| 1985 - 1991 | Senior Staff Appraiser |
| | Collective Bank |
| | Egg Harbor, New Jersey |
| 1983 - 1985 | Staff Appraiser |
| | Joseph V. Heenan & Associates |
| | Ocean City, New Jersey |

APPRAISAL EXPERIENCE

Completed and assisted in the completion of form and narrative appraisal reports of
residential and commercial properties in the Atlantic and Cape May County areas of
southern New Jersey.  Appraisal reports completed for mortgage, estate, tax purposes,
riparian claims and litigation.

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

## J. PAUL BAINBRIDGE            APPRAISER QUALIFICATIONS

<u>Designations</u>

    MAI, Member of the Appraisal Institute (No. 11889)

    New Jersey Certified General Appraiser No. RG00735

    New Jersey Real Estate License - SP8430243

<u>Professional affiliations</u>

    President - Southern New Jersey Chapter of the Appraisal Institute (2006)
    Vice President – Southern New Jersey Chapter of the Appraisal Institute (2005)
    Treasurer - Southern New Jersey Chapter of the Appraisal Institute (2004)
    National Association of Realtors - Greater Cape May
    County Board of Realtors/Atlantic County Board of Realtors

<u>Education</u>

    Montclair State University, Upper Montclair, NJ
    B.S. - Business finance                                    1983

    Seton Hall Preparatory High School, West Orange, NJ        1978

<u>Professional education</u>

The Appraisal Institute

    Completed education and experience requirements for the
    MAI designation                                            2002

    Satisfied all continuing education requirements for
    The Appraisal Institute

    Satisfied all continuing education requirements for
    The State of New Jersey

<u>Qualified as an Expert Witness</u>

United States Bankruptcy Court          Cape May County Tax Board
New Jersey Tax Court                     Superior Court of New Jersey
Condemnation Commissions

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

## J. PAUL BAINBRIDGE                    APPRAISER QUALIFICATIONS

Appraisal experience

Property type                          Intended use

Boardwalk property                 Asset evaluation
Campgrounds                        Easements
Condominiums                       Fee simple estates
Farmland                           Leased fee estates
Golf Courses                       Leasehold estates
Hotels & motels                    Financing
Industrial property                Foreclosure
Land                               Estate planning
Marinas                            Tax appeal
Multi-family dwellings             Condemnation
Restaurants                        Riparian claim
Retail and office buildings        Partial interests
Service stations                   Partition action
Shopping centers
Single family dwellings
Special purpose properties
Subdivisions

Work History

1997 to present                J. P. Bainbridge & Associates, Inc.
1992-1996                      J. Paul Bainbridge, Sole Proprietor
1991-1992                      Dennis A. Scardilli, MAI
1990                           Joseph Ravitz, IFA, CTA
                               William Sharp, MAI
                               Don Springer, IFAS
1988-1990                      William J. Shea, MAI
1985-1988                      Richard Marashlian, MAI

**J. P. BAINBRIDGE & ASSOCIATES, INC.**

## J. PAUL BAINBRIDGE                APPRAISER QUALIFICATIONS

Sampling of Active Clients

Boardwalk Bank
Commerce Bank NA
Harleysville National Bank
ING Direct
Minotola National Bank
Ocean City Home Bank
Newfield Bank
PNC Bank
Sturdy Savings Bank
Sun National Bank
Wachovia
Archer & Greiner PC
Cooper Levenson April Niedelman & Wagenheim, PA
Cozen – O'Connor Attorneys
Louis C. Dwyer, Jr., Attorney
Gadsen Schneider & Woodward LLP
Jane M. Hoy, Attorney
Ford, Flower, & Hasbrouck, PC
Frederick W. Schmidt, Jr., Attorney
Charles A. Mattison PC
Anthony P. Monzo, Attorney
Robert F. Fineberg, Attorney
Schmidt & Tomlinson PC
Tracey Huen Brennan & Company
Cape May County Open Space & Farmland Preservation
Cape May City
Casino Reinvestment and Development Authority – CRDA
Middle Township
City of Millville
North Wildwood
New Jersey Green Acres Program
The Nature Conservancy
Stone Harbor Boro
Upper Township

Significant outside activities

Served as an elected member of the Middle Township
Board of Education, 1994-1997